Nos. 2026-1345, 2026-1396

—————————————

# United States Court of Appeals for the Federal Circuit

—————————————

URT Umwelt und Recyclingtechnik GmbH,

*Appellant*

v.

Duesenfeld GmbH,

*Cross-Appellant*

—————————————

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, No. IPR2024-00887

—————————————

**BRIEF OF APPELLANT
URT UMWELT UND RECYCLINGTECHNIK GMBH**

—————————————

Brian Kauffman
bkk@nixonvan.com
Jonathan Roberts
jr@nixonvan.com
NIXON & VANDERHYE, PC
901 N. Glebe Road, Suite 1100
Arlington, Virginia 22203
Phone: 703.816.4892 (Brian Kauffman)
Phone: 703.816.4414 (Jonathan Roberts)

*Counsel for Appellant URT Umwelt und Recyclingtechnik GmbH.*

Date: April 27, 2026

**REPRESENTATIVE PATENT CLAIM AT ISSUE**

**U.S. Patent No. 11,050,097**

1. A method for the treatment of used batteries, comprising the steps:

(a) comminuting the batteries such that comminuted material is obtained;

(b) inactivating the comminuted material such that an inactivated comminuted material is obtained, wherein the inactivating step is performed during or after the comminuting step; and

(c) filling a transport container with the inactivated comminuted material;

wherein the inactivating step is performed by drying the comminuted material, and

wherein the drying occurs at a maximum pressure of 300 hPa.

**REPRESENTATIVE SUBSTITUE CLAIM AT ISSUE**

26. A battery processing installation for treatment of used batteries, comprising:

(a) a comminution unit configured to comminute the batteries such that comminuted material is obtained;

(b) an inactivation device comprising a drying device, operated in batch mode, configured to inactivate the comminuted material, wherein the inactivation device is configured to perform the inactivating step after the comminuting step of the comminution unit;

(c) a filling device configured to fill a transport container with the inactivated comminuted material; and

(d) a vacuum installation connected to the drying device and configured to generate a vacuum in the drying device, such that the drying device operates with a pressure of 300 hPa or less.

# <u>CERTIFICATE OF INTEREST</u>

Case No. 26-1345

*URT Umwelt und Recyclingtechnik GmbH v. Duesenfeld GmbH*

Filing Party/Entity:  URT Umwelt und Recyclingtechnik GmbH

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: April 27, 2026              Signature:    <u>/s/ Brian Kauffman</u>

Name:        <u>Brian Kauffman</u>

    **1.  Represented Entities** (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.

    URT Umwelt und Recyclingtechnik GmbH

    **2.  Real Party in Interest** (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

    Not Applicable

    **3.  Parent Corporations and Stockholders** (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

    Heßler & Gundersdorf Beteiligungsgesellschaft mbH

    FH Beteiligungsgesellschaft mbH

    **4.  Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to

appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

Not Applicable

**5.  Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Yes.  See Notice of Related Case Information on the following page.

**6.  Organizational Victims and Bankruptcy Cases.**  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

Not Applicable

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTEREST ................................................................i

TABLE OF AUTHORITIES ............................................................ vii

STATEMENT OF RELATED CASES .................................................x

PRELIMINARY STATEMENT ...........................................................1

STATEMENT OF JURISDICTION.....................................................4

STATEMENT OF THE ISSUES...........................................................5

STATEMENT OF THE CASE – ORIGINAL CLAIMS ...........................7

    A.    The Disclosure of the '097 Patent .........................................7

    B.    Cited Prior Art .......................................................................9

        1)    LithoRec ...................................................................9

        2)    DIN-28400 ................................................................9

        3)    Perry .......................................................................10

    C.    Procedural History................................................................11

STATEMENT OF THE CASE – CONTINGENT MOTION TO AMEND ..........15

    A.    Cited Prior Art .....................................................................15

        1)    LithoRec and Perry ...............................................15

        2)    Uchida .....................................................................15

        3)    Mitsubishi................................................................16

    B.    Procedural History................................................................16

SUMMARY OF ARGUMENT – ORIGINAL CLAIMS ......................20

SUMMARY OF ARGUMENT – CONTINGENT MOTION TO AMEND..........25

ARGUMENT – ORIGINAL CLAIMS ...............................................28

    STANDARD OF REVIEW.................................................28

I.    THE PTAB ABUSED ITS DISCRETION WHEN IT DISMISSED URT'S EVIDENCE THAT THE PTAB FOUND RENDERED THE CLAIMED PRESSURE RANGE OBVIOUS ...................................................................30

    A.    The PTAB Would Have Found the Claimed Pressure Range to Have Been Obvious but for the Improper Dismissal of URT's "Routine Optimization" Rationale...........30

    B.    The "Routine Optimization" Argument in the Reply Was the Same as the Argument in the Petition.........................31

    C.    The PTAB Should Have At Least Considered URT's "Routine Optimization" Argument as Responsive to Duesenfeld's POR and the Institution Decision .......................35

    D.    Duesenfeld Had Timely Notice of URT's "Routine Optimization" Argument and Multiple Opportunities to Submit Facts and Arguments—Which It Took .......................37

II.   THE PTAB ERRED IN CREDITING NON-OBVIOUSNESS ARGUMENTS .....................................................................39

    A.    URT Established a Rebuttable Presumption of Obviousness By Showing the Prior Art Pressure Range Overlapped the Claimed Pressure Range.................................39

    B.    The Motivation Requirement Placed on URT by the PTAB After URT Established the Rebuttable Presumption of Obviousness Was Improper ...........................41

    C.    Duesenfeld's Secondary Considerations Evidence Was Legally Insufficient to Overcome the Rebuttable Presumption of Obviousness....................................................43

        1.    No Teaching Away from the Claimed Range ................43

        2.    No Evidence of Secondary Considerations ....................44

III.  THE PTAB'S FINDING OF NO MOTIVATION TO COMBINE LITHOREC AND PERRY WAS PREDICATED ON THE WRONG LEGAL STANDARD AND WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE .............................45

A.    The PTAB Improperly Credited "Bodily Incorporation" Arguments to Reject URT's Motivation to Combine ...................................................45

B.    The PTAB's Reason for Rejecting URT's Motivation to Combine LithoRec and Perry Was Not Supported by the PTAB's Own Factual Finding ...............................................48

C.    The PTAB's Standard Was Overly Rigid When Analyzing URT's Motivation to Combine LithoRec and Perry ...............................................................50

D.    The PTAB's Finding that URT Did Not Explain Why a POSITA Would Have Looked to Perry to Define the Operating Pressure for LithoRec's Dryer Was Not Supported by Substantial Evidence ........................................52

ARGUMENT – CONTINGENT MOTION TO AMEND ......................................54

STANDARD OF REVIEW .................................................................54

I.    THE PTAB'S "MOTIVATION" ANALYSIS EMBEDDED CLEAR LEGAL ERROR, INFECTING ITS NON-OBVIOUSNESS CONCLUSION ......................................................54

A.    The PTAB Erred By Analyzing Its Own Motivation to Combine Instead of URT's Motivations .................................54

B.    The PTAB's Citations Support URT's Obviousness Arguments .................................................................56

II.    THE PTAB ERRED BY IGNORING THE PRIOR ART'S DISCLOSURE AND DUESENFELD'S EXPERT'S TESTIMONY WHEN CONSIDERING URT'S ROUTINE OPTIMIZATION ARGUMENT .........................................58

A.    Duesenfeld's Expert's Testimony Identified the Result Affected by Pressure, and Identified the Relationship Between That Result and Pressure ..............................58

B.    LithoRec and Perry Each Identified the Result Affected By Pressure and the Relationship Between that Result and Pressure ........................................................60

C.    LithoRec and Uchida .................................................61

III.    THE PTAB'S "CRITICALITY" ANALYSIS EMBEDDED CLEAR LEGAL ERROR, INFECTING ITS NON-OBVIOUSNESS CONCLUSION ......................................................62

    A.    URT Established a Rebuttable Presumption of Obviousness By Showing Overlapping Pressure Ranges ...............................................................62

    B.    The PTAB Improperly Focused on the Alleged Purpose of the Claimed Pressure Range .................................................63

    C.    The PTAB's Finding that the Claimed Pressure Range Was Critical to the Purpose of Duesenfeld's Invention Was Not Supported by Substantial Evidence ..........................64

    D.    Secondary Considerations.........................................65

IV.    THE PTAB'S MOTIVATION ANALYSIS OF MITSUBISHI WAS PREDICATED ON THE WRONG LEGAL STANDARD ...........................................................66

    A.    The PTAB Erred by Analyzing Its Own Motivation to Combine the Prior Art References...........................................66

    B.    The PTAB Improperly Credited "Bodily Incorporation" Arguments .......................................................68

CONCLUSION ..............................................................................70

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allied Erecting and Dismantling Co., Inc. v. Genesis Attachments, LLC,*
825 F.3d 1373 (Fed. Cir. 2016)...................................................... 45-46

*ClassCo, Inc. v. Apple, Inc.,*
838 F.3d 1214 (Fed. Cir. 2016)...................................................... 24, 29

*Corephotonics, Ltd. v. Apple Inc.,*
84 F.4th 990 (Fed. Cir. 2023).............................................................31

*Dickinson v. Zurko,*
527 U.S. 150, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) .....................29

*E.I. Dupont de Nemours & Company v. Synvina C.V.,*
904 F.3d 996 (Fed. Cir. 2018)...................................................... *passim*

*Everstar Merchandise Co. Ltd. v. Willis Electric Co., Ltd.,*
2025 WL 1501940 (Fed. Cir. 2025) ......................................... 50, 55, 67

*Galderma Labs., L.P. v. Tolmar Inc.,*
737 F.3d 731 (Fed. Cir. 2013)..................................................... *passim*

*Genzyme Therapeutic Prods. LP v. Biomarin Pharm. Inc.,*
825 F.3d 1360 (Fed. Cir. 2016)..................................................... 22, 37

*Henny Penny Corporation v. Frymaster LLC,*
938 F.3d 1324 (Fed. Cir. 2019).........................................................29

*In re Aller,*
220 F.2d 454 (CCPA 1955)................................................................39

*In re Applied Materials, Inc.,*
692 F.3d 1289 (Fed. Cir. 2012)..........................................................34

*In re Kahn,*
441 F.3d 977 (Fed. Cir. 2006)........................................... 5, 25, 57, 58

*In re Keller,*
642 F.2d 413 (CCPA 1981)................................................................46

*In re Peterson,*
315 F.3d 1325 (Fed. Cir. 2003)..........................................................39

*In re Sullivan*,
  362 F.3d 1324 (Fed. Cir. 2004)............................................................29

*Intel Corp. v. PACT XPP Schweiz AG*,
  61 F.4th 1373 (Fed. Cir. 2023)............................................... 50, 55, 67

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
  821 F.3d 1359 (Fed. Cir. 2016)............................................................29

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ............................................................... *passim*

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
  719 F.3d 1346 (Fed. Cir. 2013)............................................................43

*Pers. Web Techs., LLC v. Apple, Inc.*,
  848 F.3d 987 (Fed. Cir. 2017)............................................................28

*Pfizer, Inc. v. Apotex, Inc.*,
  480 F.3d 1348 (Fed. Cir. 2007)............................................................46

*Pride Mobility Products Corp. v. Permobil, Inc.*,
  818 F.3d 1307 (Fed. Cir. 2016)............................................................29

*Randall Mfg. v. Rea*,
  733 F.3d 1355 (Fed. Cir. 2013)............................................................28

*Realtime Data, LLC v. Iancu*,
  912 F.3d 1368 (Fed. Cir. 2019)............................................................42

*Rembrandt Diagnostics, LP v. Alere, Inc.*,
  76 F.4th 1376 (Fed. Cir. 2023)........................................ 21, 31, 35, 36

*Sage Products, LLC v. Stewart*,
  133 F.4th 1376 (Fed. Cir. 2015)............................................................40

*TQ Delta, LLC v. Cisco Sys., Inc.*,
  942 F.3d 1352 (Fed. Cir. 2019)............................................................29

*Wyers v. Master Lock Co.*,
  616 F.3d 1231 (Fed. Cir. 2010)............................................... *passim*

**Statutes & Other Authorities:**

5 U.S.C. § 706 .................................................................................................29

28 U.S.C. § 1295(a)(4)(A) .................................................................................4

35 U.S.C. § 141(c) .............................................................................................4

37 C.F.R. § 42.23(b) ........................................................................................36

## STATEMENT OF RELATED CASES

This is an appeal from the final written decision ("FWD") of the Patent Trial and Appeal Board ("the PTAB") in IPR2023-00889. Duesenfeld GmbH cross-appealed (*see Duesenfeld GmbH v. Ascend Elements, Inc.,* 26-1390 (CAFC)), and the proceedings were consolidated.

A district court litigation involving Duesenfeld GmbH and Ascend Elements, Inc., and the patent in dispute here, is pending. *See Duesenfeld GmbH v. Ascend Elements, Inc.,* 1:23-cv-01194-JFM (D. Del.).

Ascend Elements, Inc. appealed from a FWD of the Board in No. IPR2024-00948 involving the patent in dispute here. *Ascend Elements, Inc. v. Duesenfeld GmbH,* 26-1357 (CAFC). Duesenfeld GmbH cross-appealed (*see Duesenfeld GmbH v. Ascend Elements, Inc.,* 26-1390 (CAFC)), and the proceedings were consolidated.

x

## PRELIMINARY STATEMENT

The '097 patent is directed to battery processing that allows batteries to be inactivated and detoxified without additives. Appx65, 2:5-12; Appx5127. But the claims are drawn so broadly they do not recite any novel or nonobvious aspect. Each claim has only three basic parts: a comminuting unit that comminutes battery material, a dryer that dries the comminuted battery material and has a vacuum installation that generates a vacuum, and a filling device that fills a transport device with the dried comminuted material. Appx69-70, 10:45-12:62. "Inactivating" merely refers to an unspecified degree to which the comminuted battery material is dried. *See* Appx65-68, 2:23-29, 8:54-55.

The claimed components are old and well-known and are used in standard ways for standard purposes to achieve standard, expected results. Indeed, the claimed components were all previously described years prior in Duesenfeld's own publications stemming from the same research project that led to the '097 patent. *See* Appx657-974; Appx4023-4051; Appx6007-6031.

On the issue of anticipation, the PTAB correctly found that Duesenfeld's own LithoRec publication disclosed all the well-known features of the challenged system claims. The PTAB particularly found that LithoRec teaches a comminuting unit, a vacuum dryer that dries comminuted material under vacuum pressures, and

1

a filling device that fills a transportation device with the dried comminuted material. Appx22-31.

The challenged process claims are directed to the performance of the components recited in the system claims (i.e., comminuting, drying under vacuum, and filling a transportation device). The only practical difference between the challenged system claims and the challenged process claims is that the latter specify a pressure range under which the drying occurs (300 hPa or less). In other words, the only difference between LithoRec's process and the claimed process is that LithoRec does not specify a particular vacuum pressure at which to operate its vacuum dryer.

There is nothing special about operating LithoRec's vacuum dryer in the claimed vacuum range. Nor is there anything special about the effects of doing so. For example, it was well known to dry under vacuum pressures to lower drying temperatures and reduce the likelihood of combustion. *See* Appx2586-2586, Appx2607-2608; Appx4308; Appx6244-6245, 48:5-49:15; Appx6252, 56:10-16.

URT presented several prior art references that disclose commercial dryers operating at pressures within or overlapping the claimed pressure range. URT also explained that the claimed pressure range would have been obvious through routine optimization. Appx117-119; Appx5871-5873.

2

The PTAB correctly found claims 12-13 and 15-19 unpatentable. Incredibly, even though the PTAB acknowledged that the only difference between LithoRec and original patent claim 1 and substitute claim 26 was the claimed pressure range, and even though the prior art provided many examples of commercial dryers operating at pressures within or overlapping the claimed pressure range, and even though Duesenfeld's expert conceded that it is standard practice to optimize pressure ranges, the PTAB found that URT had not met its burden of demonstrating the obviousness of the claimed pressure range. This led to the PTAB confirming the patentability of claims 1-3 and 7-10, and granting Duesenfeld's motion to amend regarding substitute claims 26-29.

The PTAB's findings embedded legal and factual errors, including crediting bodily incorporation arguments, ignoring its own factual findings, and crediting arguments that focused on unclaimed variables that lacked a nexus with the claimed pressure range. The PTAB's judgments therefore should be reversed as to claims 1-3 and 7-10 and the granting of the Motion to Amend regarding substitute claims 26-29.

## STATEMENT OF JURISDICTION

The Patent Trial and Appeal Board issued a Final Written Decision in the underlying *inter partes* review proceeding on November 12, 2025. URT Umwelt und Recyclingtechnik GmbH timely appealed the decision on January 14, 2026. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

# <u>STATEMENT OF THE ISSUES</u>

(1)    Whether the PTAB's holding that URT has not shown the unpatentability of claims 1-3 and 7-10 of the '097 patent should be reversed as a matter of law because the PTAB abused its discretion by improperly dismissing URT's evidence found by the PTAB to support a conclusion of obviousness. *See* Argument – Original Claims § I, *infra*.

(2)    Whether the PTAB's holding that URT has not shown the unpatentability of claims 1-3 and 7-10 of the '097 patent should be reversed as a matter of law because the PTAB required additional evidence of motivation-to-combine after the PTAB's finding of fact supported a presumption of obviousness that was not rebutted. *See* Argument – Original Claims § II, *infra*.

(3)    Whether the PTAB's holding that URT has not shown the unpatentability of claims 1-3 and 7-10 of the '097 patent should be reversed as a matter of law because the PTAB's finding of no motivation to combine was predicated on the wrong legal standard and was not supported by substantial evidence. *See* Argument – Original Claims § III, *infra*.

(4)    Whether the PTAB's granting of Duesenfeld's Contingent Motion to Amend claims 12-13, 16, and 19 should be reversed as a matter of law because the PTAB misapplied *Wyers* and *In re Kahn* and restricted its obviousness analysis to

its own theory of motivation instead of the motivation presented by URT. *See* Argument – Contingent Motion to Amend § I, *infra*.

(5)    Whether the PTAB's granting of Duesenfeld's Contingent Motion to Amend claims 12-13, 16, and 19 should be reversed because the PTAB improperly ignored URT's evidence of routine optimization. *See* Argument – Contingent Motion to Amend § II, *infra*.

(6)    Whether the PTAB's granting of Duesenfeld's Contingent Motion to Amend claims 12-13, 16, and 19 should be reversed as a matter of law because the PTAB improperly based its finding on the PTAB's characterization of the purpose of Duesenfeld's invention. *See* Argument – Contingent Motion to Amend § III, *infra*.

(7)    Whether the PTAB's granting of Duesenfeld's Contingent Motion to Amend claims 12-13, 16, and 19 should be reversed as a matter of law because the PTAB restricted its obviousness analysis to bodily incorporation and its own theory of motivation instead of the motivations presented by URT. *See* Argument – Contingent Motion to Amend § IV, *infra*.

**STATEMENT OF THE CASE – ORIGINAL CLAIMS**

The challenged '097 patent claims are extremely broad and simple in operation: used batteries are comminuted and then subjected to a drying step that inactivates the comminuted material. Once inactivated, the comminuted material is loaded into a transport container. The '097 patent specification states the comminuted material is considered inactivated when at least one electrolyte is evaporated. Appx65-68, 2:23-27, 8:54-55.

**A.    The Disclosure of the '097 Patent**

The '097 patent is directed to "a method for the treatment of used batteries…such as lithium-ion batteries, with the steps (a) comminuting the batteries such that comminuted material is obtained, (b) inactivating of the comminuted material such that an inactive comminuted material is obtained, and (c) filling a transport container with the inactive comminuted material." Appx65, 1:8-15. Further, "the invention refers to a battery processing installation for the treatment of used batteries, in particular for the treatment of used lithium batteries" using the same method. Appx65, 1:16-23.

The '097 patent contends that previous methods of treating used batteries have the disadvantages of degraded plastic products contaminating the remaining components of the batteries, flammable and explosive material remaining after processing, and complexity. Appx65, 1:27-50.

To solve these alleged deficiencies in treating batteries, the '097 patent discloses comminuting the battery material and then inactivating the comminuted material by drying the comminuted material (preferably with a vacuum drying process). Appx65, 1:54-67; 2:1-4.

Figure 1 provides a "flow diagram of a method according to the invention" (annotations added for ease of reference). Appx68, 7:46-47.



EX1001, FIG.1

8

### B.    Cited Prior Art

### 1)    LithoRec

LithoRec is a published research paper that was publicly available and accessible by April 28, 2015. Appx1005-1008, ¶¶ 51-56. It reports the results of a project in which "several processes for recycling traction batteries were evaluated." Appx4083. LithoRec discloses a "[c]onceptual design of a recycling pilot plant." Appx4304. Part of this design focuses on "[s]eparation of active materials," and this separation includes both "[p]re-shredding" and "[d]rying." Appx4306-4308.

According to LithoRec, "[t]he electrolytes need to be evaporated for the subsequent dry treatment processes" to both "eliminate[] the potential hazard of flammable solvents" and "convert[] the active mass into the dry powder form required for dry processing." Appx4308. Because "some of the liquids to be vaporized are highly flammable solvents, the drying temperature should probably be severely restricted. This in turn speaks in favor of drying under vacuum, as the drying temperature can be kept low." Appx4308.

### 2)    DIN-28400

DIN-28400 is a reference document published by the German Institute for Standardization that provides "Terms and Definitions" for "Vacuum technology." Appx4342. The definitions are provided "[i]n conjunction with International standard ISO 3529-1:1981 published by the International Organization for

9

Standardization (ISO)." Appx4342. According to DIN-28400, "Vacuum refers to the state of a gas when the pressure of the gas, and thus the number density of molecules, in a container is lower than outside." Appx4342, 1.1. In other words, according to DIN-24800, a vacuum exists when the gas pressure is less than ambient pressure.

DIN-28400 further discloses that the gas is in a vacuum state when the gas pressure is "lower than the lowest atmospheric pressure on Earth's surface" (i.e., lower than 300 mbar/hPA, the same exact range in the '097 patent). Appx4342, 1.1. In addition, DIN-28400 provides pressure ranges corresponding to "Rough (low) vacuum," "Medium vacuum," "High vacuum," and "Ultra-high vacuum." Appx4342, Table 1. For "Rough (low) vacuum," the applicable pressure range is disclosed to be "$1 \cdot 10^5$ to $1 \cdot 10^2$" Pascals(1-1000 hPa), which overlaps the claimed pressure range, i.e., "a maximum pressure of 300 hPa". Appx4342, Table 1.

### 3)    Perry

The Seventh Edition of Perry's Chemical Engineers' Handbook (Perry) provides several examples of dryers that operate under vacuum conditions. Appx1414. For example, Perry provides information about "Batch Through-Circulation Dryers," including "Vacuum-Shelf Dryers," which Perry describes as "indirect-heated batch dryers consisting of a vacuum[-]tight chamber" with "a vacuum source." Appx2586. According to Perry, these dryers "are used extensively

10

for drying pharmaceuticals, [and] temperature-sensitive or easily oxidizable materials (e.g., organic solvents)," and they "operate in the range of 1 to 25 mmHg pressure" (1.33-33.33 hPa). Appx2586-2587.

Perry also discloses batch vacuum rotary dryers, which typically are employed when low temperatures must be maintained if excess heat will cause oxidation or an explosive condition and/or when materials must be dried to extremely low moisture levels. Appx2607-2608. Batch vacuum rotary dryers operate under pressure conditions as low as 5 mmHg (6.67 hPa) and sometimes even lower. Appx2608.

### C.    Procedural History

URT initiated an IPR to challenge '097 patent claims 1-3, 7-10, 12-13, and 15-19 on May 1, 2024. URT's Petition primarily relied on LithoRec, DIN-28400, and Perry. Appx93-94. The primary grounds of unpatentability were obviousness over the combination of LithoRec, DIN-28400, and Perry, and anticipation by LithoRec. Appx96-97.

For obviousness, URT argued that LithoRec teaches all features of independent claim 1 except for the claimed pressure range, which would have been achieved through routine optimization. Appx109-120. URT further argued that even though LithoRec discloses drying under vacuum in general and does not disclose a specific pressure range, a POSITA would have known to operate the

11

dryer of LithoRec within the claimed pressure range because the DIN-28400 reference document teaches that "vacuum" encompasses a pressure range overlapping the claimed pressure range. Appx117-118.

URT also argued that it would have been obvious to look to the engineering reference, Perry, to determine the pressure range under which to operate the dryer of LithoRec because Perry and the '097 patent recognize the same problem (i.e., drying volatile substances without causing combustion) and solve that problem in the same way—i.e., drying under vacuum to lower the drying temperature. Appx118. Perry also provided concrete examples of vacuum dryers operating under pressure ranges either within, or overlapping, the claimed pressure range. Appx118-119.

For anticipation, URT argued that LithoRec teaches all features of independent claim 12, including an "inactivating device comprising a drying device" and a "vacuum installation connected to the drying device." Appx131-141.

In its Patent Owner Response (POR), Duesenfeld tried to disqualify LithoRec as a non-enabling reference with respect to the "vacuum installation" and "inactivating" limitations, arguing LithoRec does not describe comminuting and drying in sufficient detail to avoid undue experimentation and that a "vacuum installation" and "inactivating by drying" are incompatible with LithoRec's equipment. Appx5151-5164.

Duesenfeld further argued that LithoRec's dryer did not "inactivate" the comminuted batteries because LithoRec's dryer did not render the comminuted battery material "safe for transport," which was Duesenfeld's then-asserted construction of "inactivate". Appx5135, Appx5167-5168. Duesenfeld also argued that LithoRec failed to inherently disclose a "vacuum installation" because LithoRec did not require vacuum drying. Appx5145-5147.

Duesenfeld challenged the combination of LithoRec and Perry by arguing that LithoRec taught away from Perry's batch dryers and that LithoRec's dryer did not dry under vacuum pressures. Appx5169-5170. Duesenfeld also challenged the combination of LithoRec and DIN-28400 by arguing that DIN-28400 did not provide any guidance as to the vacuum level to be used in the EV battery recycling context. Appx5171-5173.

In addition, Duesenfeld argued that the claimed pressure range of "300 hPa or less" was not obvious in view of various secondary factors including unexpected results, long-felt need, and commercial success. Appx5179-5187.

Duesenfeld did not challenge URT's observation that the pressure ranges disclosed in DIN-28400 and in Perry overlap the claimed pressure range of "300 hPa or less." Further, Duesenfeld's expert testified that optimizing pressure is standard for designing drying systems, and that the relationship between drying

13

pressure and drying temperature is merely an application of Boyle's law. Appx6244, 48:15-18; Appx6251-6252, 55:2-56:16.

The PTAB ruled against Duesenfeld on every issue except for the obviousness of the claimed pressure range. The PTAB determined that LithoRec's disclosure was enabling for the "comminuting," "vacuum installation," and "inactivating" limitations, and rejected Duesenfeld's "safe for transport" construction of "inactivate." Appx10-11, Appx16-22. In addition, the PTAB specifically found that batch drying was within the scope of LithoRec. Appx25-31. Accordingly, the PTAB found that LithoRec anticipated claims 12-13, 15-16, and 18-19 of the '097 patent. Appx31.

However, the PTAB found that URT did not show by a preponderance of the evidence that claims 1-3 and 7-10[1] would have been obvious over the combination of LithoRec, DIN-28400, and Perry. Although the PTAB acknowledged that DIN-28400 showed that vacuum pressures can range from 1 to 1000 hPa, the PTAB asserted that URT did not explain why a person would have chosen 300 hPa for a vacuum dryer. Appx42-45.

The PTAB also acknowledged that URT's and Duesenfeld's experts supported the obvious conclusion of achieving the 300 hPa range through routine

---

[1] The PTAB found that URT showed by a preponderance of the evidence that claim 17 would have been obvious over LithoRec and WO 2013/023640 ("Hanisch"). Appx40.

14

optimization, but dismissed URT's "routine optimization" argument as untimely. Appx42-45.

Finally, the PTAB found that URT's motivation to combine LithoRec and Perry was insufficient because URT did not explain why a POSITA would have looked to the batch dryers of Perry to operate the dryer of LithoRec given that LithoRec discloses "batch drying is not used." Appx42-45.

## STATEMENT OF THE CASE – CONTINGENT MOTION TO AMEND

Duesenfeld presented a Contingent Motion to Amend with claims that were also extremely broad and simple in operation. These claims merely added a batch drying step performed under a pressure of 300 hPa or less.

### A.    Cited Prior Art

#### 1)    LithoRec and Perry

See Statement of the Case – Original Claims §§B(1) and B(3).

#### 2)    Uchida

Uchida, U.S. Publication No. 2008/0050295, discloses treating lithium batteries and recovering material from a lithium composite oxide. Appx5979, Appx5988, ¶0002. In one embodiment, a spent lithium battery undergoes a vacuum heating process to remove electrolytes from the battery. Appx5996, ¶¶0071, 0075. During operation, the battery is opened to expose the substances contained within

15

and is then positioned within a treatment chamber (batch drying mode). A vacuum pump is actuated to reduce the pressure in the treatment chamber to a range of 1-500 hPa, and the electrolytes are heated to a temperature near their boiling point. Appx5996, ¶0074.

### 3) Mitsubishi

Mitsubishi, Japanese Publication No. 2103-4299 discloses recovering a lithium-ion battery's constituent materials. Appx6076, Abstract. During operation, a non-aqueous electrolyte is evaporated using vacuum drying to remove the electrolyte and fluorine from the battery. with the vacuum pressure being set to 1000 hPa or lower, preferably 100 hPa or lower, and the drying temperature being set to 80-120 ºC. Appx6078-6079, ¶0016; Appx6080, ¶0025.

### B.    Procedural History

Duesenfeld filed a Contingent Motion to Amend that presented claims 22-29 to potentially replace original claims 1-3, 8, 12-13, 16, and 19. The Motion added the following limitations to the claims:

1. Batch drying – added to original claims 1-3, 8, 12-13, 16, and 19,

2. Producing a gaseous electrolyte component during drying that is recoverable by condensation – added to original claims 2, 8, 13, and 19,

3. Drying the comminuted material to a point that an electrochemical reaction is impossible or only to a negligibly small extent – added to original claims 3, 16, and 19,

4. Drying at a temperature of 80 ºC or less – added to original claims 8 and 19, and

5. Drying at a pressure of 300 hPa or less – added to original claims 12-13, 16, and 19. Appx5197-5199.

URT submitted an Opposition to the Contingent Motion to Amend, which presented three grounds of unpatentability:

1. Obviousness over LithoRec and Perry (replacement claims 22-24 and 26-28),

2. Obviousness over LithoRec and Uchida (replacement claims 22-29), and

3. Obviousness over LithoRec, Perry, and Mitsubuishi (replacement claims 22-29). Appx5910.

For ground 1, URT argued that LithoRec taught all features recited in replacement claims 22-24 and 26-28 except for the pressure range. URT further argued that to the extent LithoRec did not teach batch drying, Perry taught batch drying and pressure ranges for batch dryers within or overlapping the claimed pressure range. In addition, it would have been obvious to look to Perry to operate

17

the dryer of LithoRec in batches and to determine the pressure range under which to operate the dryer of LithoRec because LithoRec and Perry recognize the same problem (i.e., drying volatile substances without causing combustion) and solve that problem in the same way—i.e., drying under vacuum to lower the drying temperature. URT also argued that the claimed range would have been achieved through routine optimization. Appx5914-5921.

For ground 2, URT presented the same arguments as ground 1, except that Uchida was relied on rather than Perry. Uchida was also relied upon to teach the claimed temperature range. Appx5922-5926.

For ground 3, URT presented the same arguments as ground 1, except that Mitsubishi was added to teach the claimed pressure range and temperature range. Appx5928-5932.

Duesenfeld challenged the LithoRec-Perry combination by arguing that LithoRec taught away from the batch dryers taught by Perry and that LithoRec's dryer did not dry under vacuum pressures. Appx6515-6518. Duesenfeld also argued that there are too many factors that go into operating a dryer for the drying pressure to be achieved through routine experimentation. Appx6510-6515. In addition, Duesenfeld argued that the claimed range was nonobvious because it produces a result that allegedly was not achieved by the prior art (i.e., "fully

inactivat[ing] comminuted Lithium-ion battery material simply using low-pressure, low-temperature drying, in a manner that would not produce HF"). Appx6514.

For the LithoRec-Uchida combination, Duesenfeld argued that Uchida's process was very different from LithoRec's process, URT's motivation did not address the differences between the two references, and Uchida did not teach batch drying. Appx6518-6520.

For the LithoRec-Perry-Mitsubishi combination, Duesenfeld relied on the same arguments raised against the first ground (the LithoRec-Perry combination). Duesenfeld also asserted that a POSITA would not have looked to Mitsubishi to modify the system of LithoRec because Mitsubishi taught processing whole batteries, whereas LithoRec disclosed processing comminuted battery material. Appx6520.

Duesenfeld's challenge to URT's grounds of unpatentability only addressed the batch drying, pressure range, and temperature range limitations.

The PTAB's preliminary guidance roundly rejected all of Duesenfeld's arguments. The PTAB inexplicably reversed course, ultimately granting Duesenfeld's Contingent Motion to Amend for replacement claims 26-29 and did not reach a decision for claims 22-25. *Compare* Appx6330-6334 and Appx6336-6342 *with* Appx49-55.

19

For the LithoRec-Perry combination, the PTAB found that URT did not present a sufficient reason to combine the two references and did not present evidence that drying pressure was a variable that would have been optimized. Appx50-52.

For the LithoRec-Uchida combination, the PTAB implicitly found that URT presented a sufficient motivation to combine the references. The PTAB also agreed that the pressure range disclosed in Uchida overlapped the claimed pressure range. However, the PTAB still found the claimed pressure range to be patentable because it allegedly was critical to preventing or minimizing the production of HF, which was allegedly not taught in the prior art. The PTAB also found that the claimed pressure range would not have been achieved through routine optimization for the same reasons as for the LithoRec-Perry combination. Appx52-54.

For the LithoRec-Uchida-Mitsubishi combination, the PTAB found that URT's reason to combine LithoRec and Mitsubishi was insufficient to overcome the differences between LithoRec and Mitsubishi, particularly because Mitsubishi was directed to processing whole batteries and LithoRec was directed to processing comminuted batteries. Appx54-55.

## **SUMMARY OF ARGUMENT – ORIGINAL CLAIMS**

**I.**     The PTAB improperly dismissed URT's "routine optimization" argument—despite finding the supporting evidence sufficient to reach a conclusion

20

of obviousness—because the PTAB erroneously considered URT's argument untimely.

URT's Petition explicitly stated that "it is not inventive to discover optimum or workable ranges by routine experimentation." And the Petition specifically raised "routine optimization" by presenting evidence that "drying pressure" was recognized as a variable that produced the result of affecting "drying temperature." Appx117; Appx119. URT's Reply merely used the more precise, legalistic term "result-effective variable" when discussing this rationale. Appx5870-5871. The argument therefore was timely.

URT's "routine optimization" argument in the Reply was also responsive to the Institution Decision and Duesenfeld's POR, which discussed URT's "routine optimization" rationale and why a POSITA would/would not have chosen the claimed pressure range. Appx4419-4420; Appx5173; Appx5069. The reply was proper because it was "responsive and simply expand[ed] on previously raised arguments." *Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1384 (Fed. Circ. 2023).

Still further, Duesenfeld's POR argued the claimed range produces unexpected results, and Duesenfeld's expert testified that "No level of experimentation, based on LithoRec's teachings, would arrive at a system for

21

inactivating shredded batteries that dries at a maximum pressure of 300 hPa." Appx5181; Appx5283, ¶144.

The PTAB's remarks and Duesenfeld's arguments, as well as the testimony from Duesenfeld's expert, invited a rebuttal. Given that the PTAB found URT's "routine optimization" evidence sufficient to support a conclusion of obviousness, URT's "routine optimization" arguments successfully rebutted the Duesenfeld's arguments. Appx43-44. Thus, URT's "routine optimization" argument and evidence should not have been dismissed. Furthermore, Duesenfeld surely had notice of URT's routine optimization arguments because not only did URT raise the "routine optimization" evidence in the Petition, Duesenfeld addressed them in its POR. *See* Appx5181-5182. The introduction of new evidence is permissible and even expected during the course of an IPR trial as long as the opposing party is given notice of the evidence and has had the opportunity to respond to it. *Genzyme Therapeutic Prods. LP v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1366 (Fed. Cir. 2016). Thus, the PTAB should have considered the "routine optimization" arguments and evidence in URT's Reply, which responded to the POR and Duesenfeld's expert's declaration. For example, Duesenfeld argued that the claimed pressure range produces unexpected results, and Duesenfeld's expert asserted that no level of experimentation would have led a POSITA to the claimed

pressure range. Appx5181; Appx5283, ¶144. And clearly, Duesenfeld had a chance for further reply in the Sur-Reply, which it took. *See* Appx6376-6378.

The PTAB therefore abused its discretion in refusing to fully consider URT's arguments and evidence regarding routine optimization, which were timely raised and which the PTAB indicated demonstrated the obviousness of the claimed pressure range.

**II.** The PTAB improperly credited factually unsupported attorney non-obviousness arguments after URT established a rebuttable presumption of obviousness. In particular, the PTAB recognized that the prior art pressure ranges presented by URT overlapped the claimed pressure range, which should have led the PTAB to find that a rebuttable presumption of obviousness had been established. Appx42-43. Once the presumption of obviousness was established, URT did not have any obligation to present further evidence of motivation. *E.I. Dupont de Nemours & Company v. Synvina C.V.*, 904 F.3d 996, 1006 (Fed. Cir. 2018). And the PTAB did not recognize any evidence presented by Duesenfeld that rebutted the presumption of obviousness. The PTAB therefore erred as a procedural matter in placing a further burden on URT after URT already established the obviousness of the claimed pressure range, when URT's evidence was not factually rebutted.

**III.**    The PTAB's finding that URT failed to present a sufficient motivation to combine LithoRec and Perry was fraught with legal error. For example, the PTAB credited bodily incorporation arguments that focused on the incorporation of "batch drying" into LithoRec's drying system when "batch drying" was not even claimed, and Perry was only relied upon to teach known vacuum pressure ranges for known vacuum dryers. Appx45; Appx118; Appx5875-51876.

In addition, the PTAB's concern that "batch drying is not used" in Lithorec would have dissuaded a POSITA from looking to Perry (because it taught batch drying) contradicted the PTAB's own finding of fact that batch drying was within the scope of LithoRec. Appx25-26, Appx29. Indeed, the PTAB improperly treated a POSITA as an under-informed automaton, occupied solely with one limited economic assumption rather than a host of other good reasons for the modification as taught by the references themselves. *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214 (Fed Cir. 2016).

The PTAB also mischaracterized URT's problem-solution motivation rationale (i.e., LithoRec and Perry identifying the same problem and solving it in the same way) when the PTAB asserted that URT failed to explain why a POSITA would have looked to Perry for pressures at which to operate LithoRec's dryer. Appx5875-5876.

Thus, the PTAB legally erred in its overly-rigid analysis and mischaracterization of URT's motivation.

## **SUMMARY OF ARGUMENT – CONTINGENT MOTION TO AMEND**

**I.** The PTAB's finding that URT failed to present a sufficient motivation to combine LithoRec and Perry was fraught with legal error. For example, the PTAB's characterization of URT's motivation changed it to such an extent that it no longer bore any resemblance to URT's originally-presented motivation. The PTAB improperly analyzed its own motivation to combine, rather than URT's. Appx50.

The PTAB's nonobvious finding was based on an incomplete analysis and caselaw that actually supports URT's obviousness rationale. In particular, the PTAB performed an analogous art analysis (which was never at issue) and then halted its analysis after determining that the analogous art prerequisite was satisfied. Appx50. *Wyers* and *Khan*, the two cases the PTAB relied on, compelled obviousness findings given fact patterns similar to those here.

**II.** The PTAB improperly ignored relevant portions of Duesenfeld's expert's testimony and the prior art's disclosure when considering URT's "routine optimization" rationale. In particular, the PTAB asserted that URT failed to show that the prior art recognized a result affected by drying pressure and failed to show that there was a relationship between drying pressure and the result despite

25

Duesenfeld's expert's testimony that lowering the drying pressure lowers the drying temperatures, and that such relationship is based on Boyle's law. The PTAB also ignored LithoRec's explicit disclosure that vacuum drying is preferred so that temperatures can be kept low to manage issues with combustion/flammability. Appx6252, 56:10-25; Appx4308; Appx2607-2608.

**III.** The PTAB's "criticality" analysis improperly focused on the purpose of the claimed pressure range and was not supported by substantial evidence. *See* Appx52-53. In particular, the PTAB's conclusion was based solely on a finding that the claimed pressure range was critical to limiting or preventing hydrogen fluoride (HF) despite the limitation not being claimed and despite Duesenfeld's failure to show that the claimed range actually achieved the alleged purpose, i.e., reduce or prevent HF. Duesenfeld provided only a single data point for pressure— providing no evidence other pressures within the range achieved the alleged purpose, or any evidence demonstrating the difference between even that single data point and a pressure outside of the claimed range.

Furthermore, the purpose of the patentee does not control when determining obviousness. Also, once a rebuttable presumption of obviousness was established by URT's showing of overlapping ranges, URT was not required to further show motivation or purpose to support a conclusion of obviousness. *See Galderma Labs., L.P. v. Tolmar Inc.*, 737 F.3d 731, 737-38 (Fed. Cir. 2013). Duesenfeld's

evidence was legally deficient, and the PTAB's analysis was legally flawed. *Dupont*, 904 F.3d at 1012.

IV.    The PTAB's motivation analysis for Mitsubishi was predicated on the wrong legal standard and was not supported by substantial evidence, again significantly altering the motivation articulated by URT. URT's motivation to combine LithoRec and Mitsubishi was that both recognized the need to remove, stabilize, and detoxify the electrolyte solution and both solved this problem through vacuum drying. Appx599. However, the PTAB's motivation merely entailed "both LithoRec and Mitsubishi broadly teach[ing] vacuum drying as part of a process of recycling lithium-ion batteries." Appx55. LithoRec and Mitsubishi do broadly teach that—but that is not all they teach.

The PTAB also credited bodily incorporation arguments to reach its conclusion of non-obviousness. In particular, the PTAB credited Duesenfeld's argument that LithoRec's drying system was "significantly" different from the drying system of Mitsubishi because LithoRec dried comminuted battery material and Mitsubishi dried whole battery material. Appx55. However, Mitsubishi was only relied upon for its drying pressure range and not its "whole battery" teaching. Neither Duesenfeld nor the PTAB provided any evidence or explained why drying pressures for whole battery material would not be applicable to drying pressures

27

for comminuted battery material, especially since both LithoRec and Mitsubishi utilized vacuum drying pressures.

Thus, the PTAB's motivation analysis legally erred by being overly rigid and mischaracterizing URT's motivation.

## ARGUMENT – ORIGINAL CLAIMS

## STANDARD OF REVIEW

Obviousness is a question of law based on underlying factual findings, which are reviewed for substantial evidence. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (*citing KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007)). This Court reviews the PTAB's legal determinations *de novo*, and the underlying factual findings for substantial evidence. *Pers. Web Techs., LLC v Apple, Inc.*, 848 F.3d 987, 991 (Fed Cir. 2017).

Moreover, "'[a] person of ordinary skill is also a person of ordinary creativity, not an automaton'…the ordinary artisan recognizes 'that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle'…The rationale of *KSR* does not support [the] theory that a person of ordinary skill can only perform combinations of a puzzle element A with

28

a perfectly fitting puzzle element B." *ClassCo*, 838 F.3d at 1219 (*Citing KSR* at 420-421).

"The substantial evidence standard asks 'whether a reasonable fact finder could have arrived at the agency's decision,' and 'involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision.'" *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019).

This Court also "'reviews Board decisions using the standard set forth in the Administrative Procedure Act, 5 U.S.C. § 706.'" *Pride Mobility Products Corp. v. Permobil, Inc.*, 818 F.3d 1307 (Fed. Circ. 2016) (citing *In re Sullivan*, 362 F.3d 1324, 1326 (Fed.Cir.2004)) (citing *Dickinson v. Zurko*, 527 U.S. 150, 154, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)). PTAB decisions that disregard a party's arguments "as improper reply arguments [are reviewed] for abuse of discretion." "The Board abuses its discretion if its decision: "'(1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact finding; or (4) involves a record that contains no evidence on which the Board could rationally base its decision.'" *Henny Penny Corporation v. Frymaster LLC*, 938 F.3d 1324, 1330 (Fed. Cir. 2019) (citing *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016)).

I.     **THE PTAB ABUSED ITS DISCRETION WHEN IT DISMISSED URT'S EVIDENCE THAT THE PTAB FOUND RENDERED THE CLAIMED PRESSURE RANGE OBVIOUS.**

A.     **The PTAB Would Have Found the Claimed Pressure Range to Have Been Obvious but for the Improper Dismissal of URT's "Routine Optimization" Rationale.**

The PTAB found that the only difference between the LithoRec's method and '097 patent claim 1 was that LithoRec does not disclose a specific vacuum pressure range at which the vacuum drying step is performed. *See* Appx26 (finding that LithoRec teaches the "inactivating step" and "the inactivating step is performed by drying the comminuted material"). Accordingly, the PTAB's analysis of claim 1 focused only on the obviousness of the pressure range at which the claimed drying step is performed. *See* Appx42.

URT argued that the claimed pressure range would have been obvious through routine optimization. Appx117-119; Appx5870-5872. In addition, URT provided evidence from its expert and Duesenfeld's own expert that optimizing pressure was standard when designing drying systems. Appx5871 (citing Duesenfeld's expert in Appx6211-6212, 15:15-16:20 and URT's expert in Appx4991, ¶39).

The PTAB agreed that the evidence presented by URT (including testimony from Duesenfeld's expert) rendered the claimed pressure range obvious ("In its Reply Petitioner argues that '[t]he claimed '300 hPa or less' pressure range would

30

have been obvious over LithoRec because a POSITA—at a minimum—would have easily achieved the claimed pressure range through routine optimization of known result-effective variables'…this argument is supported by the testimony of [URT's expert] and [Duesenfeld's expert] that optimizing the operating pressure and temperature was a standard part of the design and drying systems"). Appx43-44. Thus, the PTAB would have found claim 1 of the '097 patent to have been obvious, but for the PTAB's improper dismissal of URT's "routine optimization" evidence as being "untimely."

### B. The "Routine Optimization" Argument in the Reply Was the Same as the Argument in the Petition.

"[A] reply may be proper if it is responsive and simply expands on previously raised arguments." *Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th at 1384. "Determining whether a reply has improperly raised a new theory or argument requires a comparison between the petitioner's petition and the petitioner's reply." *Corephotonics, Ltd. v. Apple Inc.*, 84 F 4th 990, 1008 (Fed. Cir. 2023).

The PTAB dismissed URT's "routine optimization" argument for being untimely because it found it was a new argument different from the one presented in the Petition. The only explanation provided by the PTAB on this issue was "this argument is not the same argument that Petitioner proposed in the Petition."

31

Appx43-44. The PTAB never identified the differences between the Reply and the Petition and never explained <u>why</u> the argument presented in the Reply was different from the one presented in the Petition.

In the Petition, URT explained "it is not inventive to discover optimum or workable ranges by routine experimentation," and presented evidence that LithoRec identified a variable to be optimized (i.e., drying pressure) and a result achieved by optimizing that variable (i.e., the lowering of drying temperature) by citing LithoRec itself ("LithoRec teaches that dryer manufacturers should determine optimum drying pressure to keep the temperature low to prevent explosions from the highly flammable solvents."). Appx117, Appx119; and Appx622-623, ¶96.

URT's expert's declaration supported the routine optimization argument presented in the Petition. "A [POSITA] would not have found it inventive to discover optimum or workable ranges by routine experimentation, particularly when [DIN-28400] and Perry already disclosed workable ranges either matching or within those that are claimed." Appx624-625, ¶100.

URT's "routine optimization" argument in the Reply largely repeated the talking points discussed in the Petition. In particular, the Reply restated that the drying pressure is a variable to be optimized and that the effect of lowering the drying pressure has the effect of lowering the drying temperature. Appx117;

32

Appx5871. At one point, the Reply even repeats the governing caselaw word-for-word ("it is not inventive to discover the optimum or workable ranges by routine experimentation"). Appx119; Appx5871. The only difference between the "routine optimization" discussion in the Petition and the "routine optimization" discussion in the Reply is the introduction of testimony from Duesenfeld's expert and the use of the term "result-effective variable" which fits squarely within the rubric of the caselaw.

The testimony from Duesenfeld's expert confirmed the argument presented in the Petition and thus was a permissible submission of evidence, from Dusenfeld's own expert, conceding the same argument. That is, the testimony from Duesenfeld's expert was not presented to support a new argument but was instead presented to confirm what was already presented in the Petition (i.e., that it was standard practice in the art to optimize drying pressure when designing drying systems). Appx117; Appx5871; Appx6211-6212, 15:15-16:20. Furthermore, the testimony from Duesenfeld's expert was consistent with the URT's expert's first and second declarations that pressure is a variable to be optimized to achieve a desired drying output. Appx622, Appx624-625, ¶¶96, 99-100; Appx5958-5959, ¶¶52-53.

The use of the term "result-effective variable" in the Reply did not change the "routine optimization" argument presented in the Petition because the Petition

33

described pressure as a known result-effective variable without explicitly using the more legalistic term "result-effective variable" ("LithoRec teaches that dryer manufacturers should determine <u>optimum drying pressure</u> to <u>keep the temperature low</u> to prevent explosions from the highly flammable solvents"). Appx117; Appx4308 (emphasis added).

"'A recognition in the prior art that a property is affected by the variable is sufficient to find the variable result-effective.'" *Dupont*, 904 F.3d at 1006 (citing *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012)). Thus, there is no requirement to expressly use the term "result-effective variable" when arguing that a claimed range would have been obvious through routine optimization. The only requirement is to show that the prior art recognized a result affected by the parameter to be optimized. *Dupont*, 904 F.3d at 1006.

As shown above, URT presented evidence in the Petition that LithoRec recognized a result affected by adjusting the drying pressure (i.e., adjustment of drying temperature). Accordingly, the inclusion of the term "result-effective variable" in the Reply did not create a new argument but instead merely applied a label to the variable (pressure) already identified in the Petition for optimization.

Given that the Petition provided evidence to show that LithoRec recognized pressure as a variable that affected drying temperature and recognizing that lowering drying pressure lowers drying temperature and given that the Reply

34

merely added the more legalistic term "result-effective variable") and provided Duesenfeld's expert's testimony to confirm URT's already established routine optimization argument, it is clear that the PTAB's comparison between the Petition and the Reply clearly parsed URT's "arguments on reply with too fine of a filter." *See Rembrandt*, 76 F.4th at 1384. Thus, the PTAB abused its discretion in excluding URT's "routine optimization" argument.

### C.    The PTAB Should Have At Least Considered URT's "Routine Optimization" Argument as Responsive to Duesenfeld's POR and the Institution Decision.

"[T]here is no blanket prohibition against the introduction of new evidence during an IPR" because "the need to rely on new evidence in response may not arise until a particular point has been raised" in the POR or institution decision. *Rembrandt*, 76 F.4th at 1384.

As discussed above, the Petition provided evidence showing a POSITA would have been motivated to choose the claimed pressure range through "routine optimization". Appx117-119. The Institution Decision and POR each argued that URT's Petition did not explain why a POSITA would have chosen the claimed pressure range. Appx4419-4420; Appx5173; Appx5069.

In the POR, Duesenfeld argued "Petitioner's brief offers no evidence that a person of skill would apply this "300 hPa" teaching to the LithoRec context." Appx5173; *see also* Appx4419-4420.

35

In the Institution Decision, the PTAB stated "Petitioner does not explain why a person of ordinary skill in the art would have chosen the 300-mbar definition over either of the other definitions, neither of which is limited to the 'maximum pressure of 300 hPa' of claim 1…Moreover, Petitioner does not cite any evidence to support its contention that, because a pressure of 300 hPa or less 'was part of the international standard,' it 'certainly would have been used by a [person of ordinary skill in the art] who already knew to implement a dryer with a vacuum from LithoRec.'" Appx5069.

Duesenfeld further argued in the POR that the claimed range produces unexpected results, and Duesenfeld's expert testified that "No level of experimentation, based on LithoRec's teachings, would arrive at a system for inactivating shredded batteries that dries at a maximum pressure of 300 hPa." Appx5181; Appx5283, ¶144.

The PTAB's remarks, and Duesenfeld's arguments, invited URT's rebuttal. "[T]he very nature of the reply and sur-reply briefs are to respond (whether to refute, rebut, explain, discredit, and so on) to prior raised arguments within the confines of 37 C.F.R. § 42.23(b)." *Rembrandt Diagnostics* at 1384. Given that the PTAB ultimately found URT's "routine optimization" evidence sufficient to support the conclusion of obviousness, URT's "routine optimization" arguments

36

were linked to and successfully rebutted the PTAB's remarks and Duesenfeld's arguments. Appx43-44.

Thus, the PTAB abused its discretion by dismissing arguments that were properly raised in the Petition and were clearly linked to—and ultimately rebutted—other remarks and arguments from the Institution Decision and the POR.

### D. Duesenfeld Had Timely Notice of URT's "Routine Optimization" Argument and Multiple Opportunities to Submit Facts and Arguments—Which It Took.

Not only is the introduction of new evidence in the course of an *inter partes* review trial allowed, the introduction of such evidence is to be expected. The main question is whether the opposing party is given notice of the evidence and an opportunity to respond. *Genzyme*, 825 F.3d at 1366. Duesenfeld had the opportunity to respond to URT's "routine optimization" argument and in fact did so both in its POR and Sur-Reply. *See* Appx5181; Appx6376-6378. Duesenfeld's own arguments therefore demonstrate that the PTAB abused its discretion by refusing to consider URT's timely arguments.

The Petition noted the obviousness of a claimed range can be rebutted by showing criticality or unexpected results. Appx119. And Duesenfeld tried (albeit unpersuasively) to provide such evidence. *See* Appx518. Duesenfeld's unexpected results arguments in the POR responded to, and demonstrated that Duesenfeld had fair notice of, the Petition's "routine optimization" argument.

37

As further evidence that Duesenfeld recognized URT's "routine optimization" argument in the Petition and had notice of such argument, the declaration of Duesenfeld's expert—submitted in support of the POR—stated "No level of experimentation, based on LithoRec's teachings, would arrive at a system for inactivating shredded batteries that dries at a maximum pressure of 300 hPa." Appx5283, ¶144.

Duesenfeld's Sur-Reply responded to URT's "routine optimization" argument for a second time. For example, Duesenfeld argued "Petitioner asserts it would be obvious to 'optimize' the claimed pressure range. But this is not a case where 'the general conditions of a claim are disclosed in the prior art.'". Appx6376-6378.

Tellingly, Duesenfeld made arguments rebutting URT's "routine optimization" argument but never argued that URT's "routine optimization" argument was untimely.[2] Thus, URT's "routine optimization" argument, further discussed in the Reply, is "perfectly permissible" and should have been considered by the PTAB.

---

[2] In contrast, Duesenfeld did try (albeit in procedurally improper ways) to have other arguments stricken as untimely. *See, e.g.*, Sur-Reply 16; Tr. 44, 31:6-14.

II.     **THE PTAB ERRED IN CREDITING NON-OBVIOUSNESS ARGUMENTS.**

A.     **URT Established a Rebuttable Presumption of Obviousness By Showing the Prior Art Pressure Range Overlapped the Claimed Pressure Range.**

"Where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover optimum or workable ranges by routine experimentation." *Dupont*, 904 F.3d at 1006 (citing *In re Aller*, 220 F.2d 454, 456 (CCPA 1955)). "A more specific application of this general principle is that '…obviousness typically exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art.'" *Dupont*, 904 F.3d at 1006 (citing *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003)). "[S]uch overlap creates a presumption of obviousness." *Id. (*citing *Galderma*, 737 F.3d at 737-38).

As discussed above in Argument-Original Claims §I(A), the PTAB found that the only difference between LithoRec's method and '097 patent claim 1 was that LithoRec does not disclose a specific vacuum pressure range for its vacuum dryer. The PTAB also found that LithoRec disclosed drying under vacuum pressures ("we find that LithoRec discloses 'a vacuum installation connected to the drying device and configured to generate a vacuum in the drying device'"). Appx31. "'[V]acuum' naturally encompasses a range of pressure values."

Appx5870. Accordingly, the PTAB found that the general conditions of claim 1 were disclosed in the prior art.

In the Petition, URT presented DIN-28400 as a published international standard for vacuum pressure ranges. In addition, the PTAB and Duesenfeld conceded that the international standard for vacuum pressure ranges provided by DIN-28400 (including the weakest of the ranges – 1 to 1000 hPa) overlapped the claimed pressure range. Appx117-119; Appx42-43; Appx5171-5172; Appx5870-5871; Appx6383.

In addition, the PTAB did not dispute that a POSITA would have looked to DIN-28400 (an engineering reference of standards) for a general definition of "vacuum." This Court's recent decision in *Sage Products, LLC v. Stewart*, 133 F.4th 1376, n.5 (Fed. Cir. 2015), also is instructive:  A POSITA reading a German document from a German research project conducted by German inventors with a German University about building a factory in Germany (i.e., LithoRec) surely would have had knowledge about, and turned to, a German standards document (i.e., DIN-28400).

Thus, by the PTAB's own finding, the broadest vacuum pressure disclosed in LithoRec as defined by DIN-28400—the international standard defining vacuum pressures—encompassed a range of 1-1000 hPa. Therefore, URT established a rebuttable presumption of obviousness based on the overlap between the claimed

40

pressure range (300 hPa or less) and the pressure range recognized by the PTAB as being the weakest possible vacuum pressure range (1-1000 hPa).

**B.    The Motivation Requirement Placed on URT by the PTAB After URT Established the Rebuttable Presumption of Obviousness Was Improper.**

Once URT established the rebuttable presumption of obviousness due to the overlapping pressure range, the PTAB should have followed *Dupont* and concluded that the claimed pressure range was obvious. Instead, the PTAB incorrectly credited Duesenfeld's "motivation" argument and dismissed URT's arguments relating to DIN-28400 because URT did not "explain why a person of ordinary skill in the art would have chosen the 300-mbar definition over either of the other definitions, neither of which is limited to the 'maximum pressure of 300 hPa' of claim 1." Appx43. Duesenfeld's argument was not a teaching away type argument; rather, it was a legally inapposite argument about URT allegedly needing to provide a further, separate rationale when none was needed.

However, "those who seek to prove claims obvious [are only] required to show that 'the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.'…Nothing in the statute or our case law requires [that obviousness be proven] by starting with a prior art commercial

41

embodiment and then providing motivation to alter that commercial embodiment." *See Galderma*, 737 F.3d at 737 (citing *KSR*, 550 U.S. at 419). "In determining whether the subject matter of a patent claim is obvious, neither the particular motivation <u>nor the avowed purpose</u> of the patentee controls. What matters is the objective reach of the claim." *See KSR*, 550 U.S. at 419 (emphasis added). "This is particularly true where…the prior art teaches a range that encompasses both the prior art commercial embodiment and the claimed invention." *See Galderma*, 737 F.3d at 737.

Moreover, since LithoRec was found to disclose all elements of the claimed method (including vacuum drying) and DIN-28400 was relied upon merely to explain what pressures are encompassed by a "vacuum," a further, separate showing of motivation to combine was not necessary to reach a conclusion that the claimed pressure range was obvious. *See Realtime Data, LLC v. Iancu*, 912 F. 3d 1368, 1373 (Fed. Cir. 2019).

Thus, once the PTAB found that the broadest vacuum pressure range is 1-1000 hPa (which overlaps the claimed pressure range), the PTAB should have held that URT met its burden to show that the claimed range was obvious due to the overlap with the claimed pressure range of 300 hPa or less. There simply was no further burden on URT to explain why a POSITA would have limited the 1-1000 hPa vacuum pressure range of LithoRec to no more than 300 hPa.

Of course, this whole line of argument was disclaimed by Duesenfeld's counsel at the Oral Hearing. That is, Duesenfeld's counsel was asked, directly, to confirm that he "agree[s] that it [LithoRec] suggests doing this process under a vacuum"—and the answer was "I'll grant that. Yes, Your Honor." Appx6810, 44:5-8. The PTAB therefore should not have credited a legally inapposite argument that Duesenfeld ultimately disclaimed.

### C. Duesenfeld's Secondary Considerations Evidence Was Legally Insufficient to Overcome the Rebuttable Presumption of Obviousness.

"[W]here there is a range disclosed in the prior art, and the claimed invention falls within that range, the burden of production falls upon the patentee to come forward with evidence that the prior art taught away from the claimed invention; there were new and unexpected results relative to the prior art; or there are other pertinent secondary considerations." *Galderma*, 737 F.3d at 738 (citing *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1352-54 (Fed. Cir.2013)).

#### 1. No Teaching Away from the Claimed Range

As discussed above, the PTAB found that LithoRec discloses drying under vacuum pressures ("we find that LithoRec discloses 'a vacuum installation connected to the drying device and configured to generate a vacuum in the drying device'"). Appx31. Also, Duesenfeld did not argue (nor did the PTAB find) that

43

LithoRec teaches away from the claimed 300 hPa or less pressure range, and Duesenfeld ultimately conceded the point. Appx6810, 44:5-8. Appx5133, Appx5169, Appx5171-5173; Appx6383-6384.

### 2. No Evidence of Secondary Considerations

The PTAB did not find any secondary considerations that overcame URT's presumption of obviousness. Furthermore, Duesenfeld acknowledged that the data they presented to show non-obviousness through secondary considerations did not encompass the entire claimed pressure range when Duesenfeld argued that the Wendeburg data did not need to encompass the entire claimed pressure range to have a nexus with the claimed pressure range. Appx6387.

Secondary considerations must have a nexus with the claimed range. There is a nexus between a claimed range and the secondary considerations when the supporting evidence is commensurate with the claimed range. However, when the supporting evidence is only associated with a portion of a claimed range, the evidence is not commensurate with the claimed range. *Dupont*, 904 F.3d at 1012.

Given the lack of sufficient evidence to support Duesenfeld's secondary considerations, Duesenfeld failed to rebut URT's presumption of obviousness. The PTAB therefore erred and, pursuant to *KSR*, *Galderma*, and *Dupont*, should have found the claimed pressure range obvious.

**III.   THE PTAB'S FINDING OF NO MOTIVATION TO COMBINE LITHOREC AND PERRY WAS PREDICATED ON THE WRONG LEGAL STANDARD AND WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.**

**A.      The PTAB Improperly Credited "Bodily Incorporation" Arguments to Reject URT's Motivation to Combine.**

To further support the obviousness of the claimed pressure range, URT presented Perry as evidence that it was known in the prior art to operate dryers under pressure ranges that overlap or are within the claimed pressure range. Appx118; Appx5875-5876.

The PTAB rejected URT's motivation to combine LithoRec and Perry because "Petitioner does not explain why a person of ordinary skill in the art would have considered Perry's teachings regarding a shelf vacuum dryer to define the operating pressure for the vacuum dryer of LithoRec." Appx45. In other words, the PTAB found that URT had not shown that it would have been obvious to bodily incorporate one particular dryer type into LithoRec. But URT was not arguing for bodily incorporation, and "'[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference'…but rather whether 'a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention.'" *See Allied Erecting and Dismantling Co., Inc. v. Genesis Attachments,*

45

*LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) (citing *In re Keller*, 642 F. 2d 413, 425 (CCPA 1981); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)).

The evidence of record showed that both types, batch and continuous dryers, operate under the same vacuum conditions, are governed by the same scientific principle (i.e., vacuum drying lowers drying temperature), and pressure and temperature depend on the material being dried rather than the dryer type being operated. For example, Duesenfeld's expert testified that industrial dryers operate under Boyle's law, which states that lowering drying pressure lowers drying temperature. *See* Appx6244-6245, 48:5-49:6. LithoRec recognized this relationship ("As some of the liquids to be vaporized are highly flammable solvents, the drying temperature should probably be severely restricted. This in turn speaks in favor of drying under vacuum, as the drying temperature can be kept low."). *See* Appx4308. Perry likewise taught "Vacuum-shelf dryers are used extensively for drying…temperature-sensitive or easily oxidizable materials…They are particularly useful for handling small batches of materials wet with toxic or valuable solvents…Recovery of the solvent is easily accomplished without danger of passing through an explosive range…All these latter processes demand much lower operating pressures than do ordinary drying operations." Appx2586. Also, "Vacuum is used in conjunction with drying or other chemical operations when low solids temperatures must be maintained because heat will cause damage to the

46

product or change its nature, when air combines with the product as it is heated, causing oxidation or an explosive condition, when solvent recovery is required, and when materials must be dried to extremely low moisture levels." *See* Appx2607-2608.

URT's motivation to combine LithoRec and Perry was based on the relationship between pressure and temperature ("Perry provides a concrete example of a vacuum dryer operating within the claimed range, and LithoRec teaches using a vacuum dryer to keep the drying temperature low to prevent a combustion or explosion (which is similar to the reason provided by the '097 patent), a POSITA would have been motivated to select a vacuum pressure for the dryer of LithoRec within the claimed range to operate the dryer at the optimum pressure to lower the drying temperature and prevent a combustion or explosion."). Appx118.

The PTAB's conclusion is particularly untenable because it found that LithoRec did not teach away from batch drying, and instead taught that "the dryer may operate in either batch mode or continuously." Appx29. Regardless, claim 1 does not specify batch or continuous drying—so this entire argument is legally and factually inapplicable to the claim language at issue.

Given that the only difference between LithoRec and the claimed invention recognized by the PTAB was the particular pressure range at which the dryer

47

operates, the evidence of record showed both types of dryers operate under the same scientific principles and pressure and temperature depend on the material being dried rather than the dryer type, LithoRec did not teach away from "batch drying", and "batch drying" was not claimed, the PTAB's reliance on Perry's "batch drying" teaching to reject URT's motivation to combine LithoRec and Perry amounted to an impermissible "bodily incorporation" requirement.

**B.      The PTAB's Reason for Rejecting URT's Motivation to Combine LithoRec and Perry Was Not Supported by the PTAB's Own Factual Finding.**

The PTAB rejected URT's motivation to combine LithoRec and Perry because LithoRec states "batch drying is not used," and requiring an additional explicit explanation for why a POSITA would have considered the "batch dryer" teachings of Perry to "define the operating pressure for the vacuum dryer of LithoRec." Appx45. However, the PTAB's own factual findings belied the need for this (improper) heightened showing.

Specifically, the PTAB found that the phrase "batch drying is not used" did not limit the dryer of LithoRec to continuous drying. Instead, the PTAB found that continuous drying was merely a preferred embodiment, "LithoRec discloses both batch drying and continuous drying within the same process arrangement," and "the dryer [of LithoRec] may operate in either batch mode or continuously.

48

Appx25-26, Appx29. Thus, according to the PTAB, batch drying was within the scope of LithoRec.

As was also recognized by the PTAB, the phrase "batch drying is not used" in LithoRec was <u>not</u> a general rejection of all batch drying but was merely part of a statement explaining why batch drying was not used in the particular example provided. LithoRec explained "As there is currently no reliable data on the substances contained in the battery cells that would allow drying to be reliably designed, only a rough estimate of drying can be made at this point. The manufacturers of drying systems could not be persuaded to submit an offer under the given circumstances. It is assumed that the necessary process steps…of a discontinuously operating dryer require a longer work cycle in total than the pre-shredder. <u>For this reason</u>, batch drying is not used." Appx4308 (emphasis added). Of course, a POSITA does not have this limited context and is not an automaton focused exclusively on timing considerations. That is, as further explained, a POSITA would be aware of the tradeoffs between batch and continuous dryers and would have found it obvious to look to available dryers when selecting a pressure range for either or both types.

The PTAB's own factual findings thus provided the very explanation allegedly missing from URT's motivation to combine LithoRec and Perry. That is, a POSITA would have looked to the "batch drying" teachings from Perry to define

49

the operating pressure LithoRec's dryer because, as found by the PTAB, LithoRec's dryer can operate in batch mode and does not dissuade from looking to batch-related teachings.

## C. The PTAB's Standard Was Overly Rigid When Analyzing URT's Motivation to Combine LithoRec and Perry.

"An obviousness analysis, including whether a motivation to combine exists, is 'expansive and flexible…One way our precedent frames the motivation to combine analysis is that a patent challenger need only 'show that there was a known problem' in the art, that the prior art at issue 'helped address that issue,' and that combining the teachings of the prior art references at issue was not beyond the skill of an ordinary artisan…Once a patent challenger has made these showings, '[n]othing more is required to show a motivation to combine under *KSR*.'" See *Everstar Merchandise Co. Ltd. v. Willis Electric Co., Ltd.*, 2025 WL 1501940, *3 (Fed. Circ. 2025) (citing *KSR*, 550 U.S. at 406 and *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1381 (Fed. Cir. 2023)).

In this case, URT presented evidence that LithoRec recognized a problem (i.e., drying volatile materials without causing them to combust or ignite, exactly as in the '097 patent, *see* Appx66, 3:33-40) and a solution to that problem (i.e., drying under vacuum conditions to restrict the drying temperature). *See* Appx117. URT also presented evidence that Perry addressed the issue recognized by

50

LithoRec. In particular, "Perry includes a section devoted to vacuum dryers and teaches an operating pressure range for an exemplary type of vacuum dryer. 'Shelf vacuum dryers operate in the range of 1 to 25 mmHg pressure' (1.33 to 33.33 hPa)…Thus, Perry provided a concrete example of a vacuum dryer operating within the claimed range." *See* Appx118. Perry also recognized the use of this range to restrict drying temperature when drying volatile materials. *See* Appx2586.

Given that LithoRec already taught operating its dryer at vacuum pressures, it would not have been beyond the skill of a POSITA to operate the LithoRec's vacuum dryer at the vacuum pressure range taught by Perry. Accordingly, URT established a known problem in the art (drying volatile materials), the prior art addressed that problem (specific vacuum pressures for operating the vacuum dryer), and combining the prior art teachings was not beyond POSITA's skill. The PTAB did not dispute any of URT's evidence. Thus, under *KSR*, URT provided sufficient evidence to establish a motivation to combine LithoRec and Perry, and was under no obligation to present further evidence.

Therefore, the PTAB's further requirement that URT explain why a POSITA would look to Perry's batch dryer teachings when operating LithoRec's dryer after sufficiently showing motivation to combine was overly restrictive and clear legal error.

**D.      The PTAB's Finding that URT Did Not Explain Why a POSITA Would Have Looked to Perry to Define the Operating Pressure for LithoRec's Dryer Was Not Supported by Substantial Evidence.**

The PTAB's rejection of URT's motivation to combine LithoRec and Perry was based on the premise that URT failed to "explain why a person of ordinary skill in the art would have considered Perry's teachings regarding a shelf vacuum dryer to define the operating pressure for the vacuum dryer of LithoRec." Appx45. However, URT provided several reasons why a POSITA would have looked to Perry to define the operating pressure for the vacuum dryer of LithoRec.

URT argued that "[t]here is nothing in LithoRec that would lead a POSITA to understand that batch drying cannot be used to dry the comminuted material, let alone discourage a POSITA from using batch drying." Appx5875.

URT provided evidence that both LithoRec and Perry recognize the same problem and solve that problem in the same way. "LithoRec further discloses 'As some of the liquids to be vaporized are highly flammable solvents, the drying temperature should probably be severely restricted.'…This is the same reason provided by Perry for utilizing batch vacuum rotary dryers, i.e., batch vacuum rotary dryers are typically employed when low temperatures must be maintained if excess heat will cause oxidation or an explosive condition and/or when materials must be dried to extremely low moisture levels." Appx5875.

URT further explained "Perry …is relevant to the kinds of organic solvents at issue in LithoRec. Perry disclosed that vacuum-shelf dryers "are particularly useful for handling small batches of materials wet with toxic or valuable solvents. Recovery of the solvent is easily accomplished without danger of passing through an explosive range." Appx5875-5876. Thus, just like LithoRec's dryer, Perry's dryers (safely) dry volatile materials.

URT showed that LithoRec did not discourage using batch drying, both references recognized the same problem and solved that problem in the same way, and Perry was relevant to the particular materials dried by the dryer of LithoRec. The PTAB never explained why these reasons insufficiently explained why a POSITA would have considered Perry's shelf vacuum dryer teachings to define the operating pressure for LithoRec's vacuum dryer, especially given that the PTAB found that "'there [were] known tradeoffs between batch dryers and continuous dryers.'" Appx18. It is as if the PTAB simply missed URT's arguments entirely.

In short, URT provided significant unrebutted evidence why it would have been obvious to look to Perry when determining the vacuum pressure range at which to operate LithoRec's vacuum dryers. The PTAB's legal conclusion depends on legal error regarding bodily incorporation, and there is no substantial evidence for the conclusion that LithoRec lacks batch drying or teaches away from it based

53

on the PTAB's own factual conclusions. Claim 1 clearly is obvious over LithoRec, DIN-28400, and Perry.

## ARGUMENT – CONTINGENT MOTION TO AMEND

## STANDARD OF REVIEW

The legal standards set forth above apply here.

## I.    THE PTAB'S "MOTIVATION" ANALYSIS EMBEDDED CLEAR LEGAL ERROR, INFECTING ITS NON-OBVIOUSNESS CONCLUSION.

### A.    The PTAB Erred By Analyzing Its Own Motivation to Combine Instead of URT's Motivations.

The PTAB held that simply showing that "both references relate to batch drying" and "demonstrating that a set of references are all directed to the same problem" is not a sufficient rationale for combining references. Appx50. However, this was not URT's rationale for combining LithoRec and Perry.

URT explained that the motivation to combine LithoRec and Perry was that both recognized the same problem and <u>solved that problem in the same way</u>. In particular, URT stated "In view of LithoRec's teaching that the evaporation of flammable electrolytes from comminuted battery material should be performed under vacuum to lower the drying temperature, a POSITA would have employed the batch drying method taught by both LithoRec and Perry <u>because Perry teaches that vacuum batch dryers are often employed to dry hazardous materials under</u>

lower temperatures." Appx5919 (emphasis added). Also, "a POSITA would have been motivated to combine the teaching of Perry with the teaching of LithoRec since both references teach batch drying and drying under vacuum conditions in order to lower the drying temperature and avoid the ignition or combustion of the highly flammable solvents during drying." Appx5920 (emphasis added).

"An obviousness analysis, including whether a motivation to combine exists, is 'expansive and flexible…One way our precedent frames the motivation to combine analysis is that a patent challenger need only 'show that there was a known problem' in the art, that the prior art at issue 'helped address that issue,' and that combining the teachings of the prior art references at issue was not beyond the skill of an ordinary artisan…Once a patent challenger has made these showings, '[n]othing more is required to show a motivation to combine under *KSR*.'" See *Everstar*, 2025 WL 1501940, *3.

Here, URT showed that there was a known problem (drying volatile materials), the prior art helped address the problem (drying at vacuum pressures to reduce the drying temperature), and combining the prior art references (merely choosing an optimum drying pressure) was not beyond POSITA's skill. Therefore, following the Court's guidance in *Everstar*, *KSR*, and *Intel*, URT's motivation was legally sufficient.

The PTAB's Preliminary Guidance recognized URT's actual motivation to combine and its sufficiency, explaining that "Petitioner has sufficiently shown that a [POSITA] would have been motivated to substitute Perry's vacuum-shelf dryers, which operate in batch mode, with LithoRec's vibratory fluidized bed dryer…In particular, Petitioner has identified a concrete benefit of using Perry's vacuum shelf dryers, namely that they 'are particularly useful for handling toxic or valuable solvents'…a benefit that LithoRec expressly suggested was important in LithoRec's teaching that the material to be dried contains 'highly flammable solvents,' and that 'the drying temperature should probably be severely restricted,' which 'speaks in favor of drying under vacuum, as the drying temperature can be kept low.'" Appx6322.

In sum, the PTAB erred in criticizing its own incomplete obviousness theory, while also ignoring URT's actual motivation which it had previously acknowledged and found persuasive.

## B.    The PTAB's Citations Support URT's Obviousness Arguments.

The PTAB stated that merely showing that prior art references are directed to the same problem may be enough to show that they are analogous art but is not a sufficient obviousness rationale because "the inquiry as to whether a person of ordinary skill in the art would have sought to combine references 'picks up where the analogous art test leaves off.'" Appx50. The PTAB relied on *Wyers v. Master*

*Lock Co.*, 616 F.3d 1231 (Fed. Cir. 2010) and *In re Kahn*, 441 F.3d 977 (Fed. Cir. 2006) for these propositions. Appx50. But just because the PTAB focused on an analogous art argument—which was never in dispute and which resolved in URT's favor—does not mean that URT did not establish a compelling rationale for combining LithoRec and Perry. In fact, *Wyers* and *Kahn* confirm that a proper obviousness rationale was set forth.

After determining that prior art references were analogous, the Court in *Wyers* and *Kahn* moved to the "motivation to combine" analysis. The PTAB did not do so. Instead, the PTAB improperly halted its analysis after determining that the analogous art prerequisite was satisfied, ignoring URT's actual problem/solution rationale. That the PTAB engaged in an analogous art inquiry is perfectly fine, but doing so was not a valid reason to avoid addressing URT's actual arguments and evidence, particularly when the analogous art test was resolved in URT's favor—and especially so when the problem/solution rationale being relied on by URT was exactly the same as Duesenfeld's purported solution to the same problem.

*Wyers* is instructive on this specific point: "[W]here all of the limitations of the patent were present in the prior art references, and the invention was addressed to a 'known problem,' '*KSR* ... compels the grant of summary judgment of obviousness.'" *Wyers*, 616 F.3d at 1240. The PTAB did not contradict URT's

57

showing that LithoRec and Perry together disclose all claim limitations. Moreover, the PTAB acknowledged that the prior art references were directed to the same known problem. *See* Appx50. Thus, following the Court's guidance in *Wyers* "compels" a conclusion opposite to the PTAB's, i.e., a POSITA would have been motivated to combine LithoRec and Perry because those references teach all claim limitations and are directed to the same known problem, solving it in the same way.

The Court in *Kahn* came to the same conclusion as in *Wyers*, even under the rubric of the narrower pre-*KSR* teaching-suggestion-motivation test. *See Kahn*, 441 F.3d at 988.

Thus, the PTAB's focus on the analogous art test was beside the point, particularly because it resolved in URT's favor. As shown above, following *Wyers* and *Kahn* confirms that URT properly established overwhelmingly persuasive obviousness showings.

## II. THE PTAB ERRED BY IGNORING THE PRIOR ART'S DISCLOSURE AND DUESENFELD'S EXPERT'S TESTIMONY WHEN CONSIDERING URT'S ROUTINE OPTIMIZATION ARGUMENT.

### A. Duesenfeld's Expert's Testimony Identified the Result Affected by Pressure, and Identified the Relationship Between That Result and Pressure.

The FWD cited *Dupont*, noting that routine optimization requires an identification of the variable to be optimized, the result that the prior art recognized

would be affected by the variable, and the relationship between the variable and the result. Appx51. The PTAB then purported to consider and reject URT's "routine optimization" argument for failing to satisfy the last two requirements. Appx51.

In its analysis, the PTAB acknowledged that URT's expert's testimony provided evidence that humidity levels and temperatures "were routinely adjusted to properly dry the appropriate mass of material." The PTAB further acknowledged that Duesenfeld's expert testified that "pressure was a variable that would have been optimized to 'mak[e] sure a dryer works' and that…pressure was one of 'the most important variables to optimize.'" Yet the PTAB ignored the other relevant portions of Duesenfeld's expert's testimony. Appx51.

Specifically, Duesenfeld's expert identified pressure as a variable to be optimized, identified a result affected by pressure, and identified the relationship between that result and pressure. Duesenfeld's expert testified that drying an electrolyte under vacuum reduces the boiling point of the electrolyte so that "the electrolyte will evaporate more easily and it will prevent combustion." Appx6252, 56:6-8. Duesenfeld's expert further testified that lowering the pressure in a dryer lowers the drying temperature and that this result and relationship between pressure and temperature is an application of Boyle's Law—a scientific principle known for over 100 years. Appx6244, 48:15-18; Appx6251-6252, 55:2-56:16.

Thus, Duesenfeld's own expert provided the very evidence required to show a POSITA would have engaged in routine optimization to arrive at the claimed pressure. As explained by URT—and, indeed, as explained by Duesenfeld's own publications—reduced pressure enables reduced temperatures, which reduces the possibility of flammability/combustion. Appx4308; Appx6244, 48:15-18; Appx6251-6252, 55:2-56:16.

### B.    LithoRec and Perry Each Identified the Result Affected By Pressure and the Relationship Between that Result and Pressure.

The FWD asserted that URT's expert did not explain "what result would have been known to be affected by adjusting the pressure or what the known relationship between that result and pressure was." Appx51. That is incorrect and besides the point: URT's Opposition and Sur-Reply both identified portions of LithoRec and Perry that provided that particular information.

URT explained that "LithoRec discloses that due to the 'highly flammable' nature of the solvents being evaporated, vacuum drying is desired so that the drying temperature can be lowered" and "Perry discloses that batch vacuum rotary dryers are typically employed." URT further explained that LithoRec and Perry "teach batch drying and drying under vacuum conditions <u>in order to lower the drying temperature and avoid the ignition or combustion of the highly flammable solvents during drying</u>." Appx5919-5921 (emphasis added).

60

The Sur-Reply's "Result Effective Variable-Optimization of Ranges" section explains that "LithoRec discloses 'this in turn speaks in favor of drying under vacuum, as the drying temperature can be kept low.'" URT further explained that "Perry discloses 'Vacuum is used in conjunction with drying or other chemical operations when low solids temperatures must be maintained'" and "both LithoRec and Perry recognize that lowering pressure lowers drying temperature." Appx6560.

Likewise, URT's expert explained vacuum drying (lowering pressure) reduces drying temperature and in turn reduces the likelihood of combustion/flammability—with express analysis of Perry and direct quotes from LithoRec. Appx6050-6051, ¶16.

None of this should be surprising, since it was all discussed in the relied-upon references, and since it is a straightforward application of Boyle's law, as Duesenfeld's expert confirmed. It seems that the PTAB simply missed these explanations, which satisfy URT's burden and establish that the substitute claims are unpatentable.

## C.    LithoRec and Uchida

The PTAB applied the same incorrect result-effective variable reasoning to the LithoRec-Uchida combination. Appx5929-Appx5930; Appx54. That is, it ignored URT's problem/solution rationale, analyzed its own rationale, and failed to consider the overwhelming evidence from both experts and Duesenfeld's own prior

art. Accordingly, the same arguments presented above with respect to the LithoRec-Perry combination also apply to the PTAB's findings with respect to the LithoRec-Uchida combination.

## III. THE PTAB'S "CRITICALITY" ANALYSIS EMBEDDED CLEAR LEGAL ERROR, INFECTING ITS NON-OBVIOUSNESS CONCLUSION.

### A. URT Established a Rebuttable Presumption of Obviousness By Showing Overlapping Pressure Ranges.

URT presented evidence that the proposed replacement claims 26-29 were obvious over the LithoRec-Uchida combination. Uchida was relied upon to teach batch drying and an overlapping vacuum pressure range. Appx5924-5926; Appx6558-6559. The PTAB did not dispute that a POSITA would have been motivated to combine these references and agreed that Uchida's pressure range overlapped the claimed range. The PTAB only considered the dryer's pressure range in its obviousness analysis. Appx52-54.

As explained above, an overlap of ranges creates a rebuttable presumption of obviousness. Accordingly, URT established a rebuttable presumption of obviousness based on the overlap between the claimed pressure range (300 hPa or less) and Uchida's disclosed pressure range (1-500 hPa).[3]

---

[3] The PTAB recognized Uchida's 1-1000 hPa pressure range from paragraph [0074]. Uchida actually discloses multiple pressure ranges, including 1-500 hPa. Regardless, all disclosed ranges overlap the claimed range.

**B. The PTAB Improperly Focused on the Alleged Purpose of the Claimed Pressure Range.**

Despite URT establishing the presence of overlapping ranges, the PTAB found that the claimed pressure range was non-obvious because the claimed pressure range was allegedly critical to minimizing hydrogen fluoride (HF), the supposed purpose of the invention. Appx52-53. That is, the PTAB found that because Uchida allowed the drying pressure to exceed the claimed pressure range, Uchida did not restrict the temperature and did not minimize HF production—so the claimed pressure range was non-obvious.

"In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim." *See KSR*, 550 U.S. at 419. "This is particularly true where…the prior art teaches a range that encompasses both the prior art commercial embodiment and the claimed invention." *Galderma*, 737 F.3d at 737.

No replacement claim recited minimizing HF production, and only replacement claim 29 recited a temperature range. The PTAB's analytical framework therefore is flawed as a matter of law. There was no further burden on URT to explain why a POSITA would have limited the vacuum pressure range of Uchida to no more than 300 hPa.

**C.    The PTAB's Finding that the Claimed Pressure Range Was Critical to the Purpose of Duesenfeld's Invention Was Not Supported by Substantial Evidence.**

The PTAB credited Duesenfeld's "criticality" argument even though Duesenfeld failed to present any objective evidence that the claimed range even achieved the purported purpose of minimizing HF production. The PTAB did not even perform an analysis to make such a determination. Instead, the PTAB relied on subjective statements from the '097 patent and reply arguments from Duesenfeld's counsel. Appx52-53. Neither can serve as a substitute for actual evidence.

Duesenfeld's Reply asserted "no one knew it was possible to fully inactivate comminuted Lithium-ion battery material simply using low-pressure, low-temperature drying, in a manner that would not produce [HF]." Appx6514. However, Duesenfeld's Reply did not include any data showing that the claimed pressure range achieved the purported purpose (i.e., minimizing/preventing HF production). Appx6514. Nor did Duesenfeld's expert's declaration include any such data. Appx5302-5303, ¶172.

The '097 patent does not even associate the production of HF with any pressure range. Instead, the '097 patent discloses that "[t]he advantage of low temperatures is that the formation of [HF] is hindered." Appx66, 3:4-17. There is nothing in the '097 patent objectively showing that the effect of pressures above

64

300 hPa on the production of HF is any different for pressures 300 hPa and below. At most, the '097 patent discloses that it is "beneficial if the drying occurs at a maximum pressure of 300 hPa, in particular, a maximum of 100 hPa." Appx66, 3:4-17. Such a disclosure is not evidence that the claimed pressure range is critical to minimize/prevent HF production. Yet, somehow, the PTAB found from this disclosure that the pressure range of 0-300 hPa is critical to hindering or preventing the production of HF. Thus, the PTAB clearly erred in finding that the claimed pressure range was "critical."

## D.    Secondary Considerations

The PTAB did not credit any secondary considerations with overcoming the presumption of obviousness established via overlapping ranges. To the extent that Duesenfeld's alleged "criticality" of the claimed pressure range was an argument that the claimed pressure range produces unexpected results, Duesenfeld failed to provide any data associated with the claimed range indicating that the claimed pressure range is the variable that minimizes/prevents HF production of HF. Appx6514; Appx66, 3:8-14.

Further, when the supporting evidence is only associated with a portion of a claimed range (or bears no association with the claimed range), the evidence is not commensurate with the claimed range. *Dupont*, 904 F.3d at 1012.

65

Duesenfeld offered evidence relating to one isolated point within the claimed range—not the entire broad range. Appx5185; Appx5400-5401, ¶7; Appx5406-5407; Appx6387. Duesenfeld offered no evidence to contrast the effects of that single point in the range with even a single point outside of the claimed range. Therefore, the scant evidence that Duesenfeld did provide is legally insufficient to support criticality or unexpected results.

Given the lack of any secondary considerations evidence, Duesenfeld failed to rebut the presumption of obviousness. The PTAB should have followed *KSR*, *Galderma Labs*, and *Dupont*, finding the claimed pressure range obvious.

## IV. THE PTAB'S MOTIVATION ANALYSIS OF MITSUBISHI WAS PREDICATED ON THE WRONG LEGAL STANDARD.

### A. The PTAB Erred by Analyzing Its Own Motivation to Combine the Prior Art References.

Despite acknowledging that Mitsubishi's pressure range overlapped the claimed pressure range, the PTAB found that URT's motivation to combine LithoRec and Mitsubishi was insufficient because they are "significantly different" and URT's motivation to combine was "both LithoRec and Mitsubishi broadly teach vacuum drying as part of a process of recycling lithium-ion batteries." Appx55.

URT's motivation to combine LithoRec and Mitsubishi was more nuanced than the PTAB's characterization. Appx55. URT showed that similar to LithoRec,

"Mitsubishi recognizes the need to remove, stabilize, and detoxify the electrolyte solution and fluorine found inside lithium-ion batteries by way of drying under vacuum." Appx5929. A POSITA would have been motivated to combine LithoRec and Mitsubishi because both recognized a problem (the need to safely remove electrolyte solutions from battery materials) and solved the problem in the same way (drying the electrolyte solutions under vacuum pressures). That is why URT relied on Mitsubishi. Appx5929-5930.

As explained above, the problem/solution approach is a valid analytical path toward demonstrating obviousness—and "[n]othing more is required to show a motivation to combine under *KSR*." *See Everstar*, 2025 WL1501940, *3; *Intel*, 61 F.4th at 1381.

Given that LithoRec already taught operating its dryer at vacuum pressures, it would not have been beyond the skill of a POSITA to operate LithoRec's vacuum dryer at Mitsubishi's vacuum pressure range. Accordingly, URT established a known problem in the art (drying volatile materials), the prior art addressed that issue (specific vacuum pressures at which to operate the vacuum dryer), andcombining the teachings of the prior art was not beyond the skill of a POSITA. Thus, URT provided sufficient evidence to establish a motivation to combine LithoRec and Mitsubishi.

In addition, the PTAB's finding that LithoRec and Mitsubishi are so different that a POSITA would not combine them was not supported by substantial evidence. In particular, the only difference between LithoRec and Mitsubishi identified by the PTAB was that LithoRec dries comminuted battery material and that Mitsubishi dries whole battery material. Appx55. However, neither Duesenfeld nor the PTAB provided any explanation or evidence showing how or why the drying pressures taught by Mitsubishi are inapplicable to LithoRec's dryer, especially since Mitsubishi's drying pressures were chosen to evaporate the same electrolytes as in LithoRec. Appx5929.

## B.     The PTAB Improperly Credited "Bodily Incorporation" Arguments.

URT presented evidence that proposed replacement claims 26-29 were obvious over the LithoRec-Mitsubishi-Perry combination. Perry was relied upon to teach batch drying, and Mitsubishi to teach a vacuum pressure range overlapping the claimed pressure range. Appx5929; Appx6558-6559. The PTAB did not dispute that a POSITA would have been motivated to combine LithoRec and Perry.

However, the PTAB credited Duesenfeld's bodily incorporation argument that "LithoRec and Mitsubishi represent materially different processes whose various parts are not simply interchangeable." Appx55; Appx6520. The PTAB particularly stated "Mitsubishi's drying process is performed on whole batteries,

68

not on the comminuted battery material of LithoRec"—even though it raised no such concerns elsewhere.[4] Appx55. But, URT did not rely upon Mitsubishi to teach the various parts that inactivate whole batteries. Instead, URT relied upon Mitsubishi to teach the vacuum pressure range at which to operate LithoRec's vacuum dryer. Appx5929.

As explained above, bodily incorporation is not the legal test for obviousness. The obviousness analysis is "expansive and flexible," and the problem/solution approach can support a finding of obviousness.

As was noted by URT, "[s]imilar to LithoRec, Mitsubishi discloses a system and process for recycling lithium-ion batteries (including batteries used in automobiles)…Mitsubishi recognizes the need to remove, stabilize, and detoxify the electrolytic solution and fluorine found inside lithium-ion batteries by way of drying under vacuum…Mitsubishi further discloses that the vacuum pressure [for drying the electrolytes in the batteries] should be 100 hPa or less." Appx5929.

Thus, URT established that both LithoRec and Mitsubishi recognized the problem of removing volatile solutions from used battery material. Appx6078-6079, ¶16. In addition, Mitsubishi addressed this issue by teaching particular pressures at which to evaporate the electrolyte material. Appx6080, ¶25.

---

[4] The PTAB did not raise this with the LithoRec-Uchida combination, despite Uchida disclosing drying whole batteries.

Furthermore, combining Mitsubishi's drying pressure teaching with LithoRec's vacuum dryer would have been well within the abilities of a POSITA since, as noted by Duesenfeld's expert, process engineers routinely perform the optimization of drying pressure as a standard part of plant setup. Appx5930; Appx6211-6212, 15:15-16:13.

Given that both LithoRec and Mitsubishi recognized the problem of evaporating volatile electrolytes from battery material, Mitsubishi was relied upon to teach the vacuum pressure range at which to operate a vacuum dryer to evaporate volatile electrolytes from battery material, and combining the Mitsubishi's vacuum drying pressure with LithoRec's vacuum drying operation was well within the abilities of a POSITA, the PTAB's reliance on Mitsubishi's "whole battery" teaching to reject URT's motivation to combine amounted to an impermissible "bodily incorporation" requirement.

## CONCLUSION

The PTAB's judgment should be reversed, in part, so that all challenged claims are held unpatentable, and Duesenfeld's motion to amend is denied.

70

Date: April 27, 2026                Respectfully submitted,

                                    /s/ Brian K. Kauffman

                                    Brian K. Kauffman
                                    Jonathan Roberts
                                    Nixon and Vanderhye P.C.
                                    901 North Glebe Rd, 11th Floor
                                    Arlington, VA 22213
                                    Phone: 703.816.4892 (B. Kauffman)
                                    Phone: 703.816.4414 (J. Roberts)
                                    BKK@nixonvan.com
                                    JR@nixonvan.com

                                    *Counsel for Appellant*
                                    *URT Umwelt und Recyclingtechnik*
                                    *GmbH*

# <u>ADDENDUM</u>

# ADDENDUM TABLE OF CONTENTS[**]

Judgment Final Written Decision (Paper 45)
    filed November 12, 2025 ........................................................................Appx1

US Patent 11,050,097 (Exhibit 1001) ............................................................Appx59

---

[**] The parties have agreed that there is no material included in the Final Written Decision that is subject to the protective order.

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

Trials@uspto.gov    *Decision does not include    Paper 45
571-272-7822    confidential information per    Date: November 12, 2025
confidential information per
agreement of the parties*

## UNITED STATES PATENT AND TRADEMARK OFFICE

---

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

URT UMWELT UND RECYCLINGTECHNIK GMBH,
Petitioner,

v.

DUESENFELD GMBH,
Patent Owner.

---

IPR2024-00887
Patent 11,050,097 B2

---

Before MEREDITH C. PETRAVICK, CHRISTOPHER M. KAISER, and
KEVIN W. CHERRY, *Administrative Patent Judges*.

KAISER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
Granting Patent Owner's Motion to Amend in Part
*35 U.S.C. § 318(a)*

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

## I.    INTRODUCTION

### A.  *Background and Summary*

URT Umwelt und Recyclingtechnik GmbH ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1–3, 7–10,[1] 12, 13, and 15–19 ("the challenged claims") of U.S. Patent No. 11,050,097 B2 (Ex. 1001, "the '097 patent").  Duesenfeld GmbH ("Patent Owner") filed a Preliminary Response (Paper 7, "Prelim. Resp.").  With our authorization, Petitioner filed a Reply to Patent Owner's Preliminary Response (Paper 8, "Prelim. Reply"), and Patent Owner filed a Preliminary Sur-Reply (Paper 9, "Prelim. Sur-Reply").  We determined that the information presented established a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims, so we instituted *inter partes* review of all challenged claims based on all the grounds identified in the Petition.  Paper 10 ("Inst. Dec.").

Following institution of *inter partes* review, Patent Owner filed a Response to the Petition (Paper 17, "PO Resp."), Petitioner filed a Reply to the Response (Paper 23, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 31, "PO Sur-reply").  In addition, Patent Owner filed a Motion to Amend (Paper 19, "Mot. Amend"), Petitioner filed an Opposition to the Motion to Amend (Paper 25, "Pet. Opp."), Patent Owner filed a Reply to the Opposition (Paper 33, "PO Reply"), and Petitioner filed a Sur-reply

---

[1] In the Introduction and section headings of the Petition, Petitioner identifies claims 1–3, 7–9, 12, 13, and 15–19 as the challenged claims. Pet. i–ii.  In the substantive content of the Petition, however, Petitioner includes claim 10 as a challenged claim as well.  *Id.* at 34–35.

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

(Paper 39, "Pet. Sur-reply"). An oral hearing with was held on August 19, 2025, and a transcript of the hearing is included in the record. Paper 44.

We have authority to determine whether Petitioner has established by a preponderance of the evidence that any of the challenged claims is unpatentable. 35 U.S.C. §§ 6(b), 316(c). For the reasons set forth below, upon considering the briefing and the evidence of record, we determine that Petitioner has shown the unpatentability of some, but not all, challenged claims. In addition, we grant Patent Owner's motion to amend in part.

### B. Real Parties-in-Interest

Petitioner identifies URT Umwelt und Recyclingtechnik GmbH as the real party-in-interest. Pet. 2. Patent Owner identifies Duesenfeld GmbH as the real party-in-interest. Paper 4, 1.

### C. Related Matters

The parties identify the following related court proceeding: *Duesenfeld GmbH v. Ascend Elements, Inc.*, Case No. 2:23-cv-01194 (D. Del.). Pet. 2; Paper 4, 1. In addition, the parties note that the '097 patent is also being challenged concurrently in IPR2024-00948. Paper 4, 1.

### D. The '097 Patent

The '097 patent is titled "Method for the Treatment of Used Batteries, in Particular Rechargeable Batteries, and Battery Processing Installation" and issued on June 29, 2021. Ex. 1001, codes (45), (54). It is directed to "[a] method . . . for the treatment of used batteries, in particular lithium batteries." *Id.* at code (57).

The '097 patent describes several prior-art methods of processing used batteries and discusses the disadvantages of each method. *Id.* at 1:25–

3
Appx0000003

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

50. "The invention [of the '097 patent] aims to reduce" these disadvantages.

*Id.* at 1:54–55. To do so, the '097 patent describes

> a method for the treatment of used batteries, in particular used lithium batteries, such as lithium-ion batteries, with the steps (a) comminuting the batteries such that comminuted material is obtained, (b) inactivating of the comminuted material such that an inactive comminuted material is obtained, and (c) filling a transport container with the inactive comminuted material.

*Id.* at 1:8–15. It also describes

> a battery processing installation for the treatment of used batteries, in particular for the treatment of used lithium batteries with (a) a comminuting device for comminuting the batteries such that comminuted material is obtained, (b) an inactivation device for inactivating the comminuted material and (c) a filling device for filling a transport container with the inactivated comminuted material.

*Id.* at 1:16–23.

According to the '097 patent, "the inactivation occurs . . . by way of drying the comminuted material." *Id.* at 1:57–58. By doing this, "the amount of electrolyte that can be obtained from the comminuted material . . . is such that an electrochemical reaction is no longer possible, or only to a negligibly small extent." *Id.* at 1:63–66. "In addition, no flammable or explosive gas phase forms above the battery fragments, as the organic carbonates of the electrolyte have been removed." *Id.* at 1:66–2:2. This renders the comminuted material "largely inert," so that it "can be transported safely, especially if it is packed under vacuum." *Id.* at 2:2–4.

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

### E. Illustrative Claims

Petitioner challenges claims 1–3, 7–9, 12, 13, and 15–19 of the '097 patent. Claims 1 and 12 are independent and illustrative; they are reproduced below.

1. A method for the treatment of used batteries, comprising the steps:

   (a) comminuting the batteries such that comminuted material is obtained;

   (b) inactivating the comminuted material such that an inactivated comminuted material is obtained, wherein the inactivating step is performed during or after the comminuting step; and

   (c) filling a transport container with the inactivated comminuted material;

   wherein the inactivating step is performed by drying the comminuted material, and

   wherein the drying occurs at a maximum pressure of 300 hPa.

Ex. 1001, 10:45–59.

12. A battery processing installation for treatment of used batteries, comprising:

   (a) a comminution unit configured to comminute the batteries such that comminuted material is obtained;

   (b) an inactivation device comprising a drying device configured to inactivate the comminuted material, wherein the inactivation device is configured to perform the inactivating step during or after the comminuting step of the comminution unit;

   (c) a filling device configured to fill a transport container with the inactivated comminuted material; and

   (d) a vacuum installation connected to the drying device and configured to generate a vacuum in the drying device.

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

Ex. 1001, 11:48–61.

### F. Asserted Grounds of Unpatentability

Petitioner asserts the following grounds of unpatentability (Pet. 4–5, 17–57):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–3, 7, 8, 10 | 103 | LithoRec,[2] DIN 28400,[3] Perry[4] |
| 9 | 103 | LithoRec, DIN 28400, Perry, Hanisch[5] |
| 12, 13, 15, 16, 18, 19 | 102 | LithoRec |
| 17 | 103 | LithoRec, Hanisch |

In support of its unpatentability arguments, Petitioner relies on the declarations of Volker Spies (Ex. 1003; Ex. 1022; Ex. 1023; Ex. 1030). Patent Owner relies on the declaration of Vani Dantam (Ex. 2025). There is also fact witness testimony from Lydia Grote (Ex. 2040). The parties additionally filed transcripts of the depositions of Mr. Spies (Ex. 2061; Ex. 2062) and Mr. Dantam (Ex. 1039).

## II.   ANALYSIS

### A. Legal Standards

In an *inter partes* review, "a patent challenger has the burden of producing evidence to support a conclusion of unpatentability under § 102 or

---

[2] Arno Kwade et al., "LithoRec Recycling Lithium-Ion Batteries," Cuvillier Verlag (2012) (Ex. 1004, English translation submitted as Ex. 1016).
[3] "Vacuum Technology—Terms and Definitions—General Terms." DIN 28400-1, German Institute for Standards e.V., 1990 (Ex. 1007, English translation submitted as Ex. 1018).
[4] "Perry's Chemical Engineers' Handbook 7th Edition." New York: McGraw-Hill, 1997 (Ex. 1006).
[5] WO 2013/023640 A1, published Feb. 21, 2013 (Ex. 1013, English translation provided as Ex. 1020).

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

§ 103." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1375–76 (Fed. Cir. 2016) (citing *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1379 (Fed. Cir. 2015)).

### B. Level of Ordinary Skill in the Art

The level of ordinary skill in the pertinent art at the time of the invention is a factor in how we construe patent claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). It is also one of the factors we consider when determining whether a patent claim is obvious over the prior art. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696–697 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.*

Petitioner contends that one of ordinary skill in the art "would have had a B.S. degree in electrical engineering, materials science, chemical engineering, or an equivalent field, as well as at least 2 to 3 years of academic or industry [experience] in the recycling or processing of lithium-ion batteries." Pet. 14. We adopted this definition of the level of ordinary skill in the art in our Decision on Institution. Paper 10, 7–8; *see also* Prelim.

7
Appx0000007

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

Resp. 19 (not contesting Petitioner's proposed level of skill at the institution stage). Subsequently, Patent Owner stated that it "agrees that this level of skill is appropriate." PO Resp. 7–8. Accordingly, we adopt Petitioner's assessment of the level of ordinary skill in the art, which is consistent with the '097 patent and the asserted prior art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

## C. Claim Construction

We apply the same claim construction standard used in the federal courts—in other words, the claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), which is articulated in *Phillips*. *See* 37 C.F.R. § 42.100(b). Under the *Phillips* standard, the "words of a claim 'are generally given their ordinary and customary meaning,'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13.

Petitioner argues that "[n]o claim construction is needed for most of the terms in most of the claims" because "[t]he claims are unpatentable under any reasonable interpretation." Pet. 15. Patent Owner proposes constructions for "inactivate," "inactivated," "drying device configured to inactivate the comminuted material," and "drying the comminuted material." PO Resp. 8–14; PO Sur-reply 2–4. Petitioner disagrees with Patent Owner's proposed constructions. Pet. Reply 1–5.

## 1. "Inactivate" and "Inactivated"

Patent Owner argues that both "inactivate" and "inactivated" should receive their "ordinary meaning." PO Resp. 9. According to Patent Owner,

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

the ordinary meaning of "inactivate" is "to render safe for transport," and the ordinary meaning of "inactivated" is "rendered safe for transport." *Id.* Petitioner argues instead that these terms should interpreted to mean "the removal of solvents from a conducting . . . salt." Pet. Reply 2–3.

To support these proposed constructions, both parties direct us to the same sentence in the specification of the '097 patent: "The drying of the comminuted material results in inactivated material." *Id.* at 2 (quoting Ex. 1001, 8:54–55); PO Resp. 9 (quoting Ex. 1001, 8:54–55). According to Petitioner, this sentence equates "inactivating" with "drying," such that it provides "an explicit definition of 'inactivated.'" Pet. Reply 2. Patent Owner argues, however, that this sentence "shows that inactivation, rather than being coextensive with drying, is a resulting end point of the drying process." PO Resp. 9.

The specification states that "drying . . . results in inactivated . . . material," as well as that "inactivation occurs . . . by way of drying the . . . material." Ex. 1001, 1:56–58, 8:54–55. By itself, this language is consistent with both parties' proposed constructions. But the '097 patent repeatedly suggests that the drying process has an endpoint and that there are multiple points in the drying process that might constitute that endpoint. For example, in some embodiments, the endpoint of the drying process is the point where "[t]he comminuted material is . . . largely inert and can be transported safely." Ex. 1001, 2:2–4; *see id.* at 2:13–14 ("it is advantageous that a comminuted material is obtained that can be transported safely"). In other embodiments, the endpoint is defined as the point when "an electrolyte content . . . is so low that an electrochemical reaction is [not] possible." *Id.* at code (57), 4:5–7. The endpoint might be reached when "no flammable or

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

explosive gas mixture can form above the comminuted material" or when "a flammable or explosive gas mixture can[not] emerge in the transport container or during the subsequent processing." *Id.* at 3:49–55. It might be reached when "the build-up of heat is so low that a thermal runaway, i.e., a thermally induced chain reaction, is ruled out for at least two months," or when "any build-up of hydrogen is so low that after two weeks, no excess pressure occurs if a negative pressure of 500 hPa is present to begin with." *Id.* at 4:19–27. Alternatively, it may not be reached "until the electrolyte content of organic components that are volatile at 80° C. has a maximum value of 3% by weight," "the accumulated content of organic carbonates from the electrolyte that are volatile at 80° C. falls short of 3% by volume in the atmosphere above the comminuted material," or "the dimethyl carbonate content is lower than 4% by volume . . . and/or the cyclohexylbenzene content is lower than 1% by volume." *Id.* at 4:28–40. The challenged claims require both "inactivating the comminuted material" and that "the inactivating step is performed by drying the comminuted material." *Id.* at 10:45–59; *see also id.* at 11:48–61 (reciting "an inactivation device comprising a drying device"). Given the specification's repeated focus on the possible endpoints of the drying process and the multiplicity of possible points in the drying process that might constitute an endpoint, and given the claims' recitation of both inactivating and drying, we are persuaded that inactivated material is not merely material that has been dried, but rather material that has been dried until the endpoint of the drying process has been reached.

Accordingly, we agree with Patent Owner that drying and inactivation are not synonymous or equivalent in scope. We disagree with Patent

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL
IPR2024-00887
Patent 11,050,097 B2

Owner's argument, however, that the endpoint of the drying process is necessarily the point when the comminuted material has been rendered safe for transport. Only some of the endpoints identified in the specification of the '097 patent relate to the safety of transport; others do not. *See, e.g.*, Ex. 1001, 3:49–56 ("a flammable or explosive gas mixture can[not] emerge . . . during the subsequent processing"), 4:5–7 ("electrolyte content is so low that an electrochemical reaction is impossible"), 4:28–40 (defining drying as complete when the content of certain compounds is below a particular value). Instead, we conclude more generally that the comminuted material is inactivated once it has been dried sufficiently to reach the endpoint of the drying process.

2. *"Drying device configured to inactivate the comminuted material"*

Patent Owner proposes that we construe "drying device configured to inactivate the comminuted material" as "a device configured to produce inactivated comminuted material as a result of drying." PO Resp. 12–13. Petitioner argues instead that we should construe this phrase as "drying device configured to remove at least one solvent from conducting salt such that DMC and/or EMC is removed from the comminuted material." Pet. Reply 4. On the record developed at trial, we agree with Patent Owner. Petitioner's proposed construction suffers from the same over-specificity as Patent Owner's proposal to construe inactivated as having been rendered safe for transport: the specification of the '097 patent proposes multiple possible endpoints of the drying process, so the choice of any particular endpoint would be erroneous. Patent Owner's proposed construction, however, is consistent with our construction of "inactivate" in that it

11
Appx0000011

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

recognizes the nature of inactivation as the endpoint of the drying process. Accordingly, we adopt Patent Owner's proposed construction, and we construe "drying device configured to inactivate the comminuted material" as "a device configured to produce inactivated comminuted material as a result of drying."

### 3. *"Drying the comminuted material"*

Patent Owner argues that we should construe "drying the comminuted material" as "removing at least one solvent from the comminuted material." PO Resp. 13–14. Petitioner argues that "the '097 patent provides an explicit definition for 'drying,'" with that definition requiring "'the removal of at least one solvent in the conducting salt'" and, "'[i]n particular,'" the removal of "'dimethyl carbonate and/or ethyl methyl carbonate.'" Pet. Reply 4 (quoting Ex. 1001, 2:23–27). The only difference between these proposed constructions is Petitioner's suggestion that the solvent removed must be either dimethyl carbonate or ethyl methyl carbonate. But, as noted above, the specification of the '097 patent suggests that drying may be complete when compounds other than these specific carbonates are reduced to specified amounts. Ex. 1001, 4:28–40 ("the electrolyte content of organic components that are volatile at 80° C. has a maximum value of 3% by weight," "the accumulated content of organic carbonates from the electrolyte that are volatile at 80° C. falls short of 3% by volume in the atmosphere above the comminuted material," "the cyclohexylbenzene content is lower than 1% by volume"). Accordingly, we do not construe drying as limited to the removal of dimethyl carbonate or ethyl methyl carbonate. Instead, we adopt Patent Owner's proposed construction, and we construe "drying the

12
Appx0000012

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

comminuted material" as "removing at least one solvent from the comminuted material."

### D. Anticipation by LithoRec

Petitioner argues that claims 12, 13, 15, 16, 18, and 19 were anticipated by LithoRec. Pet. 39–55; Pet. Reply 5–15. Patent Owner disagrees. PO Resp. 14–39; PO Sur-reply 4–12.

#### 1. Overview of LithoRec

LithoRec reports the results of a project in which "several processes for recycling traction batteries were evaluated." Ex. 1016, 1. In particular, LithoRec discloses a "[c]onceptual design of a recycling pilot plant." *Id.* at 222. Part of this design focuses on "[s]eparation of active materials," and this separation includes both "[p]re-shredding" and "[d]rying." *Id.* at 224–226. According to LithoRec, "[t]he electrolytes need to be evaporated for the subsequent dry treatment processes" in order for both to "eliminate[] the potential hazard of flammable solvents" and "convert[] the active mass into the dry powder form required for dry processing." *Id.* at 226. Because "some of the liquids to be vaporized are highly flammable solvents, the drying temperature should probably be severely restricted. This in turn speaks in favor of drying under vacuum, as the drying temperature can be kept low." *Id.*

#### 2. Enablement of LithoRec

Patent Owner argues that "LithoRec is not enabled to anticipate the challenged claims." PO Resp. 25–38; PO Sur-Reply 8–11. Petitioner disagrees. Pet. Reply 11–15.

"In order to anticipate a claimed invention, a prior art reference must enable one of ordinary skill in the art to make the invention without undue

13

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

experimentation." *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008). In addition, "[a]n anticipatory reference need only enable subject matter that falls within the scope of the claims at issue, nothing more." *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1381 (Fed. Cir. 2003).

Patent Owner argues that this standard is not met with respect to the purported anticipation of the challenged claims by LithoRec. Specifically, Patent Owner argues that "Petitioner cannot show that speculative, future work that is in fact non-operational in practice can be enabled." PO Resp. 25. According to Patent Owner, "LithoRec is not enabled because it represents a future proposal – a concept design for a pilot plant for comminuting batteries for subsequent processing," and "[a] proposal for implementation does not enable to the extent the proposal does not instruct one of skill in the art how to achieve that which was proposed." *Id.* at 27 (citing Ex. 1016, 222; Ex. 2025 ¶¶ 68, 168).

In making this argument, Patent Owner analogizes the present case to that in *Apple Inc. v. Int'l Trade Comm'n*, 725 F.3d 1356, 1364 (Fed. Cir. 2013). *Id.* at 27–28. We find *Apple* inapposite here. In *Apple*, an alleged anticipatory reference was non-enabled to anticipate a claim reciting a "transparent capacitive sensing medium" that included "transparent . . . conductive lines" because, although the reference disclosed touch-sensitive electrodes, "[t]he only discussion of transparent electrodes appear[ed] under the 'Conclusions and Directions for Future Work' section, in which the authors explain[ed] that they were interested in future 'research directions.'" 725 F.3d at 1360, 1364. "There [wa]s no disclosure that the authors had achieved a transparent touch screen and the record d[id] not indicate that it

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL
IPR2024-00887
Patent 11,050,097 B2

would have been routine to do so." *Id.* at 1364. Such is not the case here. Patent Owner is correct that LithoRec discloses the "[c]onceptual design of a recycling pilot plant," but, unlike the record in *Apple*, the record here shows that the construction of LithoRec's "possible recycling pilot plant" would have been routine. Ex. 1016, 222. Equipment for accomplishing the vacuum drying and shredding that LithoRec discloses was well-known and familiar to those of ordinary skill. Ex. 1024 (vacuum dryer disclosed in 1901); Ex. 1025 (vacuum dryer disclosed in 1996); Ex. 1039, 34:3–37:19 ("ways and means" of shredding and drying batteries were known before 2015). Similarly, the record here does not reflect the failure to state how to obtain a result that led to a finding of non-enablement in *Forest Lab'ys Inc. v. Ivax Pharms., Inc.*, 501 F.3d 1263, 1268 (Fed. Cir. 2007), or the "speculative and tentative disclosure" that barred a finding of enablement in *Star Sci. Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1376 (Fed. Cir. 2011). Instead, LithoRec discloses a result (keeping "the drying temperature . . . severely restricted" because "some of the liquids to be vaporized are highly flammable solvents") and a non-speculative way of achieving that result ("drying under vacuum"). Ex. 1016, 226. In addition, as noted above, the means for vacuum drying were well-known and familiar to those of ordinary skill.

Patent Owner also argues that "[t]he machines [for comminution and drying] disclosed by LithoRec as part of the conceptualized system do not operate under vacuum pressure." PO Resp. 30–33. This is because "[t]he drying device recommended by LithoRec is a vibratory fluidized bed dryer, which is not a vacuum dryer," "the drying system contains a 'blower,'" which "generate[s] positive pressure," "[t]he comminution device disclosed

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

and recommended in LithoRec also does not operate at a vacuum pressure," and the "[o]ther machines referenced in LithoRec . . . do not provide enabling disclosure." *Id.* But a reference may be relied upon for all that it would have reasonably suggested to a person of ordinary skill the art, including nonpreferred embodiments, and "even if a piece of prior art does not expressly disclose a limitation, it anticipates if a person of ordinary skill in the art would understand the prior art to disclose the limitation and could combine the prior art description with his own knowledge to make the claimed invention." *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1374 (Fed. Cir. 2005) (citing *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1347 (Fed. Cir. 2000)); *Merck & Co. v. Biocraft Laboratories*, 874 F.2d 804, 807 (Fed. Cir. 1989). Here, LithoRec discloses the use of vacuum drying and provides a reason for that choice, and as noted above, the means for vacuum drying were well-known and familiar to those of ordinary skill. Ex. 1016, 226.

"Enablement is not precluded by the necessity for some experimentation," but the "experimentation needed to practice the invention must not be undue experimentation. 'The key word is "undue," not "experimentation."'" *In re Wands*, 858 F.2d 731, 736–37 (Fed. Cir. 1988) (quoting *In re Angstadt*, 537 F.2d 498, 504 (CCPA 1976)). In determining whether a reference requires undue experimentation, we consider eight factors:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL
IPR2024-00887
Patent 11,050,097 B2

predictability or unpredictability of the art, and (8) the breadth of the claims.

*Id.* at 737. Patent Owner argues that each of these factors except the final one weighs in favor of a conclusion that LithoRec did not enable its disclosure of the subject matter of the challenged claims. PO Resp. 35–38. On the record developed during trial, we disagree.

The first factor is the quantity of experimentation necessary. Patent Owner argues that a person of ordinary skill in the art "would [have] need[ed] to completely reconfigure [LithoRec's] recommended framework and bill of materials if vacuum drying was the goal, which would require extensive experimentation." *Id.* at 35–36 (citing Ex. 2025 ¶¶ 167.4, 168). According to Patent Owner, this is so because, "[w]hereas LithoRec mentions the possibility of drying under vacuum, the recommended equipment disclosed by LithoRec is <u>incompatible</u> with vacuum drying." *Id.* at 36 (citing Ex. 2025 ¶¶ 97–108). Petitioner disagrees, arguing that "little experimentation [would have been] required for a [person of ordinary skill in the art] to make the claimed invention based on the content of LithoRec." Pet. Reply 14 (citing Ex. 1023 ¶¶ 46–50). Patent Owner is correct that much of LithoRec's disclosure focuses on non-vacuum shredders and dryers. Ex. 1016, 226 (discussing the use of "a MEWA QZ1200 cross-flow shredder"), 227 (disclosing the use of "a vibratory fluidized bed dryer"), 235 (disclosing the inclusion in the "[d]rying system" of a "blower"); Ex. 2025 ¶¶ 97–108 (testifying that neither vibratory fluidized bed dryers nor cross-flow hoggers operate under a vacuum). But LithoRec is not limited to the use of the particular equipment the pilot plant designers ended up choosing. With respect to the shredding equipment, LithoRec discloses that "it seems

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

irrelevant which machine is used." Ex. 1016, 226. With respect to the drying equipment, LithoRec discloses the possible use of "drying under vacuum" and "a discontinuously operating dryer" before settling on the choice of a vibratory fluidized bed dryer. *Id.* Because "the development of . . . operating conditions [was] a standard part of [the] product engineers['] team duties," "a standard part of making sure a dryer works is to optimize variables like time, temperature, and pressure," and "there [were] known tradeoffs between batch dryers and continuous dryers," the experimentation necessary to implement a vacuum dryer in LithoRec's system would not have been large in quantity or beyond that falling within the scope of a design engineer's responsibilities. Ex. 1039, 16:2–10, 21:14–23. Thus, this factor weighs in favor of LithoRec being enabled.

The second factor is the amount of direction or guidance presented, and the third factor is the presence or absence of working examples. As Patent Owner notes, LithoRec's detailed guidance and working examples relate to non-vacuum drying. PO Resp. 35–36; Ex. 1016, 226–27, 235. Thus, these factors weigh against LithoRec being enabled.

The fourth factor is the nature of the invention. The challenged claims recite "[a] battery processing installation for treatment of used batteries" that includes "a comminution unit," "an inactivation device comprising a drying device," "a filling device," and "a vacuum installation connected to the drying device and configured to generate a vacuum in the drying device." Ex. 1001, 11:48–61. Each of the recited processes— comminution, inactivation, drying, and vacuum production—was well-known to those of ordinary skill in the art, and the tradeoffs between different methods of carrying out those processes were well-understood.

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL
IPR2024-00887
Patent 11,050,097 B2

Ex. 1001, 1:27–50; Ex. 1016, 100, 226–27; Ex. 1023 ¶ 47; Ex. 1034; Ex. 1039, 16:2–10, 20:3–25, 21:14–23, 35:10–17, 36:12–22. Thus, this factor weighs in favor of a conclusion that LithoRec is enabled.

The fifth factor is the state of the prior art. Patent Owner argues that "the prior art did not provide guidance on how to inactivate by drying" because "[t]he prior art focused on adding various chemicals to the batteries, or pre-treating the batteries in some fashion," such as by "treat[ing] the batteries with fire retardants," "aqueous solution[s] or a deactivating powder," "mineral acids," "brine solutions," or "pressurized solvents," as a means of detoxifying batteries before comminution. PO Resp. 38. But the prior art was not limited to such approaches. As the '097 patent itself recognizes, "DE 10 2011 110 083 A1 describes a method for recovering active material from a galvanic cell, in which the galvanic cells are initially mechanically comminuted, then pre-dried and subsequently sifted" before "the binder is broken down in an oven." Ex. 1001, 1:43–50; *see also* Ex. 1020, 1 (disclosing a method that includes "crushing the cells, in particular under inert gas"), 5 (disclosing drying "the cell fragments . . . at a drying temperature" "before the cell fragments are heated to the decomposition temperature"). Thus, this factor supports a conclusion that LithoRec was enabled.

The sixth factor is the relative skill of those in the art. Patent Owner argues that "[t]he level of skill in the art . . . is relatively low" and that a person of ordinary skill in the art, who "would have had a bachelor's degree in a relevant field as well as at least 2-3 years of relevant experience," "would [have] face[d] greater challenges in experimentation than, say, a Ph.D." PO Resp. 38 (citing Ex. 2025 ¶ 167). But "the development of . . .

19

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

operating conditions [was] a standard part of [the] product engineers['] team duties," "a standard part of making sure a dryer works is to optimize variables like time, temperature, and pressure," and "there [were] known tradeoffs between batch dryers and continuous dryers." Thus, the experimentation necessary to implement a vacuum dryer in LithoRec's system would not have been beyond that falling within the scope of a design engineer's responsibilities. Ex. 1039, 16:2–10, 21:14–23. Accordingly, this factor weighs in favor of a conclusion that LithoRec was enabled.

The seventh factor is the predictability or unpredictability of the art. Patent Owner argues that the art was unpredictable, citing LithoRec's disclosure that there was a "'high level of uncertainty' in being able to obtain volumes of EV batteries to work with," that "batteries 'cannot be processed as a homogeneous mass due to the different chemical compositions of the battery variants,'" and that there were significant safety hazards involved in transporting and processing used batteries. PO Resp. 37 (quoting Ex. 1016, 8, 33, 96, 220; Ex. 2025 ¶¶ 47, 167.3). Petitioner disagrees, arguing that a person of ordinary skill in the art "could have easily predicted the results of comminuting battery material and drying such comminuted material." Pet. Reply 14 (citing Ex. 1023 ¶¶ 49–50). As discussed above, we agree with Petitioner that the record supports finding that the technology disclosed in LithoRec and recited in the challenged claims was well-known and familiar to those of ordinary skill, and a person of ordinary skill in the art would have understood how to predict the behavior of used batteries undergoing comminution and drying. Ex. 1039, 16:2–10, 21:14–23. As for LithoRec's disclosure of a "high level of uncertainty," that statement relates to "the volume of used lithium-ion

20

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

batteries from electric vehicles over time" that would be available to be recycled, not to the art generally or to the behavior of battery material when being subjected to comminution and vacuum drying.  Ex. 1016, 8.  The situation is similar with respect to LithoRec's statement that the batteries "cannot be processed as a homogeneous mass due to the different chemical compositions of the battery variants," which LithoRec identifies as a complicating factor in determining how much battery material could be processed in a particular recycling plant.  *Id.* at 8–9.  Regarding LithoRec's discussion of safety considerations, these issues complicate the design of a recycling process and plant, as well as perhaps the mitigation measures that must be taken during routine experimentation, but they do not speak to the unpredictability of the art.  *Id.* at 33 (discussing "[t]he danger posed by defective batteries"), 96 (discussing the "difficult and costly handling when opening the cells" stemming from "high reactivity"), 220 (discussing regulatory burdens in "handling battery systems").  Thus, this factor weighs in favor of a conclusion that LithoRec was enabled.

The final factor is the breadth of the claims.  Here, claim 12 is moderately broad, not limiting its "[a] battery processing installation for treatment of used batteries" to the use of any particular types of "comminution unit[s]," "drying device[s]," "filling device[s]," or "vacuum installation[s]."  Ex. 1001, 11:48–61.  Accordingly, we agree with Patent Owner that "this factor is neutral" with respect to whether LithoRec is enabled.

Considering all the factors discussed above, as well as the case law cited by Patent Owner and the arguments and evidence made of record during trial, we conclude that LithoRec's disclosure of the subject matter of

21
Appx0000021

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

the challenged claims was sufficiently enabled to support Petitioner's anticipation arguments. In short, the field of the '097 patent was predictable, and those of ordinary skill in the art were sufficiently familiar with the operating principles and prior art disclosures of the processes recited in the challenged claims and disclosed in LithoRec, that the disclosure of LithoRec would have enabled a person of ordinary skill in the art to have been able to make the claimed invention without undue experimentation.

### 3. Analysis of Claim 12

#### a) "A battery processing installation for treatment of used batteries"

The preamble of claim 12 recites "[a] battery processing installation for treatment of used batteries." Ex. 1001, 11:48–61. Petitioner argues that LithoRec discloses this subject matter. Pet. 39–41. Patent Owner does not dispute this argument. PO Resp. 14–40. LithoRec discloses the design of a "recycling pilot plant" for the processing of batteries, including "Li-ion accumulators in the form of traction batteries, hybrid batteries and plug-in batteries." Ex. 1016, 222. Accordingly, LithoRec discloses the preamble of claim 12.

#### b) "A comminution unit configured to comminute the batteries such that comminuted material is obtained"

Claim 12 recites "a comminution unit configured to comminute the batteries such that comminuted material is obtained." Ex. 1001, 11:48–61. Petitioner argues that LithoRec discloses this limitation. Pet. 41–43. Patent Owner does not dispute this argument. PO Resp. 14–40. LithoRec discloses "mechanical comminution and separation of the cell and preparation of the active material," which "cause[s] the cell housings . . . to break open and . . .

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

lead to an extensive separation of the active mass from the arrester foils." Ex. 1016, 223, 226. Accordingly, LithoRec discloses this limitation of claim 12.

> c) *"An inactivation device comprising a drying device configured to inactivate the comminuted material"*

Claim 12 recites "an inactivation device comprising a drying device configured to inactivate the comminuted material." Ex. 1001, 11:48–61. Petitioner argues that LithoRec discloses this limitation. Pet. 43–46; Pet. Reply 8–10. Patent Owner disagrees. PO Resp. 21–25; PO Sur-reply 6–8.

As discussed more completely above, we construe "drying device configured to inactivate the comminuted material" as "a device configured to produce inactivated comminuted material as a result of drying," and we determine that the comminuted material is inactivated once it has been dried sufficiently to reach the endpoint of the drying process. In addition, the '097 patent describes "drying" as meaning "the removal of at least one solvent in the conducting salt." Ex. 1001, 2:23–27. Petitioner argues that LithoRec discloses this limitation of claim 12 because

> LithoRec discloses "The electrolytes need to be evaporated for the subsequent dry treatment process, which are primarily aimed at extracting the active mass. On the one hand, this step eliminates the potential hazard of flammable solvents and, on the other hand, converts the active mass into the dry powder form required for dry processing."

Pet. 44 (quoting Ex. 1016, 226). We agree that the evidence supports Petitioner's argument. As Petitioner points out, LithoRec discloses "evaporat[ing]" "electrolytes." Ex. 1016, 226. Among the electrolytes that LithoRec identifies as being evaporated is dimethyl carbonate, the same electrolyte that is removed in the drying process of the '097 patent.

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL
IPR2024-00887
Patent 11,050,097 B2

Ex. 1001, 2:25–27, 3:4–12, 4:37–40, 4:61–63; Ex. 1016, 100. Because LithoRec discloses that the result of its drying process is to "eliminate[] the potential hazard of flammable solvents," not merely to reduce that hazard, it discloses reaching the endpoint of the drying process. Ex. 1016, 226.

Against this evidence, Patent Owner raises several arguments. First, Patent Owner argues that LithoRec is not "configured to inactivate the comminuted material" because "[t]here is no disclosure that the LithoRec authors ever configured a vacuum drying apparatus." PO Resp. 22 (citing Ex. 2025 ¶¶ 148, 159–163.6). Although another limitation of claim 12 recites "a vacuum installation connected to the drying device and configured to generate a vacuum in the drying device," Ex. 1001, 11:48–61, the present limitation does not recite vacuum drying, so the assertion that LithoRec fails to disclose an apparatus configured to carry out vacuum drying is immaterial to the present limitation. As discussed above, LithoRec discloses that its drying operation "eliminates the potential hazard of flammable solvents," which constitutes reaching an endpoint of the drying process.

Patent Owner next argues that LithoRec's disclosure of this limitation is non-enabled. PO Resp. 22 (citing PO Resp. 25–38). We have already considered Patent Owner's non-enablement argument with respect to LithoRec, and, for the reasons discussed above, we do not find it persuasive.

Patent Owner argues that "[t]he only evidence that Petitioner points to in support of its position is the disclosure of the '097 patent." *Id.* at 23 (citing Pet. 44–45; Ex. 1003 ¶ 142). This is untrue. Although Petitioner cites the '097 patent as evidence that, within the scope of the '097 patent, drying includes the removal of dimethyl carbonate, Petitioner also cites the disclosure of LithoRec, as well as the testimony of Mr. Spies. *See* Pet.

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

43–46 (citing Ex. 1001, 2:23–27, 3:4–12, 4:37–40, 4:61–63, 8:14–15, 8:54–55; Ex. 1003 ¶¶ 140–144; Ex. 1016, 100, 226).

Next, Patent Owner argues that LithoRec does not disclose "configured to inactivate the comminuted material" inherently because "the structures disclosed are inconsistent with vacuum drying." PO Resp. 23–24. Once again, the present limitation of claim 12 does not require vacuum drying, only inactivation of the comminuted material, which LithoRec does disclose. Moreover, that disclosure is express, so any failure of LithoRec to disclose this limitation inherently is immaterial.

Patent Owner argues that LithoRec's "use of [a] continuous process with a vibratory fluidized bed dryer . . . could hinder the effective inactivation of the comminuted material." PO Resp. 24 (citing Ex. 2025 ¶¶ 119–120, 160–163). But LithoRec discloses both continuous drying and batch drying. Ex. 1016, 226 ("There is also the question of whether drying should also take place in a batch or continuously."). It suggests that continuous drying is preferred because "the necessary process steps (inerting, filling, drying, emptying) of a discontinuously operating dryer require a longer work cycle in total than the pre-shredder." *Id.* A reference may be relied upon for all that it would have reasonably suggested to a person of ordinary skill the art, including nonpreferred embodiments. *Merck*, 874 F.2d at 807. Thus, because LithoRec discloses both batch drying and continuous drying within the same process arrangement, the fact that it discloses that continuous drying is preferred is immaterial to whether it discloses the present limitation of claim 12.

Finally, Patent Owner argues that LithoRec could "output comminuted battery product that had been subject to drying, but which did

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

not reach a point of being inactivated," because LithoRec's "continuous process" involves "a steady supply of new comminuted material containing various solvents, and some will preferentially evaporate before others." PO Resp. 24–25 (citing Ex. 1016, 227; Ex. 2025 ¶¶ 119–120, 145.1–145.2, 160–161, 169.1). As discussed above, however, LithoRec discloses both batch drying and continuous drying within the same process arrangement, and it discloses that the drying process reaches the endpoint at which "the potential hazard of flammable solvents" has been "eliminate[d]." Ex. 1016, 226. Thus, the fact that one version of the drying process LithoRec discloses might not achieve inactivation is immaterial to whether LithoRec discloses the present limitation of claim 12.

For these reasons, we find that LithoRec discloses "an inactivation device comprising a drying device configured to inactivate the comminuted material."

> d) *"Wherein the inactivation device is configured to perform the inactivating step during or after the comminuting step of the comminution unit"*

Claim 12 recites that "the inactivation device is configured to perform the inactivating step during or after the comminuting step of the comminution unit." Ex. 1001, 11:48–61. Petitioner argues that LithoRec discloses this limitation. Pet. 45. Patent Owner does not dispute this argument. PO Resp. 14–40. In the process of LithoRec, the comminution step occurs before the drying step. Ex. 1016, 230. Accordingly, we find that LithoRec discloses that "the inactivation device is configured to perform the inactivating step during or after the comminuting step of the comminution unit."

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

> e) *"A filling device configured to fill a transport container with the inactivated comminuted material"*

Claim 12 recites "a filling device configured to fill a transport container with the inactivated comminuted material." Ex. 1001, 11:48–61. Petitioner argues that LithoRec discloses this limitation. Pet. 46–47. Patent Owner does not dispute this argument. PO Resp. 14–40. LithoRec discloses that the "active mass," the battery material that has been comminuted and dried to a "powder form, is fed by means of a suitable screw conveyer (3.19) to a drum filler with palletizing device (3.20) and packaged." Ex. 1016, 227, 228, 230. Thus, we find that LithoRec discloses "a filling device configured to fill a transport container with the inactivated comminuted material."

> f) *"A vacuum installation connected to the drying device and configured to generate a vacuum in the drying device"*

Claim 12 recites "a vacuum installation connected to the drying device and configured to generate a vacuum in the drying device." Ex. 1001, 11:48–61. Petitioner argues that LithoRec discloses this limitation. Pet. 47–49; Pet. Reply 6–8. Patent Owner disagrees. PO Resp. 16–21; PO Sur-reply 4–6.

LithoRec discloses that "some of the liquids to be vaporized are highly flammable solvents," so "the drying temperature should probably be severely restricted," which "speaks in favor of drying under vacuum, as the drying temperature can [thus] be kept low." Ex. 1016, 226. Thus, it discloses operating its drying process at vacuum pressure and suggests that doing so is preferable to operating at higher pressures, such as atmospheric pressure.

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL
IPR2024-00887
Patent 11,050,097 B2

Against this evidence, Patent Owner makes several arguments. First, Patent Owner argues that "Petitioner does not identify any structure corresponding to the claimed 'vacuum installation'" and that "LithoRec's speculative suggestion that drying could occur under a vacuum" does not "constitute[] sufficient express disclosure" of such structure. PO Resp. 16–17. We are not persuaded by this argument. First, LithoRec does not merely, as Patent Owner argues, "speculative[ly] suggest[] that drying could occur under a vacuum." *Id.* at 16. Instead, it discloses that vacuum drying is preferred in order to "severely restrict[]" the temperature reached during the drying process. Ex. 1016, 226. According to LithoRec, this is a safety measure necessitated by the fact that "some of the liquids to be vaporized are highly flammable solvents." *Id.* Second, Petitioner does identify structure that a person of ordinary skill in the art immediately would have envisaged as necessary to produce the vacuum that LithoRec discloses using in its drying process. Pet. 47–48; Pet. Reply 6. Supporting Petitioner's identification of this structure is Mr. Spies's testimony that "a dryer cannot operate under vacuum," as LithoRec discloses is preferable, "without a vacuum installation that generates the vacuum in the dryer." Ex. 1023 ¶¶ 19–20 (citing Ex. 1016, 98; Ex. 1024; Ex. 1025; Ex. 1026). To the extent that LithoRec's disclosure could be considered limited to continuous dryers, which, as discussed above, we find that it is not, Mr. Spies testifies that continuous vacuum dryers were known in the art. Ex. 1023 ¶ 36 (citing Ex. 1029, 1–2).

Second, Patent Owner argues that LithoRec fails to "expressly disclose[] any dryer in sufficient detail" other than "a 'vibratory fluidized bed dryer,'" which cannot operate under a vacuum. PO Resp. 17–18 (citing

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL
IPR2024-00887
Patent 11,050,097 B2

Ex. 1016, 222, 226, 227, 235; Ex. 2025 ¶¶ 68, 71–72, 74, 92–99.3, 150–158, 165–167.2, 168; Ex. 2026).  As discussed above, however, in addition to a detailed disclosure of a vibratory fluidized bed dryer system, LithoRec discloses drying under vacuum, and Mr. Spies testifies that a person of ordinary skill in the art would have understood that "the mere existence of a vacuum dryer (such as the one disclosed in LithoRec . . . ) means that a vacuum installation to the extent recited in claim 12 [would] be present with that vacuum dryer."  Ex. 1003 ¶¶ 151–153 (citing Ex. 1016, 226); *see* Ex. 1023 ¶¶ 19–20.

Patent Owner's next argument, that LithoRec's disclosure of a non-vacuum "cross-flow hogger" for comminution, "installed on a shared nitrogen line with the vibratory fluidized bed dryer," demonstrates that, in LithoRec, "a vacuum is not used," is similar.  PO Resp. 18 (citing Ex. 1016, 227, 230, 235; Ex. 2025 ¶¶ 100–108.1, 112, 154, 167.1).  LithoRec discloses the use of a dryer in its process.  Ex. 1016, 226, 230.  It discloses that the dryer may operate in either batch mode or continuously.  *Id.* at 226.  And it discloses that the dryer should operate under a vacuum.  *Id.*  Thus, the evidence of record shows that LithoRec discloses drying under a vacuum, not merely doing so at a higher pressure using a vibratory fluidized bed dryer.

Finally, Patent Owner argues that, "[a]t most, LithoRec contemplates the possibility of using vacuum" and that "[a] mere suggestion to use vacuum is not a disclosure of a vacuum installation."  PO Resp. 18–19.  Patent Owner is incorrect regarding LithoRec's disclosure of drying under vacuum.  Far from a mere contemplation of the possibility, as Patent Owner argues, the disclosure in LithoRec is that vacuum drying is preferred in order

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

to "severely restrict[]" the temperature reached during the drying process. Ex. 1016, 226. According to LithoRec, this is a safety measure necessitated by the fact that "some of the liquids to be vaporized are highly flammable solvents." *Id.*

Patent Owner is correct that we are not permitted "to fill in missing limitations simply because a skilled artisan would immediately envision them." PO Resp. 19 (quoting *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co., Ltd.*, 851 F.3d 1270, 1274–75 (Fed. Cir. 2017)). But "even if a piece of prior art does not expressly disclose a limitation, it anticipates if a person of ordinary skill in the art would understand the prior art to disclose the limitation and could combine the prior art description with his own knowledge to make the claimed invention." *Arthrocare*, 406 F.3d at 1374 (citing *Helifix*, 208 F.3d at 1347). Here, the preponderance of the evidence of record shows that LithoRec discloses drying under a vacuum, lacking only disclosure of the specific equipment needed to produce that vacuum, and Mr. Spies testifies that a person of ordinary skill in the art would have known what equipment was needed and could have immediately envisioned that equipment. Ex. 1003 ¶¶ 151–153; Ex. 1016, 226; Ex. 1023 ¶¶ 19–20. With respect to claim 12, which requires only "a vacuum installation connected to the drying device and configured to generate a vacuum in the drying device," LithoRec discloses only two options: drying using a vibratory fluidized bed dryer or drying under vacuum, with the machinery associated with the latter option not being described in detail. Ex. 1016, 226–227. All that is being filled in is the identity of the specific equipment used to generate the vacuum whose use LithoRec encourages, and this equipment was well-known to a person of ordinary skill in the art

30

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL
IPR2024-00887
Patent 11,050,097 B2

seeking to follow LithoRec's disclosed recommendation to dry under a vacuum. Ex. 1003 ¶¶ 151–153; Ex. 1023 ¶¶ 19–20.

For these reasons, we find that LithoRec discloses "a vacuum installation connected to the drying device and configured to generate a vacuum in the drying device."

### g) Conclusion Regarding Claim 12

Based on the record developed at trial, we find that Petitioner has shown by a preponderance of the evidence that claim 12 is unpatentable as anticipated by LithoRec.

### 4. Claim 13

Claim 13 depends from claim 12 and recites that "the drying device is configured to dry the comminuted material until an electrolyte content in the comminuted material is so low that an electrochemical reaction is impossible." Ex. 1001, 11:62–12:3. Petitioner argues that LithoRec discloses this limitation. Pet. 49–50; Pet. Reply 15. Patent Owner disagrees. PO Resp. 39; PO Sur-reply 11–12.

LithoRec discloses that the drying process "eliminates the potential hazard of flammable solvents," as well as that, once "all volatile, highly flammable solvents have been removed during the drying process, no explosion protection is required" in later processing steps. Ex. 1016, 226, 229. Mr. Spies testifies that, when the hazard of flammable solvents is eliminated, "the electrolyte content in the comminuted material is so low that an electrochemical reaction is impossible." Ex. 1003 ¶ 156; *see also* Ex. 1023 ¶ 43 (Spies testifying that "the flammable solvents (electrolytes) being evaporated are the elements needed for electrochemical reactions," so their absence "would make electrochemical reactions impossible"). Thus,

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL
IPR2024-00887
Patent 11,050,097 B2

there is sufficient evidence to find that LithoRec discloses that "the drying device is configured to dry the comminuted material until an electrolyte content in the comminuted material is so low that an electrochemical reaction is impossible."

Against this evidence, Patent Owner argues that "[t]he most that LithoRec discloses are certain goals of removing solvents to render the battery material safe," which "fall short of a disclosure that the device is configured to dry the battery material to a point that an electrochemical reaction is impossible." PO Resp. 39 (citing Ex. 1016, 226, 229; Ex. 2025 ¶ 169.1). We disagree with Patent Owner's interpretation of LithoRec's disclosure. The statement in LithoRec that the drying "step eliminates the potential hazard of flammable solvents" is not merely the disclosure of a "goal[] of removing solvents to render the battery material safe," as Patent Owner argues. Id.; Ex. 1016, 226. Instead, it is a disclosure of the result of the drying operation: not simply a reduction of risk, but a complete elimination of any hazard due to the presence of flammable solvents. Moreover, LithoRec also discloses that, once "all volatile, highly flammable solvents have been removed during the drying process, no explosion protection is required" in later processing steps. Ex. 1016, 229. This is not merely a description of a goal, but a disclosure of the result of the drying process. However the drying process of LithoRec is configured, the clear disclosure of LithoRec is that the process must be configured in such a way as to produce material in which "the potential hazard of flammable solvents" has been "eliminate[d]," and, if it is configured so as to remove "all volatile, highly flammable solvents," then "no explosion protection is required" in later processing steps. Id. at 226, 229. The testimony of Mr. Spies

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

additionally informs us that the absence of the evaporated solvents "would make electrochemical reactions impossible" and that, once the hazard of flammable solvents is eliminated, "the electrolyte content in the comminuted material is so low that an electrochemical reaction is impossible." Ex. 1003 ¶ 156; Ex. 1023 ¶ 43.

For these reasons, we find that Petitioner has shown by a preponderance of the evidence that claim 13 is unpatentable as anticipated by LithoRec.

### 5. *Claim 15*

Claim 15 depends from claim 12 and recites

a hard metal detachment device and/or a light fraction detachment device;

a separation device configured to separate active material from a carrier such that an active material fraction and a carrier fraction occur; and

a second filling device configured to separately fill the active material fraction and the carrier fraction in respective containers.

Ex. 1001, 12:7–17. Petitioner argues that LithoRec discloses this claim. Pet. 50–54. Patent Owner does not dispute Petitioner's argument. PO Resp. 14–40. LithoRec discloses a "second sorting step" that "is intended for the rough separation of heavy parts (housing parts, bridges, nuts, bolts and the like)" from a "light fraction" that "largely consists of foils (copper, aluminum, plastic) and the active mass to be recovered as powder." Ex. 1016, 227, 228. It also discloses "sieving at e.g. 1 mm sieve mesh width" to separate "the active mass from the granulator's comminution product" and that, "with this screen mesh size, the pulverized active mass can be separated very reliably from the films." *Id.* at 228. In addition,

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

LithoRec discloses that the "active mass in powder form" is sent "to a drum filler with palletizing device" and that "[t]he metal foils" are sent to "buffer containers" that "can hold at least one day's production" before being sent to a "briquette press." *Id.* at 228, 229. For these reasons, we find that Petitioner has shown by a preponderance of the evidence that claim 15 is unpatentable as anticipated by LithoRec.

### 6. *Claim 16*

Claim 16 depends from claim 15 and recites that "the carrier fraction are aluminum and copper foils." Ex. 1001, 12:18–19. Petitioner argues that LithoRec discloses this claim. Pet. 54. Patent Owner does not dispute Petitioner's argument. PO Resp. 14–40. LithoRec discloses that "[t]he light fraction largely consists of foil (copper, aluminum, plastic)." Ex. 1016, 228. For these reasons, we find that Petitioner has shown by a preponderance of the evidence that claim 16 is unpatentable as anticipated by LithoRec.

### 7. *Claim 18*

Claim 18 depends from claim 15 and recites that "the separation device is a second comminution device." Ex. 1001, 12:22–24. Petitioner argues that LithoRec discloses this claim. Pet. 54–55. Patent Owner does not dispute Petitioner's argument. PO Resp. 14–40. LithoRec discloses that its "light classifier" separation device includes a "granulator" to carry out "disintegration comminution." Ex. 1016, 228. According to LithoRec, this "disintegration shredding process should remove the active mass as completely as possible from the metal foils without shredding these foils too finely." *Id.* For these reasons, we find that Petitioner has shown by a preponderance of the evidence that claim 18 is unpatentable as anticipated by LithoRec.

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

### 8. Claim 19

Claim 19 depends from claim 12 and recites that "the batteries are lithium batteries." Ex. 1001, 12:25–26. Petitioner argues that LithoRec discloses this claim. Pet. 55. Patent Owner does not dispute Petitioner's argument. PO Resp. 14–40. LithoRec refers to the "'LithoRec – Recycling of lithium-ion batteries' project," and it discloses that "[b]attery types to be processed are Li-ion accumulators in the form of traction batteries, hybrid batteries and plug-in batteries." Ex. 1016, 1, 222. For these reasons, we find that Petitioner has shown by a preponderance of the evidence that claim 19 is unpatentable as anticipated by LithoRec.

### E. Asserted Obviousness over LithoRec and Hanisch

Petitioner argues that claim 17 would have been obvious over the combination of LithoRec and Hanisch. Pet. 56–57. Patent Owner disagrees. PO Resp. 39–40, 53–61.

### 1. Overview of Hanisch

Hanisch is a published patent application titled "Method for reclaiming active material from a galvanic cell and active material separation installation, in particular active metal separation installation." Ex. 1020, 1. It relates to "a method for reclaiming active material, in particular lithium or lithium compounds, from a galvanic cell." *Id.* The method includes

> the steps of (a) crushing the cells, in particular under inert gas, in such a way that solid cell fragments are at least additionally formed, (b) heating the solid cell fragments to a decomposition temperature selected high enough that the binder decomposes and/or evaporates, in such a way that heat-treated cell fragments are formed, and (c) classifying the heat-treated cell fragments.

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

*Id.* "The heating of cell fragments [up] to the decomposition temperature is preferably carried out under inert gas or in a vacuum." *Id.* at 5.

The method of Hanisch additionally "preferably comprises the step whereby, before the cell fragments are heated to the decomposition temperature, the cell fragments are dried at a drying temperature, in such a way that dry cell fragments and drying vapours arise, at least part of the drying vapours being condensed." *Id.* Hanisch teaches that "[t]his has the advantage that the electrolyte solvent can be reclaimed. In this context, it is advantageous for the drying temperature to be below 100 °C, in particular below 80 °C." *Id.*

Hanisch also teaches that "[a]n air jet sieve 50 is arranged downstream from the oven 44 in terms of the material flow direction." Ex. 1020, 8. In addition, Hanisch teaches that the use of its air jet sieve device achieves a "high level of separation." *Id.* at 6.

2. *Analysis*

Claim 17 depends from claim 15 and recites that "the separation device is an air jet sieving device." Ex. 1001, 12:20–21. Petitioner argues that "Hanisch teaches using an air jet sieve to separate active material from foil" and that a person of ordinary skill in the art would have had reason to combine the teachings of Hanisch with those of LithoRec. Pet. 56–57.

Patent Owner does not challenge the merits of Petitioner's arguments that Hanisch teaches using an air jet sieve device or that a person of ordinary skill in the art would have had a reason to combine the teachings of Hanisch with those of LithoRec. PO Resp. 39–40. Patent Owner does, however, argue that objective indicia of nonobviousness demonstrate that claim 17 would not have been obvious over the combination of LithoRec and

36
Appx0000036

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

Hanisch. *Id.* at 53–61. In particular, Patent Owner argues that "long-felt need, unexpected results, commercial success, and licensing . . . confirm patentability." *Id.* We consider the parties' arguments below.

### a) Hanisch teaches that the separation device is an air jet sieving device

Hanisch teaches that "[a]n air jet sieve 50 is arranged downstream from the oven 44 in terms of the material flow direction." Ex. 1020, 8. This device separates "[t]he active material particles" from "[t]he foil fraction." *Id.* at 8–9. Accordingly, Hanisch teaches that the separation device is an air jet sieving device.

### b) Petitioner has shown a reason to combine the teachings of Hanisch and LithoRec

Hanisch teaches that the use of its air jet sieve device achieves a "high level of separation." *Id.* at 6. This benefit provides a reason for a person of ordinary skill in the art to have combined Hanisch's teaching of using an air jet sieve device with LithoRec's teachings regarding the claims discussed above. *Id.* at 6.

### c) Patent Owner has not established that objective indicia confirm the patentability of claim 17

"[F]or objective indicia of nonobviousness to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention." *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33, 32 (PTAB Jan. 24, 2020) (precedential) (citing *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016)). A patentee is entitled to a presumption of nexus "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Fox*

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL
IPR2024-00887
Patent 11,050,097 B2

*Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018) (quoting *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000))).  "A finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373.  "To the contrary, the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74 (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)).  "Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention," meaning that "there must be a nexus to some aspect of the claim not already in the prior art."  *In re Kao*, 639 F.3d 1057, 1068–69 (Fed. Cir. 2011) (emphasis in original).  On the other hand, there is no requirement that "objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior art reference in order for that evidence to carry substantial weight." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331 (Fed. Cir. 2016).  A patent owner may show, for example, "that it is the claimed combination as a whole that serves as a nexus for the objective evidence; proof of nexus is not limited to only when objective evidence is tied to the supposedly 'new' feature(s)." *Id.*  Ultimately, the fact finder must weigh the secondary considerations evidence presented in the context of whether the claimed invention as a whole would have been obvious to a skilled artisan.  *Id.* at 1331–32.

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

Here, Patent Owner argues that it "is entitled to the rebuttable presumption of a nexus between the objective evidence of nonobviousness and the Challenged Claims because the evidence is tied to a specific process, Duesenfeld's battery recycling process at its Wendeburg Plant, and that process is the invention disclosed and claimed in the Challenged Claims." PO Resp. 59 (citing Ex. 2025 ¶¶ 176–177; Ex. 2036, Appx. D; Ex. 2040). The evidence to which Patent Owner directs us includes the testimony of Mr. Dantam that "the Wendeberg Plant . . . practices the '097 claimed invention." Ex. 2025 ¶ 176 (citing Ex. 2036, Appx. D; Ex. 2037; Ex. 2040 ¶¶ 1–9; Ex. 2041; Ex. 2053). Both Patent Owner and Mr. Dantam cite the claim chart included in Exhibit 2036,[6] with Mr. Dantam testifying that the "chart illustrat[es], on a per-limitation basis, how Duesenfeld's Wendeberg Plant practices Independent Claims 1 and 12 and various dependent claims." *Id.* Exhibit 2036 contains evidence that the plant in question practices claims 1, 3, 8, 9, 10, 12, and 19 of the '097 patent. Ex. 2036, 1–23. It contains no evidence with respect to whether the plant practices claim 17. *Id.* Accordingly, Patent Owner directs us to no evidence that there is a presumption of nexus between the asserted objective indicia of nonobviousness and claim 17, the only claim challenged as obvious over the combination of LithoRec and Hanisch. Petitioner challenges claims 12, 13, 15, 16, 18, and 19 as anticipated, and evidence of objective indicia of

---

[6] Both Patent Owner and Mr. Dantam refer to an "Appendix D" to Exhibit 2036, but the exhibit does not contain any appendices. PO Resp. 58; Ex. 2025 ¶ 177; *see* Ex. 2036. We treat the citations to Exhibit 2036 as referring to the claim chart that forms the entire content of the exhibit.

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

nonobviousness "simply is not relevant or material" to the anticipation inquiry. *In re Wiggins*, 488 F.2d 538, 543 (CCPA 1973).

Patent Owner also argues "that the 'unique characteristics of the claimed invention' of the '097 patent are driving the commercial success of Duesenfeld's battery recycling processes." PO Resp. 60 (quoting *Volvo Penta of the Ams., LLC v. Brunswick Corp.*, 81 F.4th 1202, 1210 (Fed. Cir. 2023)). In particular, Patent Owner cites evidence that "[a]dvertisements for Duesenfeld's battery recycling process tout the benefits of the patented '097 'vacuum drying' technology." *Id.* (citing Ex. 2012; Ex. 2053, 3, 5). The cited evidence refers to "processes that do not require melting down or high-temperature treatment of batteries," to "[d]rying below 80 degrees Celsius," to "the drying process tak[ing] place below 80°C and at a low vacuum," to "no exhaust gas scrubbing [being] necessary," to "the solvents of the electrolyte, the graphite and the lithium be[ing] recovered in a purity so that they can be reused," to "[a] low process temperature prevent[ing] the formation of toxic gases," and to "[t]he separated solvent ha[ving] a very high purity level because the production of hydrogen fluoride from reaction products is avoided." Ex. 2012; Ex. 2053, 3, 5. None of this evidence mentions or relates to the air jet sieving device of claim 17, nor does Patent Owner argue that it does. PO Resp. 60; Ex. 2012; Ex. 2053, 3, 5. Accordingly, Patent Owner has not shown a nexus between the asserted objective indicia of nonobviousness and claim 17.

### 3. Conclusion

For these reasons, we conclude that Petitioner has shown by a preponderance of the evidence that claim 17 is unpatentable because it would have been obvious over the combination of LithoRec and Hanisch.

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

### F.  Asserted Obviousness over LithoRec, DIN 28400, and Perry

Petitioner argues that claims 1–3, 7, 8, and 10 would have been obvious over the combination of LithoRec, DIN 28400, and Perry.  Pet. 17–35; Pet. Reply 16–27.  Petitioner also argues that claim 9 would have been obvious over the combination of LithoRec, DIN 28400, Perry, and Hanisch.  *Id.* at 35–38; Reply 23–27.  Patent Owner disagrees with both of these arguments.  PO Resp. 40–61; PO Sur-reply 12–25.

### 1.  Overview of DIN 28400

DIN 28400 is a glossary that provides "Terms and Definitions" of "General terms" related to "Vacuum technology."  Ex. 1018, 1.  The definitions are provided "[i]n conjunction with International standard ISO 3529-1:1981 published by the International Organization for Standardization (ISO)."  *Id.*  DIN 28400 provides a definition for "Vacuum," disclosing that "Vacuum refers to the state of a gas when the pressure of the gas, and thus the number density of molecules, in a container is lower than outside."  *Id.* ¶ 1.1.  Alternatively, DIN 28400 defines vacuum as "refer[ring] to the state of a gas . . . when the pressure of the gas is lower than 300 mbar, i.e. lower than the lowest atmospheric pressure on the Earth's surface."  *Id.*  In addition, DIN 28400 provides pressure ranges corresponding to "Rough (low) vacuum," "Medium vacuum," "High vacuum HV," and "Ultra-high vacuum UHV."  *Id.* at Table 1.  For "Rough (low) vacuum," the applicable pressure range is disclosed to be "$1 \cdot 10^5$ to $1 \cdot 10^2$" Pascals, which we note is a range of 1 to 1000 hPa.  *Id.*

### 2.  Overview of Perry

Perry is a copy of the Seventh Edition of Perry's Chemical Engineers' Handbook, an engineering reference book.  Ex. 1006.  A portion of Perry

41

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

discloses information about "Batch Through-Circulation Dryers," including "Vacuum-Shelf Dryers," which Perry describes as "indirect-heated batch dryers consisting of a vacuum[-]tight chamber usually constructed of cast iron or steel plate, heated supporting shelves within the chamber, a vacuum source, and usually a condenser." *Id.* at 12-44. According to Perry, these dryers "are used extensively for drying pharmaceuticals, temperature-sensitive or easily oxidizable materials, and materials so valuable that labor cost is insignificant," and they "operate in the range of 1 to 25 mmHg pressure." *Id.* at 12-44–12-45.

### 3.  *Analysis of Claim 1*

#### a)  *"Wherein the drying occurs at a maximum pressure of 300 hPa"*

Claim 1 recites "wherein the drying occurs at a maximum pressure of 300 hPa." Ex. 1001, 10:58–59. Petitioner contends that DIN 28400 and Perry each teach or suggest this limitation and that a person of ordinary skill in the art would have had a reason to combine the teachings of these references with those of LithoRec. Pet. 24–28.

#### (1) *Combination of LithoRec and DIN 28400*

Petitioner argues that "LithoRec discloses general conditions at which drying should occur, including keeping pressures low in order accommodate the evaporation of highly flammable solvents" but that "LithoRec does not explicitly teach a specific vacuum pressure to be used." *Id.* at 25. Instead, Petitioner argues first that "DIN 28400 teaches the conditions that define a vacuum according to the international standard ISO 3529-1: 1981 that was issued by the International Organization for Standardization (ISO)" and that "[o]ne of the conditions that meets the international standard ISO 3529-1:

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

1981 for a vacuum is that the pressure is between 0 and 300 millibars (i.e., between 0 and 300 hPa)." *Id.* at 25–26 (citing Ex. 1018 ¶ 1.1). For this reason, Petitioner argues that a pressure of 300 hPa or less "was well known for producing a vacuum," "was part of the international standard and thus certainly would have been used by a [person of ordinary skill in the art] who already knew to implement a dryer with a vacuum from LithoRec." *Id.* at 26.

We do not find Petitioner's argument persuasive. First, although DIN 28400 states that one definition of a vacuum is "the state of a gas . . . when the pressure of the gas is lower than 300 mbar," it also defines a vacuum as "the state of a gas when the pressure of the gas, and thus the number density of molecules, in a container is lower than outside," and it includes pressures as high as 1000 hPa in its definition of "Rough (low) vacuum." Ex. 1018 ¶ 1.1, Table 1. Petitioner does not explain why a person of ordinary skill in the art would have chosen the 300-mbar definition over either of the other definitions, neither of which is limited to the "maximum pressure of 300 hPa" of claim 1. Pet. 25–26. Moreover, Petitioner does not cite any evidence to support its contention that, because a pressure of 300 hPa or less "was part of the international standard," it "certainly would have been used by a [person of ordinary skill in the art] who already knew to implement a dryer with a vacuum from LithoRec." *Id.* at 26.

In its Reply, Petitioner argues that "[t]he claimed '300 hPa or less' pressure range would have been obvious over LithoRec because a POSITA—at a minimum—would have easily achieved the claimed pressure range through routine optimization of known result-effective variables." Pet. Reply 16 (citing Ex. 1023 ¶ 39). This argument is supported by the

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

testimony of Mr. Spies and Mr. Dantam that optimizing the operating pressure and temperature was a standard part of the design of drying systems. Ex. 1023 ¶ 39; Ex. 1039, 15:15–20:2. But this argument is not the same argument that Petitioner proposed in the Petition. *Compare* Pet. Reply 16–19, *with* Pet. 24–28. Although "the introduction of new evidence in the course of the trial is to be expected in *inter partes* review trial proceedings," *Genzyme Therapeutic Prods. LP v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1366 (Fed. Cir. 2016), the shifting of arguments is not, *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1286 (Fed. Cir. 2017). Accordingly, we consider this argument untimely and do not rely on it in our analysis.

### (2) *Combination of LithoRec and Perry*

As noted above, Petitioner argues that "LithoRec discloses general conditions at which drying should occur, including keeping pressures low in order accommodate the evaporation of highly flammable solvents" but that "LithoRec does not explicitly teach a specific vacuum pressure to be used." *Id.* at 25. Petitioner argues next that "Perry includes a section devoted to vacuum dryers and teaches an operating pressure range for an exemplary type of vacuum dryer," specifically a "[s]helf vacuum dryer[]," which "'operate[s] in the range of 1 to 25 mmHg pressure' (1.33 to 33.33 hPa)." *Id.* at 26 (quoting Ex. 1006, 12-45). According to Petitioner, because "Perry provides a concrete example of a vacuum dryer operating within the claimed range, . . . a [person of ordinary skill in the art] would have been motivated to select a vacuum pressure for the dryer of LithoRec within the claimed range." *Id.*

44

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

We do not find Petitioner's argument persuasive. Petitioner does not explain why a person of ordinary skill in the art would have considered Perry's teachings regarding a shelf vacuum dryer to define the operating pressure for the vacuum dryer of LithoRec. *Id.* This lack of explanation is particularly troublesome given the teachings of LithoRec that "batch drying is not used" and of Perry that "[v]acuum-shelf dryers are indirect-heated batch dryers." Ex. 1006, 12-44; Ex. 1016, 226.

For the same reasons discussed above with respect to the combination of LithoRec and DIN 28400, we determine that Petitioner's argument in its Reply that "[t]he claimed '300 hPa or less' pressure range would have been obvious over LithoRec because a POSITA—at a minimum—would have easily achieved the claimed pressure range through routine optimization of known result-effective variables," Pet. Reply 16, is untimely.

  b) *Conclusion Regarding Claim 1*

Petitioner has not shown sufficiently that a person of ordinary skill in the art would have combined the teachings of DIN 28400 or Perry with those of LithoRec to arrive at the maximum drying pressure of 300 hPa recited in claim 1. Accordingly, Petitioner has not shown by a preponderance of the evidence that claim 1 would have been obvious over the combination of LithoRec, DIN 28400, and Perry.

  4. *Claims 2, 3, and 7–10*

As discussed above, Petitioner does not show by a preponderance of the evidence that claim 1 would have been obvious over the combination of LithoRec, DIN 28400, and Perry. Petitioner relies on its arguments with respect to claim 1 in arguing for the obviousness of claims 2, 3, and 7–10, all of which depend from claim 1. Pet. 28–35, 37–38; *see* Ex. 1001, 10:60–65,

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL
IPR2024-00887
Patent 11,050,097 B2

11:16–31.  Accordingly, Petitioner does not show by a preponderance of the evidence that claims 2, 3, 7, 8, and 10 would have been obvious over LithoRec, DIN 28400, and Perry, or that claim 9 would have been obvious over LithoRec, DIN 28400, Perry, and Hanisch.

## III.    MOTION TO AMEND

Patent Owner moves to amend the Challenged Claims, "contingent upon the Board's determinations of patentability for originally-issued claims." Mot. Amend 7.  In particular, Patent Owner requests replacement "of issued claims 1, 2, 3, 8, 12, 13, 16, and/or 19" with proposed claims 22–29, respectively, but Patent Owner requests that we "not consider this motion for any of issued claims 1, 2, 3, 8, 12, 13, 16, and/or 19 that the Board finds to be patentable." *Id.* at 7, 20–26.  As discussed above, we determine that Petitioner has not shown the unpatentability of any of claims 1–3 or 8, so we do not consider Patent Owner's motion to amend with respect to the replacement of those claims with proposed claims 22–25.  We determine that Petitioner has shown, however, the unpatentability of claims 12, 13, 16, and 19, so we proceed to consider Patent Owner's motion to amend with respect to the replacement of those claims with proposed claims 26–29.

### A.  Legal Standards

"During an inter partes review . . . , the patent owner may file 1 motion to amend the [challenged] patent" by "[c]ancel[ing] any challenged patent claim" or, "[f]or each challenged claim, propos[ing] a reasonable number of substitute claims." 35 U.S.C. § 316(d)(1).  "An amendment . . . may not enlarge the scope of the claims of the patent or introduce new matter." *Id.* § 316(d)(3).  "Any motion to amend may be denied where . . .

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

[t]he amendment does not respond to a ground of unpatentability involved in the trial; or . . . [t]he amendment seeks to enlarge the scope of the claims of the patent or introduce new subject matter." 37 C.F.R. § 42.121(a)(2). The motion "may cancel a challenged claim or propose a reasonable number of substitute claims. The presumption is that only one substitute claim will be needed to replace each challenged claim, and it may be rebutted by a demonstration of need." *Id.* § 42.121(a)(3).

Patent Owner bears the ultimate burden to show that its motion to amend complies with the requirements of 35 U.S.C. § 316(d)(1), (3) and 37 C.F.R. § 42.121(a)(2), (a)(3), (b)(1), and (b)(2). 37 C.F.R. § 42.121(d)(1). Petitioner bears the ultimate burden to show that any proposed substitute claims are unpatentable. 37 C.F.R. § 42.121(d)(2).

## B. Statutory and Regulatory Requirements

### 1. Reasonable Number of Substitute Claims

A motion to amend must propose a reasonable number of substitute claims, and there is a presumption that only one substitute claim will be needed to replace each challenged claim. 35 U.S.C. § 316(d)(1)(B); 37 C.F.R. § 42.121(a)(3). Petitioner does not raise any argument on this issue. Pet. Opp. 1–24; Pet. Sur-reply 1–12. Patent Owner proposes eight substitute claims to replace eight challenged claims, and Patent Owner proposes four substitute claims to replace the four challenged claims that we determine Petitioner has shown are unpatentable. Mot. Amend 8–10. Accordingly, Patent Owner has shown it proposes a reasonable number of substitute claims.

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

### 2. Respond to Ground of Unpatentability

A motion to amend must respond to a ground of unpatentability involved in the proceeding. 37 C.F.R. § 42.121(a)(2)(i). Petitioner does not raise any argument on this issue. Pet. Opp. 1–24; Pet. Sur-reply 1–12. Patent Owner notes that "each of claims 22-29 now contains a limitation requiring a dryer, or drying, operating in a batch mode." Mot. Amend 17; *see also* Mot. Amend at 20–26 (Claim Listing). Patent Owner contends that "LithoRec's drying device, however, is not a batch drying device, and LithoRec in fact teaches away from the use of batch drying devices." *Id.* at 17. Patent Owner quotes LithoRec's teaching that, "[f]or this reason, batch drying is not used." *Id.* (quoting Ex. 1016, 226). Patent Owner further contends that "each of the claims excludes LithoRec, and the combination of LithoRec with another reference to reach the new claims would not have the necessary motivation, especially given LithoRec's express teaching away." *Id.* Accordingly, Patent Owner has shown that the motion to amend responds to a ground of unpatentability involved in this proceeding.

### 3. Scope of Amended Claims

A motion to amend may not enlarge the scope of the claims of the patent. 35 U.S.C. § 316(d)(3); 37 C.F.R. § 42.121(a)(2)(ii). Petitioner does not raise any argument on this issue. Pet. Opp. 1–24; Pet. Sur-reply 1–12. Patent Owner argues that "each Proposed Substitute Claim begins with the language of either independent claim 1 or independent claim 12, and provides only narrowing amendments thereto." Mot. Amend 12. Our review of proposed claims 26–29 shows that Petitioner is correct in its assertion that each of these claims narrows claim 12. *Id.* at 23–26.

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**
IPR2024-00887
Patent 11,050,097 B2

Accordingly, Patent Owner's Motion has not enlarged the scope of the claims of the patent.

    *4.   New Matter*

A motion to amend may not introduce new subject matter. 35 U.S.C. § 316(d)(3); 37 C.F.R. § 42.121(a)(2)(ii). Petitioner does not raise any argument on this issue. Pet. Opp. 1–24; Pet. Sur-reply 1–12. Patent Owner identifies support in the application that matured into the challenged patent (the '484 application) for each limitation of each proposed substitute claim. Mot. Amend 14–17. Accordingly, Patent Owner's Motion has not introduced new subject matter.

    *C.   Asserted Unpatentability of Claims 26–29*

Petitioner argues that claims 26–29 are unpatentable because they would have been obvious over various combinations of prior art. Pet. Opp. 1–23; Pet. Sur-reply 1–11. In particular, Petitioner argues that claims 26–28 would have been obvious over the combination of LithoRec and Perry; claims 26–29 would have been obvious over the combination of LithoRec and Uchida;[7] and claims 26–29 would have been obvious over the combination of LithoRec, Mitsubishi,[8] and Perry. *Id.* Patent Owner disagrees with each of Petitioner's arguments. PO Reply 2–12.

    *1.   Asserted Obviousness over LithoRec and Perry*

Petitioner argues that proposed substitute claims 26–28 would have been obvious over the combination of LithoRec and Perry. Pet. Opp. 1–13. Each of these claims recites "that the drying device operates with a pressure

---

[7] US 2008/0050295 A1, published Feb. 28, 2008 (Ex. 1026).
[8] JP 2013-4299 A, published Jan. 7, 2013 (Ex. 1031, English translation provided as Ex. 1032).

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

of 300 hPa or less." Mot. Amend 23–25. Patent Owner argues that Petitioner has not shown sufficiently that the prior art teaches or suggests this limitation. PO Reply 2–7.

Petitioner argues that Perry teaches "vacuum dryers (which includes batch vacuum rotary dryers) typically operate at levels above . . . 6.7 hPa," that Perry further teaches that "vacuum-shelf (batch) dryers operate in the range of . . . 1.3 to 33.3 hPa," and that a person of ordinary skill in the art "would have been motivated to combine the teaching of Perry with the teaching of LithoRec since both references teach batch drying and drying under vacuum conditions in order to lower the drying temperature." Pet. Opp. 11–12 (citing Ex. 1006, 12-45, 12-66; Ex. 1016, 226; Ex. 1030 ¶¶ 18–22). This is not a sufficient reason to combine the teachings of LithoRec and Perry. Although the argument that both references relate to batch vacuum drying may be enough to show that the two references are analogous art, *see Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238 (Fed. Cir. 2010), simply demonstrating that a set of references are all directed to the same problem is not, by itself, a sufficient rationale to combine the references. *See id.* (upon finding that two references were directed to the same problem, the Court proceeded to analyze whether a person of ordinary skill in the art would have been motivated to combine the references); *see also In re Kahn*, 441 F.3d 977, 987–88 (Fed. Cir. 2006) (noting that the inquiry as to whether a person of ordinary skill in the art would have sought to combine the references "picks up where the analogous art test leaves off").

Petitioner also argues that "it would have been obvious to arrive at the claimed pressure range through routine optimization, because pressure and temperature were recognized as being outcome-effective variables" and

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

because "[a] process engineer would perform this kind of routine optimization at the time of the invention as a standard part of plant setup." Pet. Opp. 12 (citing Ex. 1030 ¶ 22; Ex. 1039, 15:15–16:13). To show that a person of ordinary skill in the art would have arrived at the claimed invention through routine optimization, Petitioner must provide "an explanation as to *why* it would have been routine optimization." *In re Stepan Co.*, 868 F.3d 1342, 1346 (Fed. Cir. 2017) (emphasis in original). Part of that explanation must be an identification of the variable to be optimized, the result that the prior art recognized would be affected by the variable, and "the relationship between the variable and the result." *E.I. Dupont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1009 (Fed. Cir. 2018). Here, there is evidence in the record that "humidity levels" and "temperatures" were routinely adjusted to properly dry the appropriate mass of material. Ex. 1039, 15:15–16:1. There is also evidence in the record that pressure was a variable that would have been optimized to "mak[e] sure a dryer works" and that, in some unspecified contexts, pressure was one of "the most important variables to optimize." *Id.* at 16:7–20. For these reasons, Mr. Spies testifies that "pressure and temperature were recognized as being outcome-effective variables." Ex. 1030 ¶ 22. Mr. Spies and Petitioner do not explain, however, what result would have been known to be affected by the adjustment of pressure or what the known relationship between that result and pressure was. *Id.*; Pet. Opp. 11–12. In fact, there is evidence that Mr. Spies's reference to "outcome-effective variables" was an unsupported conclusory statement that even Mr. Spies himself did not understand the basis of. Ex. 2062, 138:25–139:4 (testifying that "I don't know what you mean by" the term "outcome-effective variable").

51
Appx0000051

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

Accordingly, Petitioner has not shown sufficiently that a person of ordinary skill in the art would have engaged in routine optimization of pressure to arrive at the recited pressure of 300 hPa or less.

For these reasons, Petitioner has not shown that proposed claims 26–28 would have been obvious over the combination of LithoRec and Perry.

### 2. Asserted Obviousness over LithoRec and Uchida

Petitioner argues that proposed substitute claims 26–29 would have been obvious over the combination of LithoRec and Uchida. Pet. Opp. 13–19. Each of these claims recites "that the drying device operates with a pressure of 300 hPa or less." Mot. Amend 23–25. Patent Owner argues that Petitioner has not shown sufficiently that the prior art teaches or suggests this limitation. PO Reply 10–12.

Petitioner argues first that Uchida teaches a range of operating pressures, "1 to 500 hPa," that overlaps with the claimed range of less than 300 hPa, and second that a person of ordinary skill in the art "would have known to optimize the pressure, temperature, and duration of the drying process." Pet. Opp. 15–17. According to Petitioner, the pressure range recited in claims 26–29 "is merely a workable setting for evaporating dimethyl carbonate . . . at 80 °C." *Id.* at 17.

It is true that Uchida discloses a pressure range of "0.1 to 100 kPa," or 1 to 1000 hPa, which overlaps the recited range of 0 to 300 hPa. Ex. 1026 ¶ 74. But Patent Owner argues that the recited pressure range is critical to achieving the purpose of the invention, "fully inactivat[ing] comminuted Lithium-ion battery material . . . in a manner that would not produce HF." PO Reply 6. We agree with Patent Owner that this is a purpose of the

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

claimed invention. The '097 patent describes the purpose behind "drying . . . at a maximum pressure of 300 hPa" as enabling "considerable parts of most electrolytes [to] vaporise . . . at temperatures of less than 80° C." Ex. 1001, 3:8–12. This low drying temperature is described as having "[t]he advantage . . . that the formation of hydrogen fluoride is hindered." *Id.* at 3:12–14. Although partial drying might occur at temperatures low enough to hinder the production of hydrogen fluoride, the proposed amended claims recite "an inactivation device . . . configured to inactivate the comminuted material," and we construe "inactivate" as drying sufficiently to reach the endpoint of the drying process. Thus, claims 26–29 require full inactivation, and the '097 patent's purpose is a process for accomplishing this inactivation while minimizing hydrogen fluoride production. This makes the recited range of operating pressures critical to achieving the invention's purpose.

Uchida, on the other hand, teaches a drying process in which temperature is not restricted and in which hydrogen fluoride production is not minimized. Uchida's drying process begins with exposing the battery material to "a temperature of about 85° C." Ex. 1026 ¶ 76. After 30 minutes, "the temperature . . . is raised further and maintained at 102° C. for 30 minutes." *Id.* Finally, the temperature is increased yet again and "is maintained in a temperature range equal to or greater than the thermal decomposition temperature . . . of LiPF$_6$." *Id.* ¶ 79. Thus, although Uchida's disclosed range of operating pressures overlaps the claimed range, the evidence of record demonstrates the criticality of the claimed range to achieving the invention's purpose.

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL

IPR2024-00887
Patent 11,050,097 B2

We find Petitioner's argument that a person of ordinary skill in the art "would have known to optimize the pressure, temperature, and duration of the drying process," Pet. Opp. 15–17, unpersuasive for the same reasons as the similar argument Petitioner makes with respect to the combination of LithoRec and Perry.

For these reasons, Petitioner has not shown that proposed claims 26–29 would have been obvious over the combination of LithoRec and Uchida.

### 3.  *Asserted Obviousness over LithoRec, Mitsubishi, and Perry*

Petitioner argues that proposed substitute claims 26–29 would have been obvious over the combination of LithoRec, Mitsubishi, and Perry. Pet. Opp. 19–23.  Each of these claims recites "that the drying device operates with a pressure of 300 hPa or less." Mot. Amend 23–25.  Petitioner argues that Mitsubishi teaches this limitation and that a person of ordinary skill in the art would have had a reason to combine the teachings of Mitsubishi with those of LithoRec and Perry. Pet. Opp. 20–21.  Patent Owner argues that Petitioner has not shown sufficiently that a person of ordinary skill in the art would have modified the teachings of LithoRec and Perry with those of Mitsubishi.  PO Reply 12.

On the record developed during trial, we agree with Patent Owner. Petitioner's argument that a person of ordinary skill in the art would have combined the teachings of Mitsubishi with those of LithoRec and Perry is that, because LithoRec "teaches drying electrolyte solutions under vacuum in a lithium ion battery recycling system," and because "Mitsubishi discloses a particular pressure range for drying electrolytes under vacuum in a lithium ion battery recycling system," a person of ordinary skill in the art "would

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

have applied the teaching of Mitsubishi to the system of LithoRec." Pet. Opp. 20 (citing Ex. 1030 ¶ 45). The cited testimony of Mr. Spies repeats this argument word for word. Ex. 1030 ¶ 45.

As Patent Owner points out, there is a significant difference between Mitsubishi's system and LithoRec's system, even though both are designed for recycling lithium-ion batteries. In particular, Mitsubishi's drying process is performed on whole batteries, not on the comminuted battery material of LithoRec. Ex. 1032 ¶ 18, Fig. 1; Ex. 2061, 91:21–93:10; Ex. 2062, 160:5–9. At the time of the '097 patent, processes involving drying of comminuted battery material differed from processes involving drying whole batteries. Ex. 1001, 1:27–50. Thus, Petitioner's argument, that, merely because both LithoRec and Mitsubishi broadly teach vacuum drying as part of a process of recycling lithium-ion batteries, a person of ordinary skill in the art would have used Mitsubishi's pressure in LithoRec's process, is insufficient to show a reason to combine these teachings.

For these reasons, Petitioner has not shown that proposed claims 26–29 would have been obvious over the combination of LithoRec, Mitsubishi, and Perry. Because Petitioner does not show that proposed claims 26–29 are unpatentable on any of the grounds it asserts, we grant Patent Owner's motion to amend as to these claims.

## IV.   CONCLUSION

For the reasons set forth above, we determine that (1) Petitioner has established by a preponderance of the evidence that claims 12, 13, and 15–19 of the '097 patent are unpatentable; (2) Petitioner has not shown the unpatentability of claims 1–3 and 7–10 of the '097 patent; and (3) the record

NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL
IPR2024-00887
Patent 11,050,097 B2

supports granting Patent Owner's Motion to Amend with respect to proposed claims 26–29.

In summary, with respect to the challenged claims of the '097 patent:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 7, 8, 10 | 103 | LithoRec, DIN 28400, Perry | | 1–3, 7, 8, 10 |
| 9 | 103 | LithoRec, DIN 28400, Perry, Hanisch | | 9 |
| 12, 13, 15, 16, 18, 19 | 102 | LithoRec | 12, 13, 15, 16, 18, 19 | |
| 17 | 103 | LithoRec, Hanisch | 17 | |
| **Overall Outcome** | | | 12, 13, 15–19 | 1–3, 7–10 |

In summary, with respect to Patent Owner's Motion to Amend:

| Motion to Amend Outcome | Claim(s) |
|---|---|
| Original Claims Cancelled by Amendment | 12, 13, 16, 19 |
| Substitute Claims Proposed in the Amendment | 22–29 |
| Substitute Claims: Motion to Amend Granted | 26–29 |
| Substitute Claims: Motion to Amend Denied | |
| Substitute Claims: Not Reached | 22–25 |

## V.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has shown that claims 12, 13, and 15–19 of the '097 patent are unpatentable;

FURTHER ORDERED that Petitioner has not shown that claims 1–3 and 7–10 of the '097 patent are unpatentable;

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

FURTHER ORDERED that Patent Owner's Motion to Amend is granted to the extent that claims 12, 13, 16, and 19 shall be replaced with claims 26–29, respectively;

FURTHER ORDERED that Patent Owner's Motion to Amend is moot in all other respects; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

IPR2024-00887
Patent 11,050,097 B2

FOR PETITIONER:

Brian Kauffman
Jonathan Roberts
NIXON AND VANDERHYE, P.C.
bkk@nixonvan.com
jr@nixonvan.com


FOR PATENT OWNER:

Steven Carlson
Samuel LaRoque
ROBINS KAPLAN LLP
scarlson@robinskaplan.com
slaroque@robinskaplan.com

Mathew Smith
Elizabeth Laughton
SMITH BALUCH LLP
smith@smithbaluch.com
laughton@smithbaluch.com

**NON-PUBLIC VERSION — PROTECTIVE ORDER MATERIAL**

# EXHIBIT 1001

URT EX1001
URT Umwelt und Recyclingtechnik v. Duesenfeld
IPR2024-00887

US011050097B2

(12) **United States Patent**

**Hanisch et al.**

(10) **Patent No.:**    **US 11,050,097 B2**

(45) **Date of Patent:**    **Jun. 29, 2021**

(54) **METHOD FOR THE TREATMENT OF USED BATTERIES, IN PARTICULAR RECHARGEABLE BATTERIES, AND BATTERY PROCESSING INSTALLATION**

(71) Applicant: **DUESENFELD GMBH**, Braunschweig (DE)

(72) Inventors: **Christian Hanisch**, Braunschweig (DE); **Bastian Westphal**, Braunschweig (DE); **Wolfgang Haselrieder**, Braunschweig (DE); **Martin Schoenitz**, Braunschweig (DE)

(73) Assignee: **DUESENFELD GMBH**, Braunschweig (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 344 days.

(21) Appl. No.: **15/569,484**

(22) PCT Filed: **Apr. 28, 2016**

(86) PCT No.: **PCT/EP2016/059526**

§ 371 (c)(1),
(2) Date: **Oct. 26, 2017**

(87) PCT Pub. No.: **WO2016/174156**

PCT Pub. Date: **Nov. 3, 2016**

(65) **Prior Publication Data**

US 2018/0301769 A1    Oct. 18, 2018

(30) **Foreign Application Priority Data**

Apr. 28, 2015    (DE) ..................... 10 2015 207 843.4

(51) **Int. Cl.**
**H01M 10/54**    (2006.01)
**B09B 3/00**    (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............. *H01M 10/54* (2013.01); *B02C 21/00* (2013.01); *B02C 23/10* (2013.01); *B02C 23/20* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ...... Y02W 30/84; Y02P 10/212; B02C 23/08; B02C 23/10; B09B 3/008; B09B 3/0058;
(Continued)

(56)    **References Cited**

U.S. PATENT DOCUMENTS

5,632,863 A * 5/1997 Meador ................... C10B 47/44
201/25
6,524,737 B1 * 2/2003 Tanii ....................... C22B 7/005
429/49
(Continued)

FOREIGN PATENT DOCUMENTS

CN    102496752 A    6/2012
CN    103959553 A    7/2014
(Continued)

OTHER PUBLICATIONS

Machine Translation of DE 4424825, Translated Sep. 5, 2019, 3 Pages. (Year: 1996).*
(Continued)

*Primary Examiner* — Gregory D Swiatocha
(74) *Attorney, Agent, or Firm* — W&C IP

(57)    **ABSTRACT**

A method is described for the treatment of used batteries, in particular lithium batteries, containing the steps: comminuting the batteries such that comminuted material is obtained, inactivating the comminuted material such that inactivated comminuted material is obtained, and filling a transport container with the inactivated comminuted material. The inactivation is performed by drying the comminuted material, and the comminuted material is dried until an electro-

(Continued)



URT EX1001
URT Umwelt und Recyclingtechnik v. Duesenfeld
IPR2024-00887

## US 11,050,097 B2

Page 2

lyte content is so low that an electrochemical reaction is not possible.

**21 Claims, 3 Drawing Sheets**

(51) **Int. Cl.**

| | |
|---|---|
| *B01D 53/00* | (2006.01) |
| *C22B 1/00* | (2006.01) |
| *H01M 6/52* | (2006.01) |
| *B02C 21/00* | (2006.01) |
| *B02C 23/10* | (2006.01) |
| *B02C 23/20* | (2006.01) |
| *B01D 53/04* | (2006.01) |

(52) **U.S. Cl.**
CPC ........... *B09B 3/0058* (2013.01); *C22B 1/005* (2013.01); *H01M 6/52* (2013.01); *B01D 53/002* (2013.01); *B01D 53/04* (2013.01); *B01D 2253/102* (2013.01); *Y02P 10/20* (2015.11); *Y02W 30/84* (2015.05)

(58) **Field of Classification Search**
CPC ...... B01D 53/05; B01D 53/002; B01D 11/00; B01D 2253/102; H01M 10/54; H01M 6/52
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,210,456 B2 * | 7/2012 | Stevens | ................... | B03B 9/061 |
| | | | | 241/19 |
| 9,780,419 B2 * | 10/2017 | Hanisch | ................ | H01M 10/54 |

| | | | | |
|---|---|---|---|---|
| 2003/0186110 A1 * | 10/2003 | Sloop | ..................... | H01G 9/038 |
| | | | | 429/49 |
| 2005/0241943 A1 | 11/2005 | Kakuta et al. | | |
| 2007/0134546 A1 * | 6/2007 | Hashimoto | ............. | C22B 7/005 |
| | | | | 429/49 |
| 2014/0003568 A1 * | 1/2014 | Eckardt | .................. | B01D 47/10 |
| | | | | 376/283 |
| 2014/0290438 A1 | 10/2014 | Hanisch | | |
| 2016/0043450 A1 * | 2/2016 | Sloop | ..................... | C01G 53/50 |
| | | | | 252/182.1 |
| 2016/0049699 A1 | 2/2016 | Hayashi et al. | | |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| CN | 106259062 B | 9/2015 | | |
| DE | 4424825 A1 * | 1/1996 | ............ | B03B 9/061 |
| DE | 4424825 A1 | 1/1996 | | |
| DE | 10 2011 110 083 A1 | 2/2013 | | |
| DE | 10 2012 024 876 A1 | 6/2014 | | |
| JP | 2005197149 A | 7/2005 | | |
| KR | 20060101683 | 3/2005 | | |
| KR | 10-0665626 B1 | 1/2007 | | |
| WO | 2010/102337 A1 | 9/2010 | | |
| WO | 2010/102377 A1 | 9/2010 | | |
| WO | 2010/149611 A1 | 12/2010 | | |
| WO | WO-2013023640 A1 * | 2/2013 | ............ | H01M 10/54 |

OTHER PUBLICATIONS

Machine Translation of WO 2013/023640, Translated Sep. 5, 2019, 5 Pages (Year: 2013).*
Machine translation of CN 102496752, 4 Pages. (Year: 2012).*
Dehnert et al: "Vacuum Distillation", Allgemeine Chemie, 14.3, p. 14, 1979.
Wolf et al: Allgemeine and Physikalische Chemie, Chemie, 1985.

* cited by examiner



Fig. 1

clean process gas



Fig. 2



Fig. 3

US 11,050,097 B2

<div style="display:flex;gap:2em">
<div>

1

## METHOD FOR THE TREATMENT OF USED BATTERIES, IN PARTICULAR RECHARGEABLE BATTERIES, AND BATTERY PROCESSING INSTALLATION

### FIELD OF THE INVENTION

The invention refers to a method for the treatment of used batteries, in particular used lithium batteries, such as lithium ion batteries, with the steps

(a) comminuting the batteries such that comminuted material is obtained,

(b) inactivating of the comminuted material such that an inactive comminuted material is obtained, and (c) filling a transport container with the inactive comminuted material.

According to a second aspect, the invention refers to a battery processing installation for the treatment of used batteries, in particular for the treatment of used lithium batteries with (a) a comminuting device for comminuting the batteries such that comminuted material is obtained, (b) an inactivation device for inactivating the comminuted material and (c) a filling device for filling a transport container with the inactivated comminuted material.

### BACKGROUND

US 2005/0241943 A1 describes a method for processing used batteries in which the batteries are heated prior to a comminuting step, thereby destroying plastic components in the batteries. The disadvantage of this type of procedure is that the remaining components of the batteries may be contaminated with degradation products of the plastic.

DE 10 2012 024 876 A1 describes a system for transferring transport-critical electrolyte cells, in which they are initially comminuted under inert gas and then dusted with a deactivation powder so as to prevent the electrochemically active material from spontaneously combusting. The disadvantage of this is that the resulting material still poses a comparatively high hazard potential and that the dusting powder itself poses a risk of explosion and that the formation of a flammable and explosive atmosphere in the transport container cannot be ruled out.

DE 10 2011 110 083 A1 describes a method for recovering active material from a galvanic cell, in which the galvanic cells are initially mechanically comminuted, then pre-dried and subsequently sifted. Finally, the binder is broken down in an oven. This type of device is very well-suited to the efficient recycling of larger amounts of galvanic elements. However, for partial load operation, the construction of this installation is comparatively complex.

### SUMMARY

The invention aims to reduce disadvantages of the prior art.

The invention solves the problem by means of a method according to the preamble, in which the inactivation occurs at least also by way of drying the comminuted material. According to a second aspect, the invention solves the problem through a battery processing installation according to the preamble, the activation device of which comprises a drying device.

The advantage of the invention is that the amount of electrolyte that can be obtained from the comminuted material through drying is such that an electrochemical reaction is no longer possible, or only to a negligibly small extent. In addition, no flammable or explosive gas phase forms above

</div>
<div>

2

the battery fragments, as the organic carbonates of the electrolyte have been removed [from the fragments]. The comminuted material is therefore largely inert and can be transported safely, especially if it is packed under vacuum.

A further advantage is that no additional material has to be added to inactivate the comminuted material. This decreases the complexity of the battery processing, reduces the weight of the inactivated comminuted material and increases the purity in the subsequent separation and recycling steps. In particular, in potential subsequent hydrometallurgical processing steps, a high degree of product purity that does not require the input of foreign ions is advantageous.

In addition, it is advantageous that a comminuted material is obtained that can be transported safely. The organic carbonate content is preferably so small that the formation of a significant amount of fluorophosphates can be ruled out.

Fluorophosphates are often strong neurotoxins, the formation of which must be reliably prevented. Furthermore, due to the low electrolyte content, it is guaranteed that a self-amplifying and intensifying build-up of heat triggered by an electrochemical reaction cannot occur.

Within the scope of the present description, the term drying should be understood particularly to mean the removal of at least one solvent in the conducting salt. In particular, the drying is executed such that dimethyl carbonate and/or ethyl methyl carbonate is removed.

The battery should be understood especially to mean a lithium battery. A lithium battery is a rechargeable battery whose electrochemical reaction involves lithium and/or lithium ions and/or a lithium compound.

A battery processing installation should also be understood particularly to mean a rechargeable battery processing installation for processing rechargeable batteries.

The transport container should also be understood particularly to mean transport packaging. The transport packaging is preferably sealed by way of a vacuum seal. Aluminium composite foil is especially well-suited as transport packaging.

It is beneficial if the drying occurs after the comminuting of the batteries. It is indeed possible and represents a preferred embodiment that the batteries are exposed to a vacuum when in an uncomminuted state such that at least parts of the electrolyte vaporise, wherein the resulting gas either escapes through a safety valve in the rechargeable battery or the battery is destroyed by the pressure difference between the external environment and the internal pressure, enabling a vaporising electrolyte to escape. However, since the electrolyte is predominantly located between tightly wound or stacked and pressed layers of electrodes and separators and in their pores, and it is connected to other components of the batteries, this procedure can be very time-consuming. It is thus often more beneficial and represents a preferred embodiment of the invention for the batteries to be mechanically comminuted, for example through cutting, cropping, impact, separating and/or compressing. This means that a larger interface is available for the transition of materials into the gas phase.

The drying may occur by way of vacuum drying, contact drying, convection drying and/or infra-red drying. It is favourable if the drying occurs while the comminuted material is being agitated and/or circulated.

Prior to being comminuted, the used batteries are preferably dismantled. This means that larger battery systems are dismantled into their smaller subcomponents, the modules or stacks, or even that the cells which contain the electrochemically active material are separated from the control

</div>
</div>

US 11,050,097 B2

**3**

electronics. The control electronics comprise, for example, semiconductor elements and/or sensors and are responsible for the charge control of the batteries.

According to a preferred embodiment, the drying occurs under vacuum. The size of the vacuum is preferably selected such that the vapour pressure of dimethyl carbonate at 80° C., especially at 70° C., is not reached. It is beneficial if the drying occurs at a maximum pressure of 300 hPa, in particular a maximum of 100 hPa. At such low pressures, considerable parts of most electrolytes vaporise, especially dimethyl carbonate and ethyl methyl carbonate, and do so at temperatures of less than 80° C. The advantage of low temperatures is that the formation of hydrogen fluoride is hindered. Hydrogen fluoride poses a potential risk for the battery processing installation and the surroundings. It is therefore beneficial to prevent the development of hydrogen fluoride.

The drying preferably occurs at a temperature that is lower than a decomposition temperature. The decomposition temperature should be understood particularly to mean the lowest temperature at which at least 80 percent by mass of the binder has decomposed into gaseous components after keeping the comminuted material at this temperature for an hour. The decomposition temperature can be measured by successively increasing the temperature of the comminuted material and recording when a loss of mass occurs, especially through the build-up of gas due to a decomposition of the binder, and the specified criteria is fulfilled. If necessary, the experiment must be conducted several times, each time using a new sample of comminuted material at an increased temperature.

It is favourable if the drying occurs under an atmosphere in which the partial pressure of the water vapor is lower than 50 Pa, in particular lower than 10 Pa. A low partial pressure of the water vapor leads to a low reaction rate of lithium compounds to lithium hydroxide and thus only to a low build-up of hydrogen. This prevents the formation of flammable hydrogen-oxygen mixtures and contributes to the safety of the installation.

In addition, it is favourable if the partial pressure of oxygen has a maximum value of 10 millibars, especially a maximum value of 5 millibars. This largely inhibits the reaction of oxygen with oxidisable components of the batteries. It is possible to achieve the low partial pressure of oxygen by means of drying at a low pressure. Alternatively or additionally, the drying may occur in an inert gas atmosphere.

A method is preferred in which the drying of the comminuted material is only completed if, after the completion of the drying process, no flammable or explosive gas mixture can form above the comminuted material that has been filled [in the container] and/or when the comminuted material is so dry that a flammable or explosive gas mixture can emerge in the transport container or during the subsequent processing. The property that the drying is completed if, after the completion of the drying process, no flammable or explosive gas mixture can form above the comminuted material that has been filled [in the container] should be understood particularly to mean that, within the space of one week at 50° C. and 1013 hPa, no flammable gas mixture forms in a transport container in the form of a 50 litre container that has been half-filled (relative to its volume) with the comminuted material. Pre-tests determine whether the criteria has been fulfilled. If a flammable gas mixture does form, the drying must be conducted for a longer time and/or at a lower pressure. The preliminary tests are repeated

**4**

until a drying time and/or drying pressure has been identified at which, in a set of tests of three transport containers, the requirements for the property have been fulfilled for all three transport containers.

The comminuted material is preferably dried until an electrolyte content in the comminuted material is so low that an electrochemical reaction is impossible. In other words, the electrolyte content is lower than a threshold value, the threshold value being selected such that, if this threshold value is not achieved, the cell voltage is reduced to a maximum of one quarter. This threshold value is determined, for example, by defining the cell voltage of a battery in relation to the electrolyte content. Shortly before achieving the threshold value, the cell voltage collapses, i.e. it decreases by at least 75%. If the threshold value is not achieved, the battery contains so little electrolyte that, to a good approximation, an electrochemical reaction is no longer possible.

The comminuted material is preferably dried for so long that a 50 kg amount of comminuted material, which is contained in a compacted form in a 50 litre drum, does not experience a build-up of heat, or the build-up of heat is so low that a thermal runaway, i.e. a thermally induced chain reaction, is ruled out for at least two months, and that any build-up of hydrogen is also so low that after two weeks, no excess pressure occurs if a negative pressure of 500 hPa is present to begin with.

It is beneficial if the comminuted material is dried until the electrolyte content of organic components that are volatile at 80° C. has a maximum value of 3% by weight, in particular a maximum of 2% by weight, especially preferably a maximum of 1.5% by weight.

The drying is preferably conducted for so long that the accumulated content of organic carbonates from the electrolyte that are volatile at 80° C. falls short of 3% by volume in the atmosphere above the comminuted material.

In particular, the drying is conducted until the dimethyl carbonate content is lower than 4% by volume, especially 3% by volume, and/or the cyclohexylbenzene content is lower than 1% by volume, in particular 0.5% by volume.

The drying preferably occurs immediately after comminution. This should be understood to mean that the time between the beginning of the comminution of the batteries and the point at which at least a part of the resulting comminuted material begins to dry is a maximum of five minutes, especially a maximum of one minute. The rapid drying after comminution means that the mass of material that may potentially experience an electrochemical reaction remains small; the electrochemical reaction time of potential exothermic reactions also remains small. This reduces the risk for the installation and the surroundings.

It is especially favourable if the vacuum is created by means of an injector, i.e. a venturi pump or an ejector-jet pump. Ejector-jet pumps are largely resistant to aggressive gases that are due to be pumped, particularly if an appropriate pump fluid, i.e. pump liquid, is selected. It is beneficial if the pump fluid, which is a liquid, has a pH value of at least 8, in particular of at least 9, for example at least 12. In this case, unwanted components of the gas that is being pumped can decompose or react to become less damaging substances. In this way, for example, dimethyl carbonates and/or ethyl methyl carbonates can be broken down by a saponification reaction. Any hydrogen fluoride contained in the pump fluid can be converted in the alkaline environment into a non-hazardous salt by way of an acid-base reaction.

The pump fluid preferably contains a substance that precipitates fluoride. For example, the pump fluid may

Appx0000066

US 11,050,097 B2

5

contain sodium carbonate or calcium carbonate. The salts that result from the reaction with a fluorine compound, in particular hydrogen fluoride, are preferably separated, in particular filtered or removed by sedimentation. This at least largely prevents hydrogen fluoride or other poisonous fluorine compounds from being emitted into the surroundings.

The drying preferably occurs at a maximum temperature of 80° C.: this produces almost no hydrogen fluoride. This increases the service life of the battery processing installation and reduces the environmental risk.

According to a preferred embodiment, the method comprises the steps of condensing components of the electrolyte by cooling and/or increasing the pressure such that an electrolyte condensate occurs. For example, the condensation is conducted at a point that lies between the dryer and the vacuum pump relative to the flow of gas. In this case, gases coming from the dryer must initially pass through a condenser before reaching the vacuum pump. This causes the gaseous electrolyte in the gas, which is produced during the drying, to be at least largely separated in the condenser before the remaining gas reaches the pump. Electrolyte can be recovered in this way. In addition, the flow of gas through the vacuum pump decreases, which increases the vacuum pump's service life and reduces its energy consumption.

According to a preferred embodiment, the method alternatively comprises the step of purifying the gas through the adsorption of the volatile organic components of an activated carbon filter in front of or behind the compressor unit.

Alternatively or additionally, the method according to the invention preferably comprises the step of purifying the gas produced during the drying before it reaches the vacuum pump. This may also occur, for example, by the gas through passing an activated carbon filter and/or a filter that contains substances which react with hydrogen fluoride, such as a calcium salt like calcium carbonate or a potassium salt such as potassium carbonate.

The method according to the invention preferably comprises the step of drying at a drying temperature and for a drying time that have been selected such that the binder which binds the active material of the lithium battery to a carrier at least largely decomposes. It is favourable if this drying step, which can also be described as high temperature drying, occurs in a separate space from a first drying step, described above. The latter drying step can also be described as low temperature drying.

The high temperature drying, during which the binder decomposes, is preferably conducted such that the resulting decomposition gases do not mix with the gases resulting from the low temperature drying. It is possible that the high temperature drying and the low temperature drying occur at different pressures. For example, the high temperature drying can be executed at normal pressure.

The active material should be understood to mean the material that reacts electrochemically during operation of the batteries. The carrier for the active material should be understood particularly to mean a carrier foil to which the active material is applied in the form of particles. For example, the carrier foil refers to a foil made of aluminium or an aluminium alloy. The binder is the material which binds the active material with the carrier; for example, the binder contains polyvinylidene fluoride.

It is beneficial if liquid nitrogen is added when comminuting the batteries. This cools the batteries, the comminuting machine and the comminuting material, and also drives oxygen and water vapour out of the atmosphere.

It is beneficial if the comminution occurs when the partial pressure of water vapor is a maximum of 20 Pa and/or the

6

partial pressure of the oxygen is a maximum of 40 hPa, especially a maximum of 15 hPa.

According to a preferred embodiment, the method comprises the steps of removing the comminuted material from the transport container; detaching hard parts and/or separating active material from the carrier, particularly via a second comminuting stage and/or air jet sieving, thereby producing an active material fraction and a carrier fraction; and a separate packing of the active material fraction and carrier fraction in suitable transport containers. It is beneficial if these transport containers are designed to be airtight. By separating an active material fraction and a carrier fraction, transportation generally does not require any permits. An additional advantage is that fractions separated in this way only pose a small risk.

The removal of the comminuted material from the transport container is preferably conducted under vacuum and/or shielding gas.

It is possible, but not necessary, for the transport container to be filled with comminuted material under vacuum. It is beneficial if the transport container is a vacuum container, in particular an evacuated vacuum container, such that a negative pressure or vacuum occurs in the transport container once it has been sealed. Alternatively, the transport container may be filled with an inert gas.

In a preferred battery processing installation, the separation unit and the drying device are arranged in a joint standard container. The advantage of this is that it renders the battery processing installation especially easy to transport.

The drying device is configured to dry the comminuted material until an electrolyte content is so low that an electrochemical reaction is impossible. If the drying device is operated in batch mode, which represents a preferred embodiment, the drying shall be performed, for example, for a pre-determined period of time. Alternatively or additionally, the content of organic substances, such as organic carbonates, in the atmosphere in the drying device is continually measured and the drying stopped once the concentration is lower than a pre-determined threshold concentration.

According to a preferred embodiment, the battery processing installation, in particular the vacuum installation, comprises a condenser that is configured to condense organic components of the atmosphere in the dryer, especially organic carbonates such as dimethyl carbonate, ethyl methyl carbonate and/or ethylene carbonate. The condenser is preferably arranged in the direction of material flow in front of a vacuum pump, by means of which the dryer is evacuated. It is beneficial if the condenser is cooled, preferably to a maximum temperature of 90° C., preferably a maximum of 80° C., especially preferably a maximum of 70° C. In order to keep the energy required for cooling low, the condenser, insofar as it is cooled, is cooled to a temperature of at least −10° C., in particular at least 10° C.

It is beneficial if the drying device comprises an agitator, for example an anchor agitator or a rod agitator, whose stirring rods can be arranged transversely to an agitator shaft. Alternatively or additionally, the agitator is an external agitator that moves the dryer as a whole.

The battery processing installation preferably has a vacuum installation that is connected to the drying device for the purpose of generating a vacuum in the drying device. It is especially favourable if the vacuum installation is also arranged in the standard container. The standard container

US 11,050,097 B2

7

preferably refers to a container that conforms to ISO standard 668, preferably a 40 foot container or a 20 foot container.

For example, the vacuum installation comprises an injector or venturi pump, i.e. a jet pump with a pump liquid that is used to generate the negative pressure.

The battery processing installation preferably has a hard metal detachment device and/or a light fraction separation device; a separation device, especially a classification device, for separating active material from the carrier, in particular by means of a second comminution stage and/or air jet sieving, such that an active material fraction and a carrier fraction occur; and a second filling device for the separate filling of the active material fraction and the carrier fraction. It is beneficial if this filling device is designed for filling under negative pressure and/or inter gas.

A hard metal detachment device should be understood particularly to mean a device for detaching fragments of peripheral components of the operating system, the battery cell casing and the electrical contacts. For example, the hard metal detachment device has a magnet separation device and/or a separator, in particular a cross-flow separator and/or a zigzag separator. The separation device should be understood particularly to mean a device for detaching the separator foil.

The light fraction separation device preferably has a zigzag separator and/or an air separator, wherein it is favourable if the air is conducted within a circuit. This reduces the exposure of the environment to harmful dust.

The second filling device and the separation devices are preferably arranged in a joint standard container, for example in the first standard container described above or a second standard container. It is beneficial if the container is sealed so as to be dust-tight.

The battery processing installation preferably has an airlock between the comminution unit and the inactivation device, especially the drying device. For example, this refers to a rotary airlock. The airlock reduces the amount of oxygen introduced into the inactivation device, especially the drying device.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the following, the invention will be explained in more detail by way of the attached drawings. They show

FIG. **1** a flow diagram of a method according to the invention,

FIG. **2** a cross-section through a battery processing installation according to the invention and

FIG. **3** a cross-section through further optional components of a battery processing installation according to the invention.

## DETAILED DESCRIPTION

FIG. **1** shows a flow diagram of a method according to the invention. Batteries **10.1**, **10.2**, . . . , in particular battery systems made up of several battery modules or battery stacks, which are in turn made up of several battery cells, are initially discharged in a discharge unit **12**. This is followed by the dismantling of the batteries **10** at a dismantling station **14**, if this is necessary because the battery systems cannot otherwise be delivered into the comminution unit for geometric or gravimetric reasons. In order to do this, the battery systems are opened and dismantled to the point at which the modules/stacks can be individually removed. If required, the cells can also be separated from the drive electronics. The

8

resulting sub-units (modules/stacks) and/or cells **16.1**, **16.2**, . . . are fed into a comminution unit **18**, which comprises, for example, a rotary shear with a rotor and a stator or several rotors, or a cutting mill with a rotor and several rotors.

The comminution unit **18** comminutes the batteries **10** under shielding gas **20**, which is extracted, for example, from a shielding gas cylinder **22**. Alternatively or additionally, liquid nitrogen from a liquid nitrogen source **19** may be injected. The shielding gas may refer, for example, to nitrogen, a noble gas, carbon dioxide, nitrous oxide or another gas which is preferably not toxic.

Comminuted material **24** is produced during the comminuting; the material is fed into an inactivation device in the form of a drying device **26**. An airlock **28** is arranged between the comminution unit **18** and the drying device **26**, the airlock being so gas-tight that the drying device **26** is—to a good approximation—separated from the comminution unit **18** so as to be gas-tight.

The drying device **26** is connected to a vacuum installation **29** that comprises a vacuum pump **30** and creates a vacuum. A pressure $p_{26}$ from $p_{26}$=100 hPa, preferably 50 hPa, is present in the drying device **26**. It should be noted that, within the scope of the present description, the vacuum pump should be understood particularly generally to mean a device that creates a vacuum. It is possible and preferred, but not necessary, for the vacuum pump to simultaneously work as a compressor, such that gas is emitted from it under a pressure that is greater than the ambient pressure.

In the case depicted in FIG. **1**, the vacuum pump is a compressor which sucks in and compresses gas **31** that is present in the drying device **26**. Alternatively or additionally, the vacuum installation **29** may have a jet pump which uses a pump liquid in the form of a liquid that is conducted at a high speed through Venturi nozzles. The pump liquid is alkaline and has a pH value of at least pH 1 and is, for example, a 10% potassium hydroxide solution.

The vacuum installation **29** comprises a gas purification device **32** that is arranged between the drying device **26** and the vacuum pump **30**, and which has a condenser **34** and/or an activated carbon filter **36** in the present case. The condenser is operated at a temperature of −10° C. so that dimethyl carbonate and ethyl methyl carbonate condense and can be dispensed into a condensate container **38**. In addition, any water present is separated by freezing. A control valve **40** is designed to open if the pressure $p_{26}$ becomes too great and to close if the pressure $p_{26}$ becomes too small, i.e. when a pre-determined threshold value is not reached.

The drying material is preferably moved during drying. This may be achieved via agitating with an agitator **41**, such as an anchor agitator or a rod agitator with rods arranged perpendicular to the agitator shaft. Alternatively, it can be achieved by way of a drying container that is moved.

The drying of the comminuted material results in inactivated comminuted material **42**, which is fed into a filling device **44**. A transport container **46** is then filled with the inactivated comminuted material **42** under vacuum and/or shielding gas. The transport container **46** is preferably gas-tight. It is possible, but not necessary, for the transport container **46** to be filled with inert gas prior to transportation such that it is under normal pressure. Alternatively, it is also possible for the transport container to be sealed under vacuum and transported. It is possible that, instead of the transport container, a vacuum-sealed foil is selected, such as an aluminium compound foil.

The comminution unit **18** is fed with shielding gas **20** from the vacuum pump **30** via a flushing line **48**. If the

US 11,050,097 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

vacuum pump 30 also functions as a compressor—as in the present case—which represents a preferred embodiment, the shielding gas can be stored in a pressurised gas cylinder 50. Alternatively or additionally, the shielding gas 20 can be given off into the surroundings, following additional cleaning if necessary.

FIG. 2 schematically depicts a cross-section through a battery processing installation 52 according to the invention, which comprises a standard container 54 in which the comminution unit 18, the drying device 26 and the filling device 44 are arranged. A first gas-tight conveyor 56 is arranged behind the comminution unit 18; the conveyor comprises, for example, a screw conveyor or a tube chain conveyor. The first conveyor 56 delivers the comminuted material 24 to the drying device 26, which is connected to the vacuum generation device, not depicted in FIG. 2. A second conveyor 58 is arranged behind the drying device 26 in the direction of material flow; preferably, the conveyor is also designed to be gas-tight and may include a screw conveyor or a tube chain conveyor. The second conveyor delivers the inactivated comminuted material 42 to the filling device 44.

FIG. 3 depicts optional units—available in the present embodiment—of the battery processing installation 52 according to the invention which comprise a breakdown comminutor 60, as well as a separator 62. The breakdown comminutor 60 contains a transport container draining device 64, by means of which inactivated comminuted material 42 can be removed from the transport container 46. The breakdown comminutor 60 produces breakdown material 66, which is fed into the separator 62. The separator may refer, for example, to a zigzag separator.

The battery processing installation 52 preferably comprises a comminutor, which is preferably situated in the material flow in front of the classification device 74 and includes a rapid comminution tool, wherein a peripheral speed of the rotor is greater than 1 m/s, preferably greater than 10 m/s. This comminutor comminutes the comminuted material and subjects it to such mechanical stress that the electrochemically active coating at least partially detaches from the carrier. The presence of such a comminutor is a generally preferred feature of a battery processing installation according to the invention.

A light fraction with a separator foil and fine coating material, and a heavy material fraction with carrier foils (aluminium and copper) with bigger, weakly adhering coating occur in the separator. Both fractions are each placed on a sieve for further separation into coating and separator foil, or coating and metal foil. The further processing of the resulting fractions is conducted separately.

The breakdown material 66 is fed to the separator 62 by means of a third conveyor 68. A fourth conveyor 70 guides sifted material 72, in particular the material of the light fraction that leaves the separator 62, into a classification device 74. The classification device 74 preferably has an air jet sieve, which simultaneously functions as a separation device for separating the active material from the carrier. The separation results in an active material fraction 76, with which a transport container 78 is filled.

In addition, a carrier fraction 80 is produced, which—in the present embodiment—is fed into a filling unit 84 using a fifth conveyor 82; the filling unit fills a container 86 with the carrier fraction 80. The filling unit 84 comes together with a second filling unit 88 to form part of a second filling device.

## REFERENCE LIST

| | |
|---|---|
| 10 | battery |
| 12 | discharge unit |
| 14 | dismantling station |
| 16 | cell |
| 18 | comminution unit |
| 19 | liquid nitrogen source |
| 20 | shielding gas |
| 22 | shielding gas cylinder |
| 24 | comminuted material |
| 26 | drying device |
| 28 | airlock |
| 29 | vacuum installation |
| 30 | vacuum pump |
| 31 | gas |
| 32 | gas purification device |
| 34 | condenser |
| 36 | activated charcoal filter |
| 38 | condensate container |
| 40 | control valve |
| 41 | agitator |
| 42 | inactive comminuted material |
| 44 | filling device |
| 46 | transport container |
| 48 | flushing line |
| 50 | pressurised gas cylinder |
| 52 | battery processing installation |
| 54 | standard container |
| 56 | first conveyor |
| 58 | second conveyor |
| 60 | breakdown comminutor |
| 62 | separator |
| 64 | transport container draining device |
| 66 | breakdown material |
| 68 | third conveyor |
| 70 | fourth conveyor |
| 72 | sifted material |
| 74 | classification device |
| 76 | active material fraction |
| 78 | transport container |
| 80 | carrier fraction |
| 82 | fifth conveyor |
| 84 | filling unit |
| 86 | container |
| 88 | second filling unit |
| p | pressure |

The invention claimed is:

1. A method for the treatment of used batteries, comprising the steps:
   (a) comminuting the batteries such that comminuted material is obtained;
   (b) inactivating the comminuted material such that an inactivated comminuted material is obtained, wherein the inactivating step is performed during or after the comminuting step; and
   (c) filling a transport container with the inactivated comminuted material;
   wherein the inactivating step is performed by drying the comminuted material, and
   wherein the drying occurs at a maximum pressure of 300 hPa.

2. The method according to claim 1, wherein the comminuted material is dried until an electrolyte content in the comminuted material is so low that an electrochemical reaction is impossible.

3. The method according to claim 1, wherein the drying occurs under vacuum.

4. The method according to claim 1, further comprising the steps of:

US 11,050,097 B2

11

removing the comminuted material from the transport container; and

one or more of

detaching hard parts,

separating active material from a carrier, such that an active material fraction and a carrier fraction are obtained, and

separately packing the active material fraction and carrier fraction in respective further containers.

5. The method according to claim 4 wherein separation of the active material from the carrier is performed by air jet sieving.

6. The method according to claim 4 wherein separation of the active material from the carrier is performed using a second comminution stage.

7. The method according to claim 1, wherein the drying of the comminuted material is only completed if one or more of the following conditions is met:

no flammable or explosive gas mixture is formable above the comminuted material in the transport container, and

the comminuted material is so dry that no flammable or explosive gas mixture is able to emerge in the transport container.

8. The method according to claim 1 wherein the batteries are lithium batteries.

9. The method according to claim 1 wherein drying occurs at a temperature of less than 80° C.

10. The method according to claim 1 further comprising a step of sealing the transport container so as to be dust-tight after the step of filling with the inactivated comminuted material.

11. A method for the treatment of used batteries, comprising the steps:

(a) comminuting the batteries such that comminuted material is obtained;

(b) inactivating the comminuted material such that an inactivated comminuted material is obtained; and

(c) filling a transport container with the inactivated comminuted material;

wherein the inactivating step is performed by drying the comminuted material,

wherein the drying occurs under vacuum,

wherein the vacuum is created by means of a jet pump, and

wherein a pump liquid of the jet pump has at least one of

a pH value of at least 8, and

a substance that precipitates fluoride.

12. A battery processing installation for treatment of used batteries, comprising:

(a) a comminution unit configured to comminute the batteries such that comminuted material is obtained;

(b) an inactivation device comprising a drying device configured to inactivate the comminuted material, wherein the inactivation device is configured to perform the inactivating step during or after the comminuting step of the comminution unit;

(c) a filling device configured to fill a transport container with the inactivated comminuted material; and

(d) a vacuum installation connected to the drying device and configured to generate a vacuum in the drying device.

13. The battery processing installation according to claim 12, wherein the drying device is configured to dry the

12

comminuted material until an electrolyte content in the comminuted material is so low that an electrochemical reaction is impossible.

14. The battery processing installation according to claim 12, wherein the comminution unit and the drying device are arranged in a container.

15. The battery processing installation according to claim 12 further comprising:

a hard metal detachment device and/or a light fraction detachment device;

a separation device configured to separate active material from a carrier such that an active material fraction and a carrier fraction occur; and

a second filling device configured to separately fill the active material fraction and the carrier fraction in respective containers.

16. The battery processing installation of claim 15 wherein the carrier fraction are aluminum and copper foils.

17. The battery processing installation of claim 15, wherein the separation device is an air jet sieving device.

18. The battery processing installation of claim 15 wherein the separation device is a second comminution device.

19. The battery processing installation of claim 12 wherein the batteries are lithium batteries.

20. A battery processing installation for treatment of used batteries, comprising:

(a) a comminution unit configured to comminute the batteries such that comminuted material is obtained;

(b) an inactivation device configured to inactivate the comminuted material, wherein the inactivation device comprises a drying device;

(c) a filling device configured to fill a transport container with the inactivated comminuted material;

(d) a vacuum installation that is connected to the drying device and configured to generate a vacuum in the drying device;

wherein

the vacuum installation has a jet pump with a pump liquid,

the pump liquid is conducted within a circuit, and

the pump liquid contains a substance that reacts with hydrogen fluoride.

21. A method for the treatment of used batteries, comprising the steps:

(a) comminuting the batteries such that comminuted material is obtained,

(b) inactivating the comminuted material such that an inactivated comminuted material is obtained, and

(c) filling a transport container with the inactivated comminuted material,

wherein the inactivating step is performed by drying the comminuted material,

wherein the drying occurs under vacuum,

wherein the vacuum is created by means of a jet pump, and

wherein a pump liquid of the jet pump has a pH value of at least 9.

* * * * *

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b)(1) because it contains 13,998 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14-point font.

Date: April 27, 2026          Respectfully submitted,

/s/ Brian K. Kauffman

Brian K. Kauffman